**INSLAW, INC., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Cong. Ref. No. 95–338X.**

United States Court of Federal Claims.

July 31, 1997.

**310**

C. Neal Pope, Atlanta, GA, for plaintiffs. Michael E. Friedlander, Alexandria, VA; James L. Malone, III, and Charles R. Work, McDermott, Will & Emery, Washington, DC; Philip L. Kellogg and James L. Lyons, Kellogg, Williams & Lyons, Washington, DC; Michael L. McGlamry, William U. Norwood, and Jay F. Hirsch, Pope, McGlamry, Kilpatrick & Morrison, LLP, Atlanta, GA; Earle F. Lasseter and Wade H. Tomlinson, III, Pope, McGlamry, Kilpatrick & Morrison, LLP, Columbus, GA, of counsel.

Sandra P. Spooner, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Cathy J. Burdette, Anthony J. Ciccone, Beth E. Cook, and William A. Rivera, Civil Division, Department of Justice, of counsel.

## REPORT

MILLER, Hearing Officer.

### BACKGROUND

1. *Proceedings before the congressional reference*

The Department of Justice ("DOJ") sought to implement a standardized case management system in specified United States Attorneys' Offices and the Executive Office of United States Attorneys to assist in the record keeping and tracking of civil, criminal, and debt collection actions. To this end, through the Justice Management Division, DOJ entered into a contract with INSLAW, Inc. ("INSLAW"), on March 16, 1982 (the "1982 Contract"), for the customization and installation of INSLAW's case management system—the Prosecutors' Management Information System—known as "PROMIS" in the Executive Office for United States Attorneys and in specified United States Attorneys' Offices. During the course of contract administration, disputes arose between INSLAW and DOJ. Specifically, INSLAW claimed that it made enhancements to its PROMIS software program and that these enhancements were developed with private funding. It was INSLAW's position that the enhancements and supporting documentation were proprietary to INSLAW, constituted INSLAW's property, and deserved protection as a trade secret. Because DOJ had possession of INSLAW's allegedly enhanced PROMIS, INSLAW maintained that DOJ was wrongfully exercising dominion and control over its property. This wrongful exer-

cise of control allegedly resulted in the disparagement of INSLAW's property, public questions concerning the software's ownership, and devaluation of the software by disclosing the enhancements to third parties. INSLAW also contended that DOJ failed to take appropriate action to prevent INSLAW from suffering harm due to the personal bias of key DOJ personnel in the administration of the 1982 Contract. DOJ conducted internal investigations of INSLAW's charges against officials and employees. Ultimately, INSLAW pressed its claims before both the Department of Transportation Contract Appeals Board (the "DOTCAB") and the United States Bankruptcy Court for the District of Columbia.

INSLAW's claims before the DOTCAB largely concerned administration costs associated with the 1982 Contract, including INSLAW's computer center timesharing charges; payments and fees withheld by DOJ and related costs; indirect and direct costs, including overhead; and costs incurred by INSLAW as a result of DOJ's partial termination for convenience. However, prior to trial, INSLAW "withdr[e]w its claims." Def's Br. filed Dec. 29, 1995, at 2 (Motion in Limine To Exclude as Beyond the Scope of the Reference Evidence Concerning the Version of PROMIS Provided by INSLAW to the Lands Division). "Finding that '[t]he requested dismissal in effect results in a determination that no amounts are owing to I[NSLAW] under its claims,' the DOTCAB dismissed [INSLAW's] appeals with prejudice" on November 9, 1992. *Id.* at 2–3 (quoting *Appeals of INSLAW, Inc.*, Contract JVUSA–82–C–0074, Docket Nos. 1609, 1673, 1775, 1828 (Dep't of Transp. Nov. 9, 1992)).

During 1987 INSLAW litigated its claims before the bankruptcy court. *INSLAW, Inc. v. United States (In re INSLAW, Inc.)*, 83 B.R. 89 (Bankr.D.D.C.1988), *aff'd*, 113 B.R. 802 (D.D.C.1989), *vacated*, 932 F.2d 1467 (D.C.Cir.1991). Specifically, INSLAW sought: 1) a declaratory judgment that INSLAW owned the alleged proprietary enhancements and that, by its continuing use of INSLAW's property, DOJ violated the automatic stay provision of the Bankruptcy Code; 2) an order directing DOJ to cease and desist

its exercise of control in violation of the automatic stay provision; 3) an award of damages in excess of $25,000,000.00 to redress DOJ's violations of the automatic stay provision; and 4) $5,000,000.00 in punitive damages. See Plfs' Br. filed Oct. 16, 1995, at 18–19 (describing INSLAW's claims before bankruptcy court).

INSLAW obtained an automatic stay from the bankruptcy court.

The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. The stay gives the debtor a breathing spell from creditors and stops all collection efforts, all harassment, and all foreclosure actions.

Although the primary purpose of the automatic stay is to benefit the debtor or trustee, the stay also provides creditor protection. By prohibiting such a race for the debtor's assets and assembling all the creditors and their claims into the Bankruptcy Court for a single organized proceeding, the stay facilitates the administration of the bankruptcy case to allow the orderly resolution of all claims and the distribution of the debtor's assets in accordance with the priorities recognized by the Bankruptcy Code.

9A *Am.Jur.2d Bankruptcy* 1369 (1991) (footnotes omitted). The bankruptcy court found that INSLAW made proprietary enhancements to PROMIS; that INSLAW's proprietary enhancements deserved protection as trade secrets; that DOJ unlawfully used the proprietary enhancements in violation of the automatic stay; that DOJ induced INSLAW to sign a contract modification through fraud; that DOJ failed to correct bias against INSLAW, thereby violating the automatic stay; that INSLAW was entitled to a permanent injunction; and that INSLAW was entitled to "to recover of and from the United States for its wrongful acts" over $6.79 million, as well as attorneys' fees and costs. Plfs' Br. filed Oct. 16, 1995, at 18–19 (discussing bankruptcy court's findings).

After the bankruptcy court ruled in INSLAW's favor and the district court affirmed the ruling, the federal appeals court vacated the lower court's decision, holding that the bankruptcy court lacked subject matter juris-

diction to adjudicate INSLAW's claims. *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1475 (D.C.Cir.1991). Investigations by the Senate Judiciary Committee, Senate Permanent Investigations Subcommittee, and the House Judiciary Committee, as well as renewed DOJ investigations followed. Plfs' Br. filed Oct. 16, 1995, at 7–8. Now the matter is before this court, after a three-week trial, as a congressional reference case.

A congressional reference is a unique mechanism that allows a party to seek relief through a private bill passed by one house of Congress. *See* 28 U.S.C. § 1492 (1994).

> Congressional [reference] cases, of which this [case] is one, are peculiar to the jurisdiction of this court alone and have their origin in those acts ... which authorize either house ... of Congress to refer certain bills for a judicial investigation upon which findings are to be made and reported to the body transmitting the resolution. They are a separate class of cases designed to supply information so full and exact as to leave to the legislative body nothing to do but determine the justice of the complaint ... as a legal or equitable demand against the United States....

*Alleman v. United States*, 43 Ct.Cl. 144, 150–51 (1908); *see Spalding & Son, Inc. v. United States*, 28 Fed. Cl. 242 (1993).

Because of the "[c]onsiderable controversy surround[ing] the merits of INSLAW's claim[s,]" 141 Cong. Rec. 5910 (daily ed. May 1, 1995) (statement of Sen. Hatch), on May 3, 1995, by S. Res. 114, 104th Cong., 1st Sess. (1995), the Senate referred S. 740, 104th Cong., 1st Sess. (1995), to the Chief Judge of the United States Court of Federal Claims. The resolution reads in full:

> *Resolved,* That the bill S. 740 entitled "A bill for the relief of I[NSLAW], Inc., and William A. Hamilton and Nancy Burke Hamilton" now pending in the Senate, together with all the accompanying papers, is referred to the chief judge of the United States Court of Federal Claims. The chief judge shall proceed with the same in accordance with the provisions of sections 1492

and 2509 of title 28, United States Code, and report thereon to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States or a gratuity and the amount, if any, legally or equitably due to the claimants from the United States.

S. 740, the Bill accompanying this resolution, provides:

> The Secretary of the Treasury shall pay, out of any money in the Treasury not otherwise appropriated, the sum due, if any, jointly to I[NSLAW], Inc., a Delaware Corporation, and William A. Hamilton and Nancy Burke Hamilton for damages incurred arising from claims relating to the furnishing of computer software and services to the United States Department of Justice.
>
> The payment ... shall constitute full settlement of all legal and equitable claims by I[NSLAW], Inc., and William A. Hamilton and Nancy Burke Hamilton against the United States, or any agency, official, officer, employee, or agent thereof.
>
> Nothing in this Act shall be construed as an inference of liability on the part of the United States.

### 2. *Preliminary proceedings in the Court of Federal Claims*

Plaintiffs[1] filed in the Court of Federal Claims their complaint, which, as amended, pleads seven counts:

1) deprivation of property without due process of law in violation of the Fifth Amendment to the Constitution of the United States;

2) taking of private property for public use without just compensation in violation of the Fifth Amendment to the Constitution of the United States;

3) common law fraud, misrepresentation, suppression and deceit;

4) conversion;

---

1. Plaintiffs in this congressional reference include the owners of INSLAW, William A. Hamilton and Nancy Burke Hamilton, although prior proceedings were brought by INSLAW alone. The term "plaintiffs" herein includes INSLAW and the other named plaintiffs.

5) disparagement and breach of the duty of good faith and fair dealing;

6) negligence and wantonness; and

7) copyright infringement.

Complaint filed Aug. 4, 1995; Amended Complaint filed Oct. 2, 1995. Defendant denied plaintiffs' right to recovery, asserted several affirmative defenses, Answer filed Oct. 3, 1995,[2] and moved for entry of a scheduling order to limit discovery and set trial for the liability phase of the case. *See* Def's Br. filed Oct. 3, 1995 (Motion for Entry of a Scheduling Order).

Defendant pointed out that plaintiffs had "alleged elsewhere that DOJ distributed the PROMIS software to foreign countries, international organizations, and a half a dozen federal law enforcement or intelligence gathering agencies." *Id.* at 7. Defendant took the position, in these circumstances, that the most efficient way to advance the case was to limit discovery and trial to what it deemed the threshold issue: "[D]id the contract give DOJ unlimited rights in the software that INSLAW delivered to it?" *Id.* at 5. If DOJ had unlimited rights to the software, defendant proposed that limiting discovery to the threshold issue would save the court and "the parties the expense and time needed to litigate [the other] issues that will, in all likelihood, be rendered moot." *Id.* at 6.

Plaintiffs opposed this motion, arguing that even if Defendant is correct in its contention (with which Plaintiffs herein and two other Courts have disagreed) that it obtained unlimited rights in Enhanced PROMIS, that would be totally insufficient to extinguish even the claims of copyright infringement, much less all of Plaintiffs' other claims and demands, nor diminish the necessity to investigate the dissemination of Plaintiffs' other claims and demands, nor diminish the necessity to investigate the dissemination of Plaintiffs' property.

Plfs' Br. filed Oct. 16, 1995, at 25. Plaintiffs attached to their brief copies of the bankruptcy and appellate court opinions and the Investigative Report by the Committee on the Judiciary, entitled *THE INSLAW AFFAIR*. Not for the last time, a party attempted to interject the prior litigation and investigations into this matter. Unfortunately, references to these prior proceedings continually resurfaced.[3]

The court chose not to review these prior fact-finding proceedings and defined its role for the parties at the October 30, 1995 status conference held after defendant filed its motion to limit the scope of discovery and trial. The court stated:

I am not a special prosecutor. More pertinently, I am not an investigating magistrate. I am here to review all information that you wish to bring to my attention that passes through the filter of admissible evidence. And when evidence is deemed admissible, it will get full consideration. . . .

Transcript of Proceedings, *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 26–27 (Fed.Cl. Oct. 30, 1995) (hereinafter

---

**2.** Defendant asserted the following affirmative defenses: 1) 28 U.S.C. § 2401 (1994) (statute of limitations for actions in Court of Federal Claims); 2) laches; 3) *res judicata;* 4) estoppel; 5) Clause 74 of the contract granting the Government unlimited rights in the software; 6) Clause 22 of the contract incorporating Contract Disputes Act of 1978, 41 U.S.C. § 605(b) (1994) (providing for review of contracting officer's decision only upon timely appeal); 7) 28 U.S.C. § 2401(b) (1994) (stating prerequisites to commencing tort claim against United States), and the Federal Tort Claims Act, 28 U.S.C. §§ 2671— 2680 (1994) (describing issues associated with administration of tort claims); 8) payment in full; 9) set-off and recoupment; 10) failure of plaintiffs William A. and Nancy Burke Hamilton to state any claim distinct from INSLAW; 11) 28 U.S.C. § 1498(b) (1994) (barring copyright claims); and 12) failure to register any copyrights prior to infringement.

**3.** The court also learned that both Attorney Generals William P. Barr and Janet Reno ordered investigations into the INSLAW matter. First, Former District Judge Nicholas Bua "conducted an independent investigation of the I[NSLAW] allegations on behalf of Attorney General Barr." Transcript of Proceedings, *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 30–31 (Dec. 14, 1995) ("Tr."). "[F]ollowing the nomination and confirmation of Attorney General Reno and in response to I[NSLAW]'s further criticisms of Judge Bua's report, the Attorney General asked the Assistant Associate Attorney General to take a second investigation and that was done." *Id.* at 31. The court refers to these investigations as the Bua and Dwyer investigations, respectively.

**314**

"Tr."). The court cannot rely on the "facts" found in an evidentiary proceeding that does not adhere to the Federal Rules of Evidence. *See Sac and Fox Indians of Iowa v. Sac & Fox Indians of Oklahoma,* 45 Ct.Cl. 287, 300, 1909 WL 895 (1910) ("Counsel can not, by stipulation or otherwise, require a court to admit testimony, which under legal rules, is not admissible as evidence in a case. Hence said *ex parte* affidavits, even though they may be printed in the report of a congressional committee, can not properly be admitted as testimony in this litigation."), *aff'd,* 220 U.S. 481, 31 S.Ct. 473, 55 L.Ed. 552 (1911). Nor can the court rely on factual findings by the bankruptcy court because the opinion was vacated and therefore does not exist.[4] *See Myers v. International Trust Co.,* 263 U.S. 64, 70–71, 44 S.Ct. 86, 87, 68 L.Ed. 165 (1923); *Southern Pac. R.R. Co. v. United States,* 168 U.S. 1, 48–52, 18 S.Ct. 18, 27–29, 42 L.Ed. 355 (1897); *State of Oklahoma v. United States,* 146 Ct.Cl. 185, 193, 173 F.Supp. 349, 354 (1959); *Edgar v. United States,* 145 Ct.Cl. 9, 11–12, 171 F.Supp. 243, 245–46, 248 (1959). The court has limited its involvement with this prior proceeding to a restatement of the bankruptcy court's holdings solely to provide the background of the case at bar. *See INSLAW, Inc. v. United States,* 35 Fed.Cl. 63, 64–65 (1996) (order denying motion *in limine*). Any other knowledge the court has of the prior pro-

ceedings or their findings is a direct result of the evidence adduced at trial, as well as the parties' pleadings and representations. The court has read none of these earlier materials, except for the rulings in the bankruptcy court's opinion summarized above.

3. *Ruling on the scope of the congressional reference*

The court denied defendant's motion to limit discovery and trial to DOJ's rights under the 1982 Contract. Defendant thereafter filed a motion *in limine* seeking to exclude, as beyond the scope of the congressional reference, all of INSLAW's claims concerning the version of PROMIS provided by INSLAW to the Land and Natural Resources Division of DOJ. *See* Def's Br. filed Dec. 29,1995 (Motion *in Limine* To Exclude as Beyond the Scope of Discovery the Version of PROMIS Provided by INSLAW to the Lands Division); *INSLAW,* 35 Fed.Cl. 63. In support of its motion, defendant argued that the congressional reference only covered the PROMIS software provided under the 1982 Contract with the Justice Management Division.

The court determined that the reference was broad and allowed for all of plaintiffs' claims. *INSLAW,* 35 Fed.Cl. at 68. The legislative history describes INSLAW's claims: "I[NSLAW] sold to [DOJ] a software program it alleges was improperly shared

---

4. The court was hopeful that the parties could stipulate to some of the bankruptcy court's findings of fact. Considering the 12–14 year period since the dispute's inception, the court was concerned about the potential for loss of witnesses' memory. This concern was addressed in the December 14, 1995 status conference:

> THE COURT: Well, I hope every deposition goes as smoothly. What's the recall 12 years later?
> MR. NORWOOD: Very, little, as it turns out.
> THE COURT: That doesn't surprise me. This is why we're going to try this in May [1996]. If my prior experience with this type of case, I don't mean Congressional reference, I mean a case that turns on facts, is any indication, you're going to find that every day counts. That's why I'm hoping we can get some sort of agreement on findings that were entered in other proceedings to the extent that there's sort of background and baseline information is not of a disputatious nature.

Tr. at 83 (Fed.Cl. Dec. 14, 1995). The court attempted to effect litigative economies in discov-

ery. No justification existed "for putting plaintiffs to proof of matters as to which no reasonable basis exists for retrying them." *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 2 (Fed.Cl. Oct. 31, 1995); *see* Tr. at 33 (Fed.Cl. Oct. 30, 1995) ("I realize the opinion has been vacated, and I'm not using it as a basis for any finding. It's a checklist on wasting time and effort of the opposing party, which isn't fair."). Unfortunately, as time progressed, it appeared that almost every fact was in dispute and the feasibility of such an approach was questionable. The court therefore abandoned its requirement that the parties agree on the prior findings. *See, e.g.,* Tr. at 36 (Fed.Cl. May 8, 1996) ("Having had much more experience ... with the parties, their dramatically different views about what was decided, and the vacated findings of the Bankruptcy Court will render this [attempt to obtain agreement on prior findings] totally futile.... So, I am vacating that order."); *see also INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, ¶ 6 (Fed.Cl. May 9, 1996) (vacating order entered October 31, 1995).

with other federal agencies." 141 Cong. Rec. 5910 (daily ed. May 1, 1995) (statement of Sen. Hatch). The Senate referred the IN-SLAW matter to the Court of Federal Claims to resolve "this matter once and for all." *Id.* INSLAW asserted that "[d]efendant through a series of contracts and through a course of dealings, had a confidential relationship with Plaintiffs." Compl. filed Aug. 4, 1995, ¶ 34. "INSLAW seeks compensation from defendant based on claims that DOJ knowingly misappropriated computer enhancements made to the PROM-IS software that INSLAW exclusively owned." *INSLAW,* 35 Fed.Cl. at 68. Therefore, in order to serve the congressional reference, the court found that plaintiffs must be given an opportunity to demonstrate their claims for furnishing "computer services to the Department of Justice," 141 Cong. Rec. 5911 (daily ed. May 1, 1995) (statement of Sen. Hatch), not just a division of DOJ. *See INSLAW,* 35 Fed.Cl. at 68.

After the parties' first discovery dispute, which concerned defendant's privilege claims and privilege logs, the parties entered into an agreement to obviate litigating defendant's privilege claims to facilitate an early trial date. *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X (Fed.Cl. Dec. 19, 1995) (Stipulated Order). Defendant agreed to produce "all depositions, sworn affidavits, sworn statements, staff memoranda of witness interviews, and documents memorializing evidence collection on trips, as well as documents identified by these categories." *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, ¶ 3 (Fed.Cl. Dec. 15, 1995). "All documents that defendant deems fall outside the categories described above" were to be listed in a privilege log. *Id.* The documents and the privilege log were produced for an *in camera* inspection "to verify that the documents excluded do not fall within the categories that defendant has agreed to produce. However, to the extent that the materials submitted *in camera* contain 'substantive pieces of information,' the court will direct the production of some or all the affected documents." *Id.; see* First Submission of Privileged Documents Pursuant to the Court's Order of December 19, 1995, filed Jan. 25, 1996; Second Submission of Privi-

leged Documents Pursuant to the Court's Order of December 19, 1995, filed Feb. 26, 1996; Third and Final Submission of Privileged Documents Pursuant to the Court's Order of December 19, 1995, filed Mar. 15, 1996.

In total, the court reviewed thousands of documents—many duplicated in the serial submissions—ordering the production of some documents and upholding defendant's privilege claims in others. *See INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X (Fed.Cl. Mar. 13, 1996) (Hand-out to Parties at the March 13, 1996 Status Conference); *Id.* (Fed.Cl. Mar. 26, 1996); *Id* (Fed. Cl. Mar. 29, 1996); *Id.* (Fed.Cl. Apr. 2, 1996); *Id.* (Fed.Cl. Apr. 22, 1996); I & (Fed.Cl. July 12, 1996) *Id.* (Fed.Cl. Sept. 12, 1996); *Id.* (Fed.Cl. Nov. 1, 1996). The court reviewed these documents in an effort to protect the integrity of the proceedings. Tr. at 46–47 (Fed.Cl. Nov. 6, 1996).

4. *Rulings on plaintiffs' legal and equitable data rights claims*

On January 17, 1996, defendant filed its second Motion *in Limine* or, Alternatively, for Partial Summary Judgment upon Contractual Data Rights Issue, seeking a ruling that the Government had unlimited rights in the software delivered by INSLAW to DOJ. The court learned that the 1982 Contract was a $9.6 million cost-plus-basis contract, requiring

> INSLAW to prepare and install 1) the computer-based public domain PROMIS software in the [Executive Office for United States Attorneys] and in the 20 largest United States Attorneys' Offices, with an option by which DOJ could require installation of the software in another 10 offices; and 2) a word process-based casetracking system in the remaining smaller United States Attorneys' Offices.... There are two versions of PROMIS at issue. The "VAX" version of PROMIS was made available to DOJ via telephone lines through INSLAW's own in-house VAX computer. The "PRIME" version of PROMIS was made available to DOJ upon INSLAW's installation of the system on government-furnished computers.

*INSLAW, Inc. v. United States,* 35 Fed. Cl. 295, 298 (1996) (order granting in part motion *in limine* and motion for partial summary judgment) (footnote omitted). Defendant contended that the Government conclusively possesses all the rights to the VAX and PRIME versions of PROMIS delivered pursuant to the 1982 Contract. *See id.* at 298–99.

In considering the motion, the court focused on two contractual provisions, Clause 74(b) and Modification No. P0012. Clause 74(b) is part of the original contract, whereas the parties entered into Modification 12 on April 11, 1983, after "a number of disputes [arose] between INSLAW and DOJ—regarding, among other issues, the funding of certain alleged enhancements made to the PROMIS system and the extent of the Government's rights in the PROMIS system." *Id.* at 300. The court's rulings limited and framed several issues involving Clause 74 and Modification 12 for trial.

Clause 74(b)(1), "Rights in Technical Data and Computer Software," gave the Government "Unlimited Rights" in

(i) technical data and computer software resulting directly from performance of experimental, developmental or research work which was specified as an element of performance in this or any other Government contract or subcontract;

(ii) computer software required to be originated or developed under a Government contract, or generated as a necessary part of performing a contract;

(iii) computer data bases, prepared under a Government contract, consisting of information supplied by the Government information in which the Government has unlimited rights, or information which is in the public domain;

(iv) technical data necessary to enable manufacture of end-items, components and modifications, or to enable the performance of processes, when the end-items, components, modifications or processes have been, or are being, developed under this or any other Government contract or subcontract in which · experimental, developmental or research work is, or was specified as an element of contract perfor-

mance, except technical data pertaining to items, components, processes, or computer software developed at private expense (but see (2)(ii) below);

(v) technical data or computer software prepared or required to be delivered under this or any other Government contract or subcontract and constituting corrections or changes to Government-furnished data or computer software;

(vi) technical data pertaining to end-items; components or processes, prepared or required to be delivered under this or any other Government contract or subcontract, for the purpose of identifying sources, size, configuration, mating and attachment characteristics, functional characteristics and performance requirements ("form, fit and function" data, e.g., specification control drawings, catalog sheets, envelope drawings, etc.);

(vii) manuals or instructional materials prepared or required to be delivered under this contract or any subcontract hereunder for installation, operation, maintenance or training purposes;

(viii) technical data or computer software which is in the public domain, or has been or is normally furnished without restriction by the Contractor or subcontractor; and

(ix) technical data or computer software listed or described in an agreement incorporated into the schedule of this contract which the parties have predetermined, on the basis of subparagraph (i) through (viii) above, and agreed will be furnished with unlimited rights.

Clause 74(a)(7) defines "Unlimited Rights" as the "rights to use, duplicate, or disclose technical data or computer software in whole or in part, in any manner and for any purpose whatsoever, and to have or permit other[s] to do so." These clauses allowed the Government to do whatever it wished with the PROMIS software that was required to be delivered under the contract.

Clause 74(b)(2), however, states that the Government shall have "Limited Rights" in

(i) technical data, listed or described in an agreement incorporated into the Schedule of this contract, which the parties have

agreed will be furnished with limited rights; and

(ii) technical data pertaining to items, components or processes developed at private expense, and computer software documentation related to computer software that is acquired with restricted rights, other than such data as may be included in the data referred to in [Clause 74](b)(1)(i), (v), (vi), (vii), and (viii). [P]rovided that only the portion or portions of each piece of data to which limited rights are to be asserted pursuant to (2)(i) and (ii) above are identified (for example, by circling, underscoring, or a note), and that the piece of data is marked with the legend below....

Clause 74(a)(8) defines "Limited Rights" as

rights to use, duplicate, or disclose technical data, in whole or in part, by or for the Government, with the express limitation that such technical data shall not, without the written permission of the party furnishing such technical data be (a) released or disclosed in whole or in part outside the Government, (b) used in whole or in part by the Government for manufacture, or in the case of computer software documentation, for preparing the same or similar computer software....

Despite these contractual provisions, the 1982 Contract did not provide for a limitation of the Government's limited rights. "The portion of Clause 74(b)(2) of the contract labeled 'Limited Rights Legend' is marked prominently 'N/A,' signifying not applicable." *INSLAW*, 35 Fed.Cl. at 299.

The contract, by Clause 74(a)(9), also granted the Government "Restricted Rights," which "apply only to computer software and include a right to: (i) use computer software with the computer for which or with which it was acquired ...; (ii) use computer software with a backup computer ...; (iii) copy computer programs for safekeeping (archives) or backup purposes[.]" Finally, Clause 74(b)(3) provides the Government with "Restricted Rights"

in computer software, listed or described in a license or agreement made a part of this contract, which the parties have agreed will be furnished with restricted rights, provided, however, notwithstanding any contrary provision in any such license or agreement, the Government shall have the rights in (a)(9)(I) through (v). Such restricted rights are of no effect unless the computer software is marked by the Contractor with the following legend ...

Once again, that portion of Clause 74(b)(3) labeled "Restricted Rights Legend" is marked prominently "N/A." *INSLAW*, 35 Fed.Cl. at 300.

INSLAW argued that "the court must interpret the evidence independently of the contractual provisions, because the Government allegedly obtained INSLAW's property by tortious acts." *Id.* The court held that INSLAW was entitled "to a trial on all contested factual issues, but the meaning of clear, unambiguous English in a contract is not among them." *Id.* Accordingly, the court reviewed the contractual provisions above and held that, ignoring Modification 12, the contract

conferred upon the Government Unlimited Rights in computer software and other technical data. Furthermore, the "N/A" notations, on the two Clause 74 sections dealing with limitations in the Government's rights, indicate that these contract provisions were inoperative and did not limit the Government's rights. INSLAW may attempt to show that the "N/A" notations had some other purpose or use, but such an effort very likely will prove fruitless. Consequently, the contract itself, without consideration of Modification 12, fully empowered the Government to use INSLAW's computer software and other technical data in whatever manner it deemed proper, including, but not limited to, dissemination of these materials beyond the [Executive Office for United States Attorneys] and the United States Attorneys' Offices.

*Id.* at 305.

The court also examined Modification 12, which states, in pertinent part:

The purpose of this Supplemental Agreement is to effect delivery to the Government of VAX–Specific PROMIS computer programs and documentation requested by the Government on December 6, 1982, pur-

suant to Article XXX—Date Requirements, and to at this time resolve issues concerning advance Payments to the Contractor.

A. The Contractor shall deliver to the Government all PROMIS Computer programs and supporting documentation developed for or relating to this contract . . . .

. . . .

The information provided pursuant to this request must include everything necessary to transfer all above mentioned operation versions of PROMIS to a different VAX computer with a minimum of effort, and to further develop, tailor, and implement PROMIS software to the extent contemplated in this contract on a different VAX computer.

B. The Government shall limit and restrict the dissemination of the said PROMIS computer software to the Executive Office for United States Attorneys, and to the 94 United States Attorneys' Offices covered by the Contract, and, under no circumstances shall the Government permit dissemination of such software beyond these designated offices, pending resolution of the issues extant between the Contractor and the Government under the terms and conditions of Contract No. JVU-SA–82–C–0074; and

. . . .

E. Contract No. JVUSA–82–C–0074 governs the rights and obligations of the parties thereto. Neither the Government nor the Contractor intend by means of the Supplemental Agreement to change or affect in any way the terms and conditions of the said Contract. . . . Rather, this Supplemental Agreement to the Contract is intended solely and only to assure access by the Government to the current software utilized by the Contractor in performance under the Contract, and to limit dissemination of the same by the Government, as set forth above, pending a decision with respect to the data rights in enhancements to VAX computer software being used to run U.S. Attorneys['] PROMIS. . . .

All other terms and conditions remain unchanged.

Defendant argued that Modification 12 applies only to the VAX version of PROMIS and that the Government maintained unlimited rights to the PRIME version of PROMIS. INSLAW countered that Modification 12 applies to both the VAX and the PRIME versions. The court determined that Modification 12 was ambiguous because it provided that INSLAW must deliver " 'all PROMIS computer programs and supporting documentation developed for or relating to this contract.' " *INSLAW*, 35 Fed.Cl. at 305 (quoting Modification 12). Thus, the court allowed INSLAW to present

> 1) evidence that, as a result of, and pursuant to Modification 12, INSLAW gave the Government software or other technical data related to the PRIME version of PROMIS; and 2) contemporaneous statements or documentary evidence, from INSLAW or government officials involved in the drafting of Modification 12, that the parties' intended the modification to apply to the PRIME version.

*Id.* The court held that, if INSLAW could not make such a showing, then Modification 12

> applies only to the VAX version, and any claim by INSLAW for recovery based on the deprivation, conversion, dissemination, or other use complained of with respect to the PRIME version, whether endowed with privately-funded enhancements or not, will provide no basis for relief. Such a result is mandated by the broad and Unlimited Rights for software and other technical data that the contract accords to the Government.

*Id.* at 306.

Defendant also asserted that consideration of plaintiffs' claims is foreclosed because plaintiffs had failed to meet a statute of limitations. After contract completion INSLAW submitted a claim to the contracting officer on October 17, 1985, seeking additional compensation on issues relating to the privately-funded enhancements. On February 21, 1986, the contracting officer issued a final decision: "INSLAW's claim for licensing fees . . . is denied in its entirety." INSLAW had 90 days to appeal this decision to the DOTCAB, *see* 41 U.S.C. § 606 (1988), or

12 months to appeal to the United States Claims Court (this court's former name). *See* 41 U.S.C. § 609(a)(3) (1988).

INSLAW did seek review before the DOT-CAB, but not with respect to the contractual rights issue. *INSLAW*, 35 Fed.Cl. at 306. INSLAW did not seek review before the Claims Court. "In the context of a congressional reference, failure to meet a statute of limitations bars legal recovery." *Id.* at 306 (citing cases). INSLAW's failure to seek review of the contracting officer's decision rendered it final. *Id.* Consequently, "the merits of [the] decision cannot be judicially challenged." *Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1562 (Fed.Cir.1990); *see* 41 U.S.C. § 605(b) (1988) (providing that contracting officer's decision not reviewable in any tribunal absent timely appeal or suit).

INSLAW argued that its claims were not time-barred, as several of its tort-based claims could not be brought before the contracting officer. However, INSLAW did

> not quarrel with the case law establishing that jurisdiction to resolve a government contract claim empowers the cognizant agency board or the court to resolve tort claims related to the Contract Disputes Act, 41 U.S.C. § 601–613 (1994).... Since INSLAW's claims of conversion, deprivation, dissemination, and other tortious acts, with regard to the contractual data rights issue, could have been brought to the contracting officer, the applicable statute of limitations bars its claims for legal recovery.

*INSLAW*, 35 Fed.Cl. at 306.

INSLAW also argued that the statute of limitations had not expired pursuant to Modification 12. Modification 12 states: "[U]nder no circumstances shall the Government permit dissemination of [the] software beyond those designated offices [the Executive Office for United States Attorneys and the 94 United States Attorneys' Offices], pending resolution of the issues extant between the Contractor and the Government...." "From this INSLAW would infer a free–floating limitations event that never occurred, since the Government and INSLAW never resolved the issues between them." *INSLAW*, 35 Fed.Cl. at 307. The court held that

"when the contracting officer rendered his final decision regarding INSLAW's contract claim for 'propriety rights to privately financed enhancements,' a decision was made...." *Id.* The contracting officer denied INSLAW's claim in its entirety; the issue, in effect, was resolved. The court held:

> As a legal matter, any claims by INSLAW for conversion, deprivation, dissemination, and other unauthorized acts with regard to PROMIS after the date on which the contracting officer's final decision became unappealable cannot provide a basis for recovery as legal claims. However, in pursuing its equitable claims, INSLAW may present evidence concerning the meaning of the term "resolution" in Modification 12.

*Id.* With respect to INSLAW's equitable claims, the court stated:

> The absence of a legal right to recovery does not foreclose INSLAW's right to a claim under a theory of equitable relief. A right to equitable relief " 'must rest on some unjustified governmental act that caused damage to the claimants.' " *California Canners*, 9 Cl.Ct. at 785 (review panel) (quoting *Wong*, Cong. Ref. No. 3–74, slip op. at 12–13). "[W]hile equitable claims, like legal claims, may be founded on the Constitution, a statute, a regulation, or a common law principle, such bases are not absolutely necessary to warrant relief in equity." *Spalding & Son, Inc. v. United States*, 24 Cl.Ct. 112, 132 (1991), *rev'd on other grounds*, 28 Fed.Cl. 242 (1993) (congressional reference). In ascertaining whether INSLAW suffered a wrong, the first step is to determine if INSLAW possessed some right or interest that could have been damaged by the Government's alleged wrongful actions.

*INSLAW*, 35 Fed.Cl. at 307–08. Resolution of defendant's motion assisted in framing several issues presented at trial: 1) whether the "N/A" notations in Clause 74 had some significance other than their obvious implication; 2) whether Modification 12 applies to both the PRIME and VAX versions of PROMIS; 3) what the parties intended by the term "resolution" in Modification 12; and 4) what rights or interests INSLAW pos-

sessed with respect to the PROMIS software. *See id.* at 308–09 & n. 12.

### 5. *Protocol proposed for the expert panel review of software*

As discovery progressed, the court learned more about this case characterized by plaintiffs as involving "software piracy." Tr. at 23 (Fed.Cl. Jan. 29, 1996). Plaintiffs explained that, despite the lengthy history of the matter, they had not inspected the Government's software or compared it with plaintiffs' PROMIS to determine whether the Government truly made use or had possession of the alleged proprietary enhancements.

> MR. NORWOOD: The court has noted that there has been a long history of discovery in this case. And one of the things that happened was that the District Court, at one point, ordered the government to produce software, Judge Robinson issued an order to produce the software for inspection and comparison.
>
> Before that order was complied with, the Court of Appeals vacated the judgment[ ] below on grounds of jurisdiction[ ]; so it never was done.

Tr. at 24 (Fed.Cl. Jan. 29, 1996). Plaintiffs sought additional discovery on the data management systems, used by federal agencies other than the United States Attorneys' Offices (the "USAOs") and the Executive Office of the United States Attorneys (the "EOUSA"), that plaintiffs allege are similar to INSLAW's PROMIS software.

Initially, plaintiffs sought to examine software used by eight agencies, two within and six outside DOJ, in order to ascertain any similarities that might exist between these programs and INSLAW's PROMIS. A dispute arose concerning the nature and extent of allowable discovery on the data management issue. *See* Tr. at 27–28 (Fed.Cl. Jan. 29, 1996). The court recognized that there was a

> need to find out whether and to what extent plaintiffs' software has moved from beyond the Department of Justice, because we know the Department of Justice had rights to use it; and we know that the Department of Justice limited itself from disseminating, beyond Justice, any soft-

ware in which I[NSLAW] could show that it had a proprietary interest.

> So we need to know if there is software out there that is plaintiffs'.

*Id.* at 40–41. Plaintiffs explained that they

> attempted ... to seek, chronologically, the advance ... of dissemination or the piracy of the software; seeking first eight particular agencies, two within Justice and six without, where there has been some indication and some testimony before some bodies, not always the same body, [of] the fact that it [the Government's software] is a pirated copy of P[ROMIS] or a derivative of a pirated copy of P[ROMIS].

*Id.* at 27. Plaintiffs asserted that they narrowed their initial discovery requests to these eight particular agencies because testimony in the prior proceedings and the House Judiciary report lead them to these agencies. *Id.* at 31.

Defendant contended that the agencies were not using any PROMIS program or PROMIS derivative. Defendant represented that it

> took th[e] step of asking each of these agencies that the plaintiffs included in their interrogatories to provide information about the systems that they were currently using or used that were called P[ROMIS] or particular programs that the plaintiffs asked about.
>
> And then the government provided sworn statements by agency employees describing those systems and swearing that they were not related to I[NSLAW]'s P[ROMIS].

*Id.* at 39. Defendant was concerned that plaintiffs were embarking on a fishing expedition, although plaintiffs continually represented that they could support their requests with sworn statements from individuals with knowledge that certain software was based on PROMIS. *See id.* at 32 ("I think we can get it for you. And I think it's probably already in the can, like I say, if we can get these documents in."). In fact, plaintiffs stated that they already had sworn testimony to support certain discovery requests. *See id.* ("I know we've got the sworn testimony

of Michael Riconosciuto and Jula Lavieve and perhaps a half dozen people.").

The court and the parties established a protocol to address plaintiffs' request to examine the software at the agencies in order to ascertain any similarities that might exist between the Government's software and IN-SLAW's PROMIS. This procedure

allowed for discovery into the alleged dissemination of PROMIS–based software to eight government agencies upon plaintiffs' production of sworn statements, by individuals with first-hand knowledge, that a certain piece of software at issue is believed by that individual to be based on PROMIS. Defendant would have the right to contact the affiant to confirm that the individual made the statement, but otherwise the sufficiency of the statement would be obvious on its face. Once the sworn statement was produced, a panel of three experts (one chosen by each side and the third chosen by both) would review the software configuration to determine whether it is a PROMIS–based program. The review would be conducted pursuant to an agreed-upon methodology. If the three experts were to reach a unanimous assessment on a particular piece of software, that assessment would be accepted by and binding on the parties. If the experts were to disagree on a certain piece of software, then the nature and basis of any disagreement could be explored at trial.

*INSLAW v. United States,* Cong. Ref. No. 95–338X, at 1–2 (Fed.Cl. Mar. 7, 1996) (summarizing agreement made at January 29, 1996 status conference). The use of this expert panel allowed for an objective and competent method of evaluating plaintiffs' dissemination claims.

On March 4, 1996, pursuant to the agreement reached at the January 29, 1996 status conference, plaintiffs submitted four affidavits—those of Charles S. Hayes, Thomas M. Strzemienski, Michael J. Riconosciuto, and · William Usher Norwood. Plaintiffs noted that

the Court only required Plaintiffs, in order to conduct discovery, to submit a facially sufficient affidavit setting forth first-hand knowledge that INSLAW's proprietary en-

hanced PROMIS is or was located within these agencies. For these reasons, Plaintiffs have not submitted any further circumstantial evidence concerning these particular agencies or any other agencies. In fact, the court specifically instructed the parties to go forward with said comparison without challenges to these affidavits.

Plfs' Br. filed Mar. 4, 1996, at 4 (Plaintiffs' Submission).

Plaintiffs also narrowed their discovery requests; they no longer sought discovery at eight agencies, but, rather, at six: 1) the U.S. Customs Bureau ("Customs"); 2) the Federal Bureau of Investigation (the "FBI"); 3) the Drug Enforcement Agency (the "DEA"); 4) the National Security Agency (the "NSA"); 5) the Defense Intelligence Agency (the "DIA"); and 6) the Central Intelligence Agency (the "CIA").

The sufficiency of the four affidavits was addressed at the March 13, 1996 status conference. Defendant challenged the facial sufficiency of the affidavits and asked "the Court to rule that they do not justify the burden and expense of expert review of any Government software." Def's Br. filed Mar. 11, 1996, at 1 (Status Report). Three of the four affidavits did not comply with the parties' agreement established at the January 29, 1996 status conference. The affidavits of Thomas M. Strzemienski and William Usher Norwood were based on hearsay, not first-hand knowledge, Tr. at 13–14 (Fed.Cl. Mar. 13, 1996), so these failed to satisfy the agreed-upon standard. *See id.* The court found that the affidavit of Michael J. Riconosciuto was remote because it was executed on March 21, 1991, almost five years prior to plaintiffs' submission in this proceeding. *Id.* at 17–18. Plaintiffs agreed. *Id.* at 17 (commenting that affidavit "is remote"). Because the affidavit did not satisfy the standard developed in the January 29 status conference, the court asked plaintiffs to "[s]ee if [Riconosciuto] will execute something that meets the standards …, but right now this is remote." *Id.* at 18. Plaintiffs responded: "That is fine, Your Honor. We can accomplish that." *Id.* Plaintiffs never produced a more recent affidavit.

Defendant challenged the sufficiency of the Hayes' affidavit, *see* Def's Br. filed Mar. 11, 1996, at 1 (Status Report), arguing that the affidavit failed "to show how the affiant knows the statements that he makes in the affidavit." Tr. at 14 (Fed.Cl. Mar. 13, 1996); *see id.* at 19. The affidavit, defendant submitted, was "inadequate because it lack[ed] any factual predicate to lead anyone reading it objectively to realize that he had any basis for making these bold assertions in his affidavit." *Id.* at 15. The court found the Hayes' affidavit sufficient under the standard adopted at the January 29 status conference, *id.* at 18, and allowed the discovery plaintiffs sought with respect to the agencies referenced in the Hayes' affidavit: the FBI, NSA, DIA, DEA, and Customs.[5] *Id.* at 100.

On March 28, 1996, plaintiffs filed a Supplemental Submission consisting of two affidavits, the affidavit of Joe N. Pate and Carl Jackson. Plaintiffs submitted these affidavits to support their request for comparing the DEA's and FBI's "case/information management and tracking systems with INSLAW's proprietary enhanced PROMIS." Plfs' Br. filed Mar. 28, 1996, at 1 (Supplemental Submission). The court discussed these affidavits with the parties at an off-the-record status conference on April 4, 1996. The court found:

> With respect to plaintiffs' supplemental submission filed on March 28, 1996, the affidavit of Joe N. Pate is insufficient because it is hearsay and not based on personal knowledge. The affidavit of Carl L. Jackson is redundant, since an examination of case-tracking software used by the Drug Enforcement Administration already is being undertaken.

*INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 2, ¶ 4 (Fed.Cl. Apr. 4, 1996).

In order to safeguard the integrity of the agreed-upon protocol developed at the January 29, 1996 status conference,

[t]he court requested that both parties memorialize an agreement, to be signed by plaintiffs William A. and Nancy . Burke Hamilton, as well as by the authorized representative of the Attorney General of the United States, whereby the parties manifest their agreement to the procedure covered by the transcript of proceedings of January 29, 1996 and the order entered on March 7, 1996. Under this procedure [after the plaintiffs' produced the required affidavits] defendant will produce case-tracking software to plaintiffs for expert examination to determine whether the software is based on or derived from PROMIS without the need for plaintiffs to establish their entitlement thereto utilizing the procedures of RCFC 26. This agreement shall be filed as soon as practicable, but no later than April 20, 1996. Since the procedure affords both parties litigative advantages with corresponding costs, it is essential to the integrity of these proceedings that the parties manifest their assent. In the court's view, under this procedure plaintiffs will be able to secure examination of case-tracking software without establishing their entitlement, through the traditional tools of discovery, to examine software used by agencies other than the Executive Office of the United States Attorneys and the United States Attorneys' Offices; defendant will secure a defined universe of software subject to examination. The parties will secure an eventual termination to plaintiffs' long-time quest for this information and to the long-time internal and external investigations of DOJ respecting the PROMIS software.

*Id.* ¶ 5. The parties complied with this request and filed their Stipulation Respecting Review of Software on April 23, 1996. Once again they expressly "agree[d] to address the[ ] contentions using the procedures" set forth in the agreement pursuant to the Janu-

---

5. Mr. Hayes stated: "I was in a position to become familiar with and have direct knowledge of the software used by many federal agencies, to include the FBI, NSA, DOD (including army, air force, marines, navy and coast guard), DIA, DEA, and Customs." Affidavit of Charles Hayes, Feb. 16, 1996 ¶ 2. Mr. Hayes asserted that INSLAW's PROMIS was linked to software at the FBI, NSA,

DIA, DEA, and Customs. Mr. Hayes did not make any averments concerning software at the DOD. Consequently, the DOD was not subject to the protocol established by the parties. *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X (Fed.Cl. Apr. 23, 1996) (Stipulation Respecting Review of Software).

ary 29 and March 13, 1996 status conferences. *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 1 (Fed.Cl. Apr. 23, 1996) (Stipulation Respecting Review of Software).

The court also allowed plaintiffs to examine two other data management systems used by DOJ, the Uniform Office Automation and Case Management Project software ("Project Eagle") and USACTS (including the "PC," "DG," and "SCO" versions). *See INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X (Fed.Cl. Apr. 15, 1996); *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X (Fed.Cl. Mar. 7, 1996). After learning that "Project Eagle was a large-scale procurement of both hardware and software for a number of agencies within the Department of Justice," the court, with the parties' consent, on April 15, 1996, modified the scope of this discovery. *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 1 (Fed.Cl. Apr. 15, 1996). Defendant was ordered to produce "any case-tracking software used on or related to Project Eagle hardware within the United States Attorneys' Offices, the Executive Office of United States Attorneys, the Solicitor General's Office, and the Office of Professional Responsibility." *Id.* at 2, ¶ 1. The court also ordered defendant to "provide to plaintiffs case-tracking software used by the following agencies within the Department of Justice that both use case-tracking software and participated in Project Eagle: the Tax Division, the Criminal Division, the Office of Information and Privacy, and the Office of Pardon Attorney." *Id.* ¶ 2.

Pursuant to the parties' Stipulation Respecting Review of Software, the systems to which the court granted plaintiffs access were to be evaluated under a two-step procedure. First, plaintiffs were required to provide a sworn affidavit of an "individual with first hand-knowledge of the system or by an expert who has compared the system with PROMIS and affirms that it is based on PROMIS." *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 3 (Fed.Cl. Mar. 7, 1996). Second, if plaintiffs made this showing, the software would be analyzed by the expert panel pursuant to the protocol. *Id.*

On May 7, 1996, plaintiffs filed under seal a Status Report regarding their review of the USACTS software. Although plaintiffs' examiners did not find any evidence that any of the versions of USACTS software were based on PROMIS software, they did find that some

> PROMIS–like features exist in the software resident on the AMDAHL mainframe computer in Washington, D.C.... [This] can be inferred from the kinds of reformatting that U.S. Attorney's Offices perform on the computerized caseload data they extract from these hyphenated USACTS databases before sending the extracts to Washington, D.C. each month for automated entry into the AMDAHL–based software system.

Affidavit of Plfs' Examiners at 3 (May 2, 1996); *see* Plfs' Br. filed May 7, 1996. Based on this showing, the affiants recommended that the court allow the expert panel established pursuant to the protocol to examine the AMDAHL mainframe-based software.

In denying the request, the court stated:

> When the court, with considerable assistance from the parties, developed the software discovery protocol during the January 29, 1996 status conference, the objective was to speed the discovery process so that this matter, which dates from the early 1980s, could move as swiftly as practicable to trial. In keeping with this goal, the court, through the protocol, offered the parties an opportunity to participate in a procedure that would yield each side benefits, but would also exact certain costs. On the benefit side, plaintiffs would get access to certain software programs without making the necessary showing under RCFC 26(b)(1), while defendant would be obligated to allow plaintiffs to examine a defined universe of software. On the cost side plaintiffs would be limited in the number of programs they could examine, while defendant would be obligated to allow examination of certain programs that plaintiffs might not have been able to examine under RCFC 26(b)(1).
>
> It was a bargain that was not foisted upon the parties, but offered to them.

They accepted the offer and pledged to abide by it. *See INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X (Fed.Cl. Apr. 23, 1996) (Stipulation Respecting Review of Software). Plaintiffs' request to examine the AMDAHL mainframe software undermines the protocol. By this request plaintiffs seek more than they bargained for. The April 22, 1996 Confidentiality Order listed specifically what software plaintiffs could examine. Upon finding that none of the USACTS versions examined is based upon PROMIS, plaintiffs seek to expand the list of software subject to examination.

. . . .

Even absent the protocol, defendant has proffered strong evidence to blunt plaintiffs' showing that they are entitled to examine the AMDAHL mainframe software. When the protocol is factored into the analysis, plaintiffs' request could be regarded as an attempt to sidestep that agreement. A bargain was struck between the parties that gave each benefits and similarly exacted costs, The parties agreed to this bargain. If plaintiffs now wish to renege on that bargain, they may do so. The court will rescind the protocol, call off the software review, disband the review panel, and proceed with discovery in the normal course prescribed under RCFC 26. The court is not forcing either party to participate in the protocol. As long as each party manifests a commitment to comply with its procedures and limitations, however, those procedures and limitations will be enforced.

*INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 3–4 (Fed. Cl. June 4, 1996); see Tr. at 42–43 (Fed.Cl. May 8, 1996). Because neither plaintiffs nor defendants wished to abandon the protocol, it remained in effect, and discovery continued.

Controversy permeated discovery concerning the Hayes affidavit. On April 2, 1996, defendant deposed Mr. Hayes to discover the basis of the statements made in his affidavit. *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 2 (Fed.Cl. May 8, 1996). Mr. Hayes' comments were "evasive and abusive in the extreme. He refused to answer defense counsel's substantive questions and repeatedly insulted defense counsel." *Id.* The court severely understates the degree of Mr. Hayes' uncooperative behavior.

On April 8, 1996, defendant brought the United States' Motion for Order Compelling Answers to Deposition Questions and for an award of costs pursuant to RCFC 37. The court asked defendant to file a supplemental brief to address whether Mr. Hayes, as he claimed, was "inhibited by virtue of any legal prohibitions from answering questions relative to the grand jury testimony dealing with Judge Nicholas [Bua's] investigation." *See supra* note 3. Defendant was also to address the effect on Mr. Hayes' deposition testimony, if any, of security agreements made between Mr. Hayes and any federal agency with which he was associated. Tr. at 3–4 (Fed.Cl. May 8, 1996).

Defendant filed a supplemental motion, and the issue was briefed fully. Plaintiffs' response, or lack thereof, proved problematic. *See* Plfs' Br. filed Apr. 26, 1996, at 2 n. 1 (Response to the United States' Supplemental Motion for Order Compelling Answers to Deposition Questions) ("[W]hen Plaintiffs questioned Mr. Hayes regarding the basis of his opinions contained in his affidavit, he refused to respond based upon confidentiality agreements and Grand Jury secrecy."). The court found:

Plaintiffs have no answer at all with respect to the motion to compel. They seem to concede that the scope of the questioning is well within the purview of the rules. The[y] ask that the Court, Defendant, and themselves petition the court in charge of the grand jury for release of the transcript—that's a matter that Plaintiffs can handle. It is not necessary to involve this Court or Defendant. Certainly it's not a defen[s]e to that motion. That matter could have been fully addressed before the deposition and indeed should have been.

Secondly, and also problematic, is Plaintiff's response to the Rule 11 problem of whether they've made a reasonable inquiry into this affidavit before proffering in terms the factual background—the answer is no. To take the position that Mr. Hayes was a[s] uncooperative with them as he

was with Defendant is not an answer.... We're too busy to stop the presses in this particular case, but the Court notes that, with a degree of pleasure, Defendant has exercised forbearance in not asking for the cancellation of the examination of the software of the five agencies that were covered by Mr. Hayes' affidavit. We're going to go ahead with that. I don't want to see anything more like that in this case. It's very, very close to sanctionable conduct, and the only reason it is not going to be closer is that I am not going to proceed under Rule 11.

Tr. at 4–5 (Fed.Cl. May 8, 1996).

The court ordered plaintiffs to "reimburse defendant for attorneys' fees and expenses related to the April 2, 1996 deposition, the subsequent motion to compel answers to deposition questions, and the resumption of Mr. Hayes' deposition." *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 3, ¶ 3 (Fed.Cl. May 8, 1996). The court also ordered Mr. Hayes "to answer all deposition questions relevant to this matter ... and related to the statements he made in his affidavit, including issues supposedly discussed before the grand jury." I. ¶ 1. Rather than having Mr. Hayes answer the deposition questions, the parties entered into a stipulation respecting Mr. Hayes' testimony, which provided:

1. Charles S. Hayes shall not be called as a witness in this proceeding.

2. Plaintiffs shall not offer prior statements made or testimony given by Charles S. Hayes in this or any other proceeding involving the United States.

*INSLAW, Inc, v. United States,* Cong. Ref. No. 95–338X (Fed.Cl. July 11, 1996) (Stipulated Order Respecting the Testimony of Charles S. Hayes).

With Mr. Hayes out of the picture, plaintiffs could no longer rely on his affidavit to justify discovery. Nonetheless, the court held defendant to its agreement, noting:

The protocol was implemented despite plaintiffs' failure to produce any qualified affidavits. *See INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X (Fed.Cl. May 8, 1996) (discussing Hayes' affidavit); Tr. at 99 (Fed.Cl. Mar. 13, 1996) (instruct-ing parties to begin software examination process). Thus, plaintiffs gained discovery rights despite their failure to meet the minimal standards specified by the protocol.

*INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 2 (Fed.Cl. Dec. 10, 1996).

During the November 6, 1996 status conference, plaintiffs raised another concern— the availability of documents and computer source codes for the expert panel. Plaintiffs sought access to government computer software from the 1970s and 1980s, as well as supporting documentation demonstrating the software's development. Defense counsel asserted that the Government would furnish everything available; however, the Government had not retained every document or every version of computer software used during the 1970s and 1980s. Plaintiffs suggested that the Government should be penalized in some way for the missing evidence. The court stated: "Absent ongoing litigation, there is simply no requirement to keep materials that you otherwise are not disposed to keep around beyond a period described by various agencies." Tr. at 38 (Fed.Cl. Nov. 6, 1996). This matter has not "always been in court. But [after] a lengthy period of time, it's been under various investigations, internal and those initiated by the parties involving each other. And there just is no basis unless internal procedures weren't followed to draw adverse inferences." *Id.* at 39. Because of plaintiffs' concerns, the court instructed defendant to file affidavits providing "an explanation why [documents/source code are] not available." *Id.* at 40. Defendant responded that it was "committed to submitting affidavits attesting to the production of all available source code and documentation." Def's Br. filed Dec. 3, 1996, at 5; *see* Tr. at 40–41 (Fed.Cl. Nov. 6, 1996) (reflecting plaintiffs' agreement); *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 3–4 (Fed. Cl. Dec. 10, 1996) (discussing integrity of protocol). These affidavits were filed in due course, and plaintiffs did not attack their sufficiency. More importantly, neither plaintiffs nor the expert panel contested the scope of the examination.

As a further assurance that plaintiffs received everything to which they were entitled, the court ordered defendant to produce for an *in camera* inspection all documents that "reflect an actual inspection, examination, or report concerning software in any agency." *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, ¶ 1 (Fed.Cl. Nov. 12, 1996). The court did so to allay plaintiffs' concerns that developmental data existed, but was not being produced. The court determined that plaintiffs were not entitled to any material in addition to that already disclosed.

Pursuant to the protocol, the expert panel filed its report on December 18, 1996. The panel concluded:

> [N]o evidence in the software we examined that any of the Agency software listed below was copied from INSLAW's PROMIS system or that any of it was derived from INSLAW's PROMIS system:
>
> 1. The FBI's Field Office Information Management System, FOIMS
>
> 2. The U.S. Customs Service's TECS–II
>
> 3. The Drug Enforcement Agency's Case Status System, CAST
>
> 4. The National Security Agency's PROMIS System
>
> 5. A system written by PROMIS Systems Ltd., purchased in or about 1985 by the National Security Agency, from I.P. Sharp Co.
>
> 6. A variety of systems used by the Defense Intelligence Agency.

Significantly, the expert panel did not express any reservation concerning its access to any agency facility or the time allowed for their analysis. The report represents a thorough and credible analysis by an objective and competent panel of experts. The panel's analysis laid to rest plaintiffs' dissemination claims with respect to non–DOJ agencies.

Throughout this litigation "the court has expressed the. view that this matter should move quickly to trial because the underlying disparate facts date back over ten years and it already has been the subject of one full

adversary proceeding, as well as numerous investigations by the Department of Justice and Congress." *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 3 (Fed.Cl. Aug. 5, 1996). Nevertheless, even with the implementation of the protocol and the parties' best efforts, discovery deadlines were extended and trial was rescheduled twice. *See INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 1 (Fed.Cl. July 12, 1996) (continuing trial due to time required by expert panel); *INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 2–3 (Fed. Cl. May 9, 1996) (granting plaintiffs' motion for continuance); *INSLAW, Inc. v. United States,* Cong Ref. No. 95–338X, at 1–2 (Fed. Cl. Mar. 13, 1996) (setting trial dates). With the filing of the expert panel's report, however, no further discovery was warranted, and trial commenced on March 10, 1997.

## 6. *Rulings on issues for trial*

The court's rules provide that

> the parties shall . . . file a joint statement setting forth the issues of fact and the issues of law to be resolved by the court. Issues should be set forth in sufficient detail to enable the court to resolve the case in its entirety by addressing each of the issues listed. The statement of issues shall control the admissibility of evidence at trial and evidence will be deemed to be irrelevant unless it pertains to one or more of the issues.

RCFC App. G ¶ 15. Unable to agree to the triable issues, the parties proposed them, and the court adopted the following issues for trial: [6]

> 1. The effect of Modification 12 on the 1982 Contract, including, but not limited to,
>
> > a) the meaning of "N/A" as it appears as a marginal entry beside Clause 74.
> >
> > b) whether Modification 12 applies to the PRIME version of the PROMIS software, as well as the VAX (or time-sharing) version.

---

6. The court read into the record the accepted triable issues of plaintiffs, followed by those of defendant. This list combines the two.

c) the meaning of the term "resolution" as it is used in Modification 12.

2) whether, and to what extent, the software INSLAW delivered pursuant to Modification 12 was "enhanced."

3) if the software INSLAW delivered pursuant to Modification 12 was "enhanced," whether the enhancements were privately funded.

4) whether DOJ impeded, frustrated or refused to respond unjustifiably or in bad faith to INSLAW's efforts to resolve the issue of its rights to any enhancements, or did DOJ officials frustrate, interfere with or prevent INSLAW's exercise of its rights under Modification 12 to present to the EOUSA evidence that the claimed enhancements were privately funded.

5) whether DOJ improperly precluded INSLAW from proving the existence and ownership of any "enhancements" in the software delivered pursuant to Modification 12.

6) if the software INSLAW delivered pursuant to Modification 12 was "enhanced," whether no further compensation for those copies was due because INSLAW acted as a volunteer.

7) whether any recommended monetary award to INSLAW should be reduced by $503,162.00, as a set-off for prior overpayments (if any) to INSLAW under the 1982 contract.

8) whether DOJ took possession of and/or used and/or possesses and/or uses copies of INSLAW's privately funded, enhanced software (if any) so as to entitle INSLAW, Inc. and William A. and Nancy Burke Hamilton to an award relating to the furnishing of computer software and services to DOJ as a claim, legal or equitable, against the United States or a gratuity and the amount, if any, legally or equitably due.

9) whether DOJ's continued possession and/or use of INSLAW's privately funded enhanced software (if any) violates copyright laws so as to entitle INSLAW to damages.

10) whether INSLAW, Inc. and William A. and Nancy Burke Hamilton diligently pursued their rights and their claims against DOJ.

11) whether DOJ holds monies as a constructive trust for the benefit of INSLAW, Inc. and William A. and Nancy Burke Hamilton because it held INSLAW's privately financed enhanced PROMIS software, and derived benefits therefrom.

12) whether as a part of any monetary award to plaintiffs, an additional amount should be awarded as costs and expenses of litigation and attorneys' fees.

See Tr. at 85–87 (Fed.Cl. Feb. 20, 1997); Plfs' Joint Pretrial Issues of Fact and Law (Feb. 19, 1997); Def's Proposed Issues of Fact and Law (Feb. 19, 1997).

The court's opinion in *INSLAW*, 35 Fed. Cl. at 309, established that plaintiffs' legal claims based on data rights (issues 1–6, 8–9, and 11) are barred because plaintiffs failed to meet an applicable statute of limitations. *See id.* at 302–03, 306–07 (citing cases). Under this congressional reference, the court can consider them fully as equitable claims and will determine whether plaintiffs have proved that an unjustified governmental act, which encompasses negligence or wrongdoing, caused damage to them. *See id.* at 302, 307–08 (citing cases).

Two issues that were tried can be resolved summarily. As to issue 1(a), the evidence was wholly one-sided that "N/A" had no other significance than non-applicable.[7] As to issue 10, the court finds that Mr. and Mrs. Hamilton diligently pursued their rights and their claims against DOJ.[8]

■ Plaintiffs press the claim, as part of a general claim that DOJ administered the 1982 Contract in bad faith, that they are entitled to recovery for wrongful withholding of computer center costs. This claim is the

---

7. The testimony of James F. Kelley, INSLAW's former General Counsel and negotiator on the 1982 Contract, was unequivocal that the Limited Rights Clause was not made applicable.

8. The record reflects the dates and types of actions taken by the Hamiltons in pursuit of their remedies. The underlying exhibits were not admitted into evidence. *See* Tr. at 57–59 (Fed.Cl. Feb. 20, 1997).

mirror image of issue 7, defendant's claim for a set-off. The DOTCAB dismissed INSLAW's several claims relating to the computer center costs after INSLAW withdrew them. *Appeals of INSLAW, Inc.,* Contract JVUSA–82–C–0074, Docket Nos. 1609, 1673, 1775, 1828 (Dep't of Transp. Nov. 9, 1992). As a legal claim in this proceeding, the doctrine of *res judicata* therefore bars plaintiffs' claim relating to computer center costs. *Kochendorfer v. United States,* 193 Ct.Cl. 1045, 1055 (1970). Consequently, it will be considered fully as an equitable claim. *See id.* Plaintiffs' data rights claims also embrace issues of bad-faith contract administration, which are considered fully as equitable claims. However, the issues for trial do not comprehend a general claim for bad-faith contract administration apart from issues 1–9 and 11.

## FACTS AND DISCUSSION

Plaintiffs seek damages for claims relating to the furnishing of computer software services to DOJ. Plaintiffs assert that before and after the execution of the 1982 Contract, they notified DOJ that INSLAW had enhanced substantially its PROMIS software with private funding. Defendant contends that plaintiffs have failed to prove 1) that INSLAW created all but 12 of the 106 claimed discrete and three stand-alone enhancements or 2) that any of the claimed enhancements was developed with funds from sources other than the Federal Government and therefore is proprietary to INSLAW.

This court previously ruled that the statute of limitations barred plaintiffs from recovering damages on any legal claim. *See INSLAW, Inc. v. United States,* 35 Fed. Cl. 295, 302, 306–07 (1996) (order granting in part motion for partial summary judgment and motion *in limine*). The court did not make findings as to whether the bar of the statute of limitations should be lifted in order to consider plaintiffs' legal claims.

28 U.S.C. § 2509(c) (1994), the statute authorizing congressional references, requires that the court make findings, *inter alia,* "bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy." If this court finds that the bar should not be removed, the parties take dramatically opposed positions on the consequences. Plaintiffs submit that the court should proceed to consider their claims under the equitable standards set forth in the court's opinion. *INSLAW,* 35 Fed.Cl. at 302. Defendant views a negative answer as a gateway: Without finding that good reason exists to lift the statute of limitations, the court cannot consider either plaintiffs' legal or equitable claims. *See McQuown v. United States,* 199 Ct.Cl. 858, 874–76 (1972).

The statute, by its terms, directs the inquiry as to whether the bar should be lifted only with respect to legal claims, which explains why *McQuown* is singular in its approach. Interestingly, the cases cited in *INSLAW,* 35 Fed.Cl. at 306, stand for the proposition that when the court finds that a legal congressional reference claim is barred by a statute of limitations, the court proceeds to consider it as an equitable claim without making any separate finding on lifting the bar. Although such has been the procedure since at least 1954, this court will make the finding sought by 28 U.S.C. § 2509(c) with respect to plaintiffs' legal claims. *See Spalding & Son, Inc. v. United States,* 28 Fed.Cl. 242, 251 (1993) (Merow, J. concurring).

INSLAW was advised to press its data rights claims in bankruptcy court instead of the DOTCAB. Michael E. Nannes and Richard J. Conway, INSLAW's former attorneys, so testified. Tactical considerations were involved. The decision was a considered one, although the forum proved not to be proper. Similarly, INSLAW abandoned its claims concerning computer center costs before the DOTCAB. INSLAW was in bankruptcy at the time, and financial considerations dominated. Countervailing these circumstances are those of the Government, for it was put to protracted and costly defenses in both the bankruptcy court and DOTCAB proceedings. Relieving plaintiffs from INSLAW's decisions is not warranted. No inability or excusable failure to pursue remedies is present; rather, INSLAW made

an incorrect choice of one legal forum and abandoned another legal proceeding for financial reasons. The court finds that plaintiffs have failed to demonstrate good cause why the bar of the statute of limitations should be lifted with respect to plaintiffs' legal claims, including any claims relating to computer center costs not brought before the DOTCAB. In any event, the court already has noted that plaintiffs' claim for computer center costs that was appealed to the DOT-CAB is *res judicata*, which forecloses its consideration as a legal claim. With respect to plaintiffs' equitable claims, however, the court considers them fully on the merits.

 In the context of a congressional reference, even if consideration of plaintiffs' claims as legal claims is foreclosed, an unjustified governmental act that damages plaintiffs can be redressed. *See INSLAW*, 35 Fed.Cl. at 307–08. The general principles of law bearing on a claim assist in applying the proper standards for fixing liability. *See id.* at 308. According to plaintiffs, the Government has wrongfully appropriated INSLAW'S proprietary rights in PROMIS such that the court should impose a constructive trust. In order to recover on such a theory plaintiffs must demonstrate that they have a *res*, some property right, upon which to construct a trust. *See id.* at 307–08 & n. 12. Thus, putting aside whether INSLAW produced—or was prevented from producing—sufficient proof to DOJ personnel of its proprietary enhancements and INSLAW's funding of such enhancements, the court must determine whether plaintiffs have proved by a preponderance of evidence that INSLAW created enhancements and that those enhancements are proprietary to INSLAW. Plaintiffs are obligated to discharge this burden whether their data rights claims are viewed as legal or equitable claims. *See INSLAW*, 35 Fed.Cl. at 308. This overriding concept is crucial. Since the 1980s plaintiffs have claimed to DOJ, the bankruptcy court, and Congress that during 1983 DOJ officials frustrated or otherwise impeded their efforts to prove that plaintiffs had developed with INSLAW's funds enhancements to PROMIS that were not called for by the 1982 Contract.

To the court's knowledge, the nonjudicial inquiries have focused on DOJ's actions or inactions, as opposed to plaintiffs' *a priori* ownership interests. This court now resolves this threshold issue.

If plaintiffs fail, they may still be able to establish their equitable claim that the contract was administered in bad faith, specifically concerning INSLAW's rights under Modification 12 and concerning the withholding of computer center costs. Plaintiffs argue that the Project Manager on the 1982 Contract, C. Madison ("Brick") Brewer, III, conspired to destroy INSLAW and its President and Chairman of the Board, William A. Hamilton; that Mr. Brewer and others frustrated and impeded INSLAW's efforts to complete the 1982 Contract; and that he and others hampered INSLAW with increasing administrative burdens, ultimately driving INSLAW into bankruptcy. The court must evaluate plaintiffs' claims and decide whether DOJ committed any unjustified governmental act in administrating the 1982 Contract that damaged plaintiffs. Although the court considers this claim broadly, the parties limited the issues on plaintiffs' claim of bad-faith contract administration to two identified issues—Modification 12 and computer center costs.

 In rendering its decision on all of plaintiffs' claims, the court must

adjudicate the issues that are in controversy; and it is the responsibility of the attorneys for the parties to select and present to the court those items of evidence which they regard as pertinent to the issues in controversy and as supporting their respective theories of the case.

*H.R. Henderson & Co. v. United States* 169 Ct.Cl. 228, 249 (1965). "[N]either testimony nor physical objects are evidence unless they are produced, introduced, and received in a trial." 29 *Am.Jur.2d Evidence* § 3 (1994) (citing cases).

This case is unique in that the underlying transactions occurred beginning 15 years ago. One key witness could not testify in person,[9] and time took a predictable toll on

---

9. Marion Mullins Holton was not able to testify at trial. The court admitted designated portions

the memory of other witnesses. A significant degradation in memory was admitted by witnesses who testified in the 1987 bankruptcy proceedings. The testimonial evidence would have been more probative had this court sat as trier of fact a decade ago. Through no fault of the Government, the court lacked that opportunity. Plaintiffs had elected what proved to be the wrong trial forum for the trial that was conducted in 1987. Nonetheless, the evidence was adequate to enable findings over a range of complex, interrelated, and contentious factual issues. This was due in large part to the quality of the advocates; the parties presented their best cases, and counsel deserve commendation for their advocacy.

## I. PROMIS, INSLAW, and the Institute

After leaving the National Security Agency, where he worked as an intelligence analyst, Mr. Hamilton went to work for Peat, Marwick, Mitchell & Company, a public accounting firm. At Peat, Marwick, Mr. Hamilton primarily worked as Project Manager on a contract to develop computer software for the District of Columbia Superior Court Division of the United States Attorneys' Office (the "DCUSAO"). Dean C. Merrill joined Mr. Hamilton on the project and became one of its principal programmers. While working on this project, Messrs. Hamilton and Merrill assisted in developing the Prosecutor's Management Information System ("PROMIS"), described by Mr. Hamilton as "a computer software system for keeping track of criminal prosecutions, wit-

nesses, police officer[s], defendant[s], everybody involved in a case as it goes through the criminal justice system." Dr. Randall Davis, defendant's expert in computer software, described PROMIS as giving personnel in the prosecutors' offices the ability

> to collect, update, and retrieve the large amounts of information they collected concerning cases they were working on. The system allowed them to do such things as:
>
> a) enter into a database information about a specific case, such as name of defendant, name of prosecuting attorney, name of opposing counsel, charge, sentence, and so forth;
>
> b) update that information as it changed;
>
> c) print out the information in a consistent format for reporting purposes; and
>
> d) obtain statistics from the database by extracting data, such as the number of arrests, the number of murder defendants, the caseload for a specific attorney in an office, and so forth.

John L. Gizzarelli, Jr., was managing the implementation of the PROMIS system for the DCUSAO. After approximately one year, the three men resigned and became contractors or consultants to "perfect" the PROMIS software. In January 1973 Mr. Hamilton, together with Mr. Merrill, who became Vice President for Systems (later Vice President for Marketing); Joyce Deroy, who became Vice President for Software; and Mr. Gizzarelli, who became Special Counsel,[10] founded the Institute for Law and

---

of her trial testimony from the prior bankruptcy court trial. *INSLAW, Inc. v. United States*, 83 B.R. 89 (Bankr.D.C.1988) (testimony of Ms. Holton taken on July 27 and August 5, 1987, and January 28, 1988). The court was at a severe disadvantage by not having Ms. Holton's live testimony. In 1978 INSLAW hired Ms. Holton as Senior Systems Analyst. She worked on both the pilot and 1982 Contract and was promoted in due course to the Director of Systems and Software. The testimony readily revealed that Ms. Holton is the most knowledgeable INSLAW employee on the subject of enhancements to the PROMIS program. Ms. Holton identified the alleged proprietary enhancements and attempted to link them to private funding. Without her live testimony, the court lacked Ms. Holton's assistance in resolving questions concerning her methodology.

10. Mr. Gizzarelli worked at the Institute until he became an attorney and a member of the bar in 1973, when he joined the United States Attorney's Office as an Assistant United States Attorney. After approximately three and one-half years, in 1976, Mr. Gizzarelli left the United States Attorney's Office and rejoined the Institute, which, in 1981, became INSLAW, as "Special Counsel" for approximately a ten-year period. Mr. Gizzarelli did not do much substantive legal work while at INSLAW; his was largely project work. For the most part, Mr. Gizzarelli retained his Special Counsel title, except for a brief period in which he was the Director of International Relations.

Social Research (the "Institute").[11]

The Institute was a not-for-profit Internal Revenue Code 501(c)(3) corporation, whose purpose, Mr. Hamilton explained, was to "repackage" the DCUSAO's PROMIS "so that it could be distributed at no cost to local district attorneys' offices throughout the United States" pursuant to contracts with DOJ's Law Enforcement Assistance Administration ("LEAA"). As LEAA's purpose was to promote state and local justice systems, approximately 90% of the Institute's business came from "local, street crime prosecution offices, [and] state and local" government. Mr. Hamilton stated that the Institute did not distribute the software to the USAOs because the Institute developed the software pursuant to state-level LEAA funds, and the USAOs are federal offices. The 1982 Contract between the Justice Management Division (the "JMD") and INSLAW, which is the subject of this litigation, was the first national effort to implement PROMIS in the US-AOs. Prior to the 1982 Contract, the USAOs used an internally-developed case management system.

LEAA awarded the Institute a "PROMIS transferability" grant in 1973. Under this grant the Institute was "to adapt PROMIS and make it available to the widest range of state prosecutors and courts." The Institute won a second grant in 1976 that allowed it to reprogram PROMIS by 1) making it an "online" system, providing updated case monitoring, and 2) making PROMIS available on microcomputers.

The Institute conducted an EOUSA–sponsored pilot/feasibility study examining the USAOs' case management and information systems in 1979. The feasibility study also contained a "pilot project" under which the Institute was to automate two USAOs, San Diego and Newark, with computer-based PROMIS and install word processing-based PROMIS in two other offices.[12] Gregory A. McKain, currently INSLAW's Research and Development Manager, worked on that pilot study as a programmer. According to Mr. McKain, the San Diego and Newark offices received the LEAA PRIME version of PROMIS ported from INSLAW's PDP 11/70 computer.

In 1979 the Institute won another competitively awarded cost-plus contract, Contract J–LEAA–006–79. from the LEAA. The contract was to run from May 1979 to May 1982; however, in 1980 after Congress decided to phase out the agency, LEAA notified the Institute that it could not continue the project for its third year beginning on May 15, 1981.[13] As described by one of INSLAW's law firms[14] in a July 12, 1982 opinion letter to INSLAW,

> Upon the cessation of LEAA funding, the Bureau of Justice Statistics . . . , within the [DOJ], which assumed certain LEAA functions, undertook the administration of the LEAA contract. Although LEAA funding had terminated, the [DOJ], through the [EOUSA], transferred funds to BJS to enable it to continue the administration of the contract, so that INSLAW might adapt the software for additional purposes specified by the Executive Office. On December 24, 1981, the 1979 contract was modified. Instead of calling for generalized maintenance services as it had previously, the 1979 contract was revised to call for the development of five named, specified enhancements, of particular interest to [USAOs].

These enhancements became known as the "BJS enhancements."

Mr. Hamilton sent a memorandum dated April 2, 1982, to one of INSLAW's attorneys. Attached to this memorandum was his "His-

---

11. The Institute was also known by its acronym INSLAW. The court uses INSLAW to refer to the for-profit corporation only.

12. The parties and the court repeatedly made reference to the "word processing-based" version of PROMIS. This version was not actually "PROMIS," but was a non-computerized version of the PROMIS software designed to run on word processors.

13. Under the 1979 LEAA contract, the Institute was paid $2.4 million.

14. The evidence includes communications to and from their attorneys as to which plaintiffs waived the applicable privilege.

tory of Federal Funding for PROMIS Development," which states:

> At the time LEAA funding for PROMIS ceased, 54 PROMIS systems were fully operational in state and local agencies, 116 were actively in the process of transferring PROMIS, and 108 were planning to transfer PROMIS. The basic, prosecutor's version of PROMIS had been adapted to serve the needs of courts, juvenile justice agencies, and on-line booking and jail management agencies. Use of the PROMIS technology had also spread to several provinces in Canada and to the Republic of Ireland.

Mr. Hamilton testified that at some point during the 1980s PROMIS had been distributed to Canada, Australia, Ireland, United Kingdom, Italy, other European countries, the Middle East, and the Far East. DOJ, through LEAA, had spent approximately $10 million to create and update the software. Without federal funding INSLAW faced a crisis, as Mr. Hamilton described the situation. In order to maintain PROMIS' viability, the software required constant maintenance. According to Mr. Hamilton, INSLAW found alternative funding sources with state and local governments and invested about $150,000.00 of its own capital to sustain maintenance.

During fall 1980 Mr. Hamilton retained Roderick M. Hills and James F. Rogers, attorneys with Latham & Watkins,[15] to assist in organizing a for-profit corporation whose primary purpose would be to upkeep and upgrade the PROMIS software then operating at approximately 60 local district attorneys' offices. This for-profit corporation would sell, as Mr. Hamilton recounted, "a proprietary upkeep and upgrade service to the ... local prosecutors, where I[NSLAW]

would have the rights to the improvements that it made pursuant to those fixed-price contracts with them." In essence, the newly-formed for-profit corporation would not sell the old PROMIS, but an upkeep and upgrade to the old PROMIS, which eventually became known as "Enhanced PROMIS."[16]

INSLAW also planned to market derivatives of PROMIS. Mr. Hamilton testified that INSLAW "intended to create derivative products from the enhanced version of PROMIS for trial and appellate courts, jails, municipal law departments, which are civil law departments for the entire administration of justice in a county level and for the legal departments of Fortune 500 companies."

1. *Formation of the for-profit corporation INSLAW*

■■■ Before converting the not-for-profit Institute to the for-profit INSLAW, Mr. Hamilton met with his attorneys, Messrs. Hills and Rogers; the United States Attorney for the District of Columbia, Charles F.C. Ruff; and Deputy Attorney General Charles Renfrew. They discussed the potential incorporation of the Institute and informed the Government of the for-profit corporation's marketing plans. Mr. Hamilton stated that Mr. Renfrew welcomed Mr. Hamilton's efforts to sustain the PROMIS software developed pursuant to the LEAA project. He claimed that Mr. Ruff expressed a similar sentiment. In January 1981 INSLAW purchased the Institute's assets and was formed. "INSLAW did not pay anything for the PROMIS software because it was deemed to be in the public domain," Mr. Hamilton wrote in a January 16, 1986 memorandum to one of his attorneys.[17] Mr. Ham-

---

**15.** During the course of Messrs. Hills' and Rogers' representation, Latham & Watkins became Latham, Watkins & Hills.

**16.** The court notes that the parties provided detailed definitions of various PROMIS versions. The court adopts these definitions where necessary. However, for this general introduction, the court adopts Mr. Hamilton's characterization at trial:

> Enhanced PROMIS is the version of PROMIS containing privately financed enhancements

not required to be delivered to the United States Government under any contract. And old PROMIS is the preceding version of PROMIS that contains—that does not contain such privately financed enhance[ments].

**17.** "Items that have been determined to be in the public domain are available for free copying and use by anyone." J. Thomas McCarthy, *McCarthy' Desk Encyclopedia of Intellectual Property* 354 (2d ed.1995). Although plaintiffs admitted in their responses dated December 7, 1995, to request for admission Nos. 5 and 47 that the

ilton was named President and Chairman of the Board and continues to serve in those capacities today.

### 2. Operations of INSLAW and the Institute

The Institute and INSLAW operated in much the same manner. Both companies performed work under competitively awarded cost-plus contracts from DOJ. Mr. Hamilton explained that "many of the LEAA contracting and auditing personnel who were involved in our contracts when we were at the Institute moved over to what's referred to as Main Justice when LEAA was abolished, and many of them continued to perform similar functions with the for-profit I[NSLAW]." Prior to the contract at issue in this litigation, Messrs. Hamilton and Gizzarelli claimed that the company had no significant negative dealings with DOJ.

INSLAW also performed work that the Institute failed to complete. The July 12, 1982 legal opinion continues:

LEAA pilot version of PROMIS was in the public domain, Mr. Hamilton testified that the pilot version was not public domain, but only bestowed on the Government unlimited rights in the software. According to Mr. Hamilton, these unlimited rights allowed the Government to distribute the software anywhere within the Federal Government, but not to third parties. No other witnesses supported Mr. Hamilton's assertions; neither did plaintiffs' counsel. Indeed, defense counsel represented that this was the first time in the case's history that such an assertion was made. Generally,

the party seeking to establish a right to exclude another from using a creation or marketing tool has the burden to prove its entitlement to one of the forms of intellectual property. The burden of proving validity and infringement of an intellectual property right is on the party wishing to exclude. The using or copying party does not have the initial burden to prove that what it is using is in the public domain. McCarthy, *supra*, at 355.

"When the federal government funds an enhancement to a software system, certain precautions must be taken to avoid transfer of ownership of the enhancement to the federal government." *Thomas Bradshaw Assoc., Inc. v. Computer Corp. of Am.*, 7 Computer L. Serv. Rep. 1103, 1105 (D.D.C.1980). Because Clause 74(b)(1) of the 1982 Contract grants the Government unlimited rights in all "computer software required to be originated or developed under a Government contract, or generated as a necessary part of performing a contract," any

After the May 15, 1981, cessation of LEAA funding, INSLAW delivered to the [DOJ] a copy of the software as it existed on May 15, 1981, together with all associated documentation. That version was the version being employed by users of the software, since INSLAW had kept each user's software up-to-date where requested by the user.

Included in the delivered software were three of the five BJS enhancements. The other two enhancements were "only partially developed when funding under the three-year contract ceased." Because the Institute was unable to finish these enhancements within the timeframe and with the money provided, Mr. Hamilton testified that EOUSA

provided through an interagency transfer of funds some money for [INSLAW] to do that work on the five BJS enhancements through an existing contract that INSLAW had been awarded by the now defunct [LEAA]. [INSLAW was] unable to

enhancements made to the PROMIS software that were funded by the Government "must contain explicit restrictions or ownership of the enhancement is obtained by the government." 7 Computer L. Serv. Rep. at 1105 (stating that because Government had unlimited rights in "software resulting from development work," contracts in which the government funds enhancements explicitly must restrict Government's rights in order to be proprietary to contractor).

The pilot study may or may not have been developed pursuant to a contract bestowing on the Government unlimited rights and placing the pilot study version of PROMIS in the public domain. However, plaintiffs did not introduce the LEAA pilot study contract into evidence. Moreover, apart from Mr. Hamilton, every other witness who testified on point stated that the pilot version was in the public domain, and no affirmative evidence other than Mr. Hamilton's assertion that he conferred with an intellectual property lawyer was presented. The court finds that the pilot version of PROMIS was in the public domain. *See generally* McCarthy, *supra*, at 354–56 (defining public domain); 9 John Cosgrove McBride *et al.*, *Government Contracts: Cyclopedic Guide to Law, Administration, and Procedure*, Patents, Proprietary Rights and Data, Trade Secrets and Copyrights § 52.170[3] (1997) (discussing computer software produced during course of contract performance); I Paul Goldstein, *Copyright* § 2.5.2.2 Works of the United States Government (2d ed.1996) (discussing protections provided by Copyright Act).

finish the work within the time, May '81 to May '82, and within the amount of money that the Executive Office transferred in the interagency transfer.

So the contracting officer, V[i]denieks, authorized us to finish the work under the PROMIS implementation contract which is this contract in this proceeding and to do it by finding economies in the implementation services which we could obtain because the new five BJS enhancements we believed would reduce the amount of IN-SLAW's labor when they went out to the [USAOs] to implement the software.

### 3. *The 1982 Contract*

DOJ, through the JMD, awarded IN-SLAW Contract No. JVUSA–82–C–0074 on March 16, 1982. The JMD administered the 1982 Contract. The contract was an incrementally funded, three-year cost-plus-incentive-fee contract with a target price not to exceed $9.612 million. Joan S. Lovelace was defendant's expert in government cost analysis, with a speciality in software-type contracts. She explained that the contractor and the Government share the risks of contract performance. "The Government still has the risk that ... there will be a cost overrun that they will have to pay. But the contractor has the risk that he will not earn the fee that is designated as the target fee."

The 1982 Contract essentially has three variable components: 1) It is incrementally funded, 2) reimburses costs, and 3) contains an incentive fee. In her expert report, Ms. Lovelace explained:

▮ "Incrementally funded" means that, when I[NSLAW] and DOJ entered into the contract, the amount of money available to pay for the work required under the contract was less than the complete contract price.

. . . .

▮ The "cost-reimbursable" character of the contract means that I[NSLAW] would only be reimbursed for its actual allowable

costs allocated to the performance of the contract work. These costs would be determined through audit procedures.

▮ An "incentive fee" contract uses an adjustment of fee to motivate the contractor to effectively manage costs (FPR 1–3.405–4, FPR 1–3.407, and FAR 16.402–1, FAR 52.216–10). The incentive fee was a formula-based determination where I[NSLAW] would earn a "target fee" of 8% of its actual costs (to the extent allocable and allowable) if those costs were equal to the original contract "target cost"—which was $8,900,000—or to the "target cost" as increased (or decreased) by modifications to the contract.... I[NSLAW] would increase the percentage of fee earned if actual costs were below the contracted "target cost." Conversely, I[NSLAW] would lose a percentage of fee if its actual costs exceeded the contracted "target cost." ... Under this type of fee structure, the contractor risks losing fee if it does not manage its costs.

(Footnote omitted.) The JMD contracting officer was charged with overseeing all three aspects of the contract.

The contract required INSLAW to customize, prepare, and install PROMIS case-tracking software in various USAOs and in the EOUSA. Specifically, INSLAW was to install: 1) the computer-based PROMIS software in EOUSA headquarters and in the 20 largest USAOs [18] and 2) a word-processing program designed to function like PROMIS in the remaining smaller USAOs.[19]

DOJ was to furnish the hardware for the contract and ultimately selected PRIME computers for the 20 largest USAOs and Lanier word processors for the remaining USAOs. Pending on-site installation of the PRIME computers, the 1982 Contract required INSLAW to provide ten USAOs with access to its computer-based software via a "time-sharing" arrangement on one of its VAX computers located in Lanham, Maryland.

---

**18.** DOJ had an option to require installation of the computer-based PROMIS in an additional ten USAOs.

**19.** The parties and the court refer to this word-processing software as the word-processing version of PROMIS. The court recognizes that the program was not the actual PROMIS.

The contract provided that INSLAW must base the PROMIS developed for the 1982 Contract on the pilot study version of PROMIS. The pilot study project used computers with 16–bit technology. Under the 1982 Contract, INSLAW was required to use VAX and PRIME computers that had 32–bit technology. In short, INSLAW was to perform the 1982 Contract using software based on the 16–bit technology developed in the 1979 pilot study and install it in computers with 32–bit technology. The word-processing portion of the 1982 Contract, as well, was to be based on the pilot study.

In addition to basing the software developed in the 1982 Contract on the pilot study, INSLAW undertook other requirements. First, INSLAW was to add to the PROMIS software the five BJS enhancements that were still in the developmental stages. Second, INSLAW was required to develop software and procedures for converting data from the USAOs' docket and reporting systems to the PROMIS database. Third, INSLAW was to tailor the PROMIS developed to meet the demands of each USAO, provided the tailoring did not alter the base version of PROMIS by 25%. INSLAW also committed to perform an annual retailoring or restructuring of the PROMIS databases. In so doing, INSLAW also was required to reformat the existing records within the databases or the PROMIS program would not function properly.

## II. *Proprietary enhancements*

At a meeting on February 4, 1983, DOJ officials learned that INSLAW was using allegedly proprietary enhancements in its performance under the 1982 Contract. DOJ officials immediately requested INSLAW to identify those enhancements. Since then, INSLAW's claims of proprietary enhancements have varied. In a submission to DOJ dated April 5, 1983, INSLAW's government contracts counsel, Harvey G. Sherzer, claimed in excess of 800 proprietary enhancements. This number dropped to 251 discrete enhancements plus four major enhancements on April 12, 1983, in connection with another submission to DOJ from Mr. Sherzer; it then skyrocketed to more than 1,000 on June 9,

1986, in connection with INSLAW's complaint in the bankruptcy proceeding. This number dropped to 97 discrete and three major enhancements on August 4, 1995, in connection with plaintiffs' complaint in this proceeding, and then increased to 106 discrete and three major enhancements in connection with their pretrial filings on January 30, 1997. Although Mr. Hamilton posits that these fluctuations can be attributed to the use of different methods in accounting for the degree of INSLAW's enhancements, the attorney who worked on the bankruptcy complaint, Mr. Conway, testified that the number of enhancements was less than 200.

1. *What types of enhancements did IN-SLAW make?*

INSLAW began to develop enhancements to the PROMIS software using private non-government funds beginning in May 1981. These enhancements took two forms: discrete and stand-alone enhancements. Whereas discrete enhancements are "sewn inside" the existing PROMIS code, stand-alone enhancements add functionality and are "hooked-on" to the PROMIS code. As described by Mr. Hamilton, the stand-alone enhancements are not "loaded on to a computer with the PROMIS application, [but] kept … on the shelf and use[d] … when" needed. Plaintiffs claim that they made three stand-alone enhancements to PROMIS: 1) port to VAX, 2) batch update, and 3) database adjustment.

### 1) *Port to VAX*

Mr. Hamilton explained that "I[NSLAW] used the 1970s generation of Digital Equipment Corporation [("DEC")] computers for its software development during the 1970s." The computers were called PDP 11/70s, and had a 16–bit architecture machine, "which means that you could process data inside the computer in increments of 16–bits, which is a computer measurement." Mr. McKain, IN-SLAW's Research and Development Manager, testified that the 16–bit architecture is "an indication of how much the computer can keep track of at any one point in time. It's known as a 16–bit address. So you have that much space. The computer basically does one thing at a time, and it has to know where

to do it, where to get the data from. That's contained in a 16–bit register."

During the 1980s the 16–bit PDP 11/70s were superseded by 32–bit architecture machines, such as the VAX 11/780 and PRIME 550. INSLAW had three of these VAXes. With these machines Mr. Hamilton considered

that the VAX would enable [its] customers to do things with [its] software that they could not do. during the 1970s, and to execute commands at much greater speed than you execute commands on a 16–bit architecture machine. And because you wouldn't have the delay in performance, you could attempt to get additional logic into the software to do more things, more features and more functions, and make the system easier to use for the customers.

In order to take advantage of the VAX's additional capabilities, however, Dr. Thomas G. DeLutis, plaintiffs' expert in information technologies, testified that "certain structural components of PROMIS would have to be rewritten in order to be able to simplify the software and make its operation more efficient." Availing itself of the VAX technology, INSLAW "ported"[20] the PROMIS program from its existing DEC PDP 11/70 to the VAX. INSLAW took the LEAA PDP public-domain version of PROMIS and transferred it to the VAX sometime between June 1981 through September 1981. Marion Mullins Holton, then INSLAW's Director of Systems and Software, testified at the 1987 trial, see supra note 9, that INSLAW did not utilize private funding, labeled the project research and development, and charged the costs to the computer center.

Up until this point, the master version of PROMIS ran on the 16–bit PDP 11/70. After the port, the 32–bit VAX version became the "master copy" and was used for research

and development, maintenance, and time-sharing services for the USAOs under the 1982 Contract. Ms. Holton also testified that all of INSLAW's software application systems are developed "using the same software. We maintain one version and develop those different database applications using that same software." Thus, once INSLAW adopted the VAX version as its master version of PROMIS, it became the sole version.[21] Every witness addressing the subject other than Mr. Hamilton testified to this effect. Thus, to use any other version of PROMIS in implementing any contract would cause INSLAW considerable time and expense. Because INSLAW maintained the VAX version for upkeep, corrections (or "bug fixes"), and maintenance, no other version was retained in such error-free condition, as vouchsafed by Ms. Holton.

Ms. Holton's testimony established the following: Although the 1982 Contract called for a PROMIS version in which the Government would have unlimited rights, INSLAW used the VAX version of PROMIS to create the version required to be installed on the government-furnished PRIME computers. INSLAW used the VAX version, not the earlier pilot version, because the differences between the PRIME computers selected by the Government and the VAX version were not as extensive. Moreover, keeping one master decreased INSLAW's maintenance costs. When INSLAW ported the VAX to the government-furnished PRIME computers, everything that had been done on the VAX was transferred to the PRIME, whether or not DOJ requested the additional programming.

Ms. Holton acknowledged that INSLAW could have ported the pilot PROMIS version from the PDP to the PRIME. It may not have been as efficient; INSLAW would have

---

**20.** Defendant's expert Dr. Davis defined porting as

simply a technical term that means moving the software from one hardware platform to another. And in doing so it's typically necessary to change the software to a lesser or greater degree, and the degree depends in part on what hardware you are starting with, and what hardware you are going to.

Ms. Holton's testimony was consistent.

**21.** The court notes that Dr. Davis testified that a second line of PROMIS may have been developed for IBM machines. However, INSLAW's personnel, other than Mr. Hamilton, all testified that INSLAW kept one version of PROMIS. Even if INSLAW had maintained a second version for IBM computers, the existence of that software would have had no effect on INSLAW's performance under the 1982 Contract.

needed to add all bug fixes reported by DOJ, the BJS enhancements, and the docket and reporting conversion ("D&R") [22] and have needed to tailor [23] the software to each USAO. In fact, Mr. McKain testified that he was not certain that the BJS enhancements or the docket and reporting data could be added to the pilot version. Although both Mr. McKain and Dr. DeLutis testified that INSLAW should have been able to use the 16–bit program on the 32–bit machine, it would not run as efficiently.

Mr. McKain explained the process by which INSLAW took the LEAA public–domain version of PROMIS, ported it to the VAX, and then ported the VAX version to the PRIME computer. INSLAW made this decision deliberately and conscientiously for the ease of its programming. Ms. Holton testified:

Q: So it was INSLAW, in effect, that in creating the PRIME version of PROMIS for the [EOUSA] in connection with the 1982[C]ontract, determined or decided to make that PRIME version of the software out of its VAX version, as opposed to using a different version of PROMIS that was being utilized in the San Diego [USAO]?

A: It was our decision because the earlier version was so different.

Q: Do you know whether anyone at IN-SLAW asked the Government whether they wanted INSLAW to make the PRIME version out of the VAX version?

A: I believe that we were reimbursed for that port, and the most cost-effective way was to start with the VAX version because it was more compatible with the newer PRIME compiler.

Q: In fact the Government paid to have the version of PROMIS ported from the VAX version to the PRIME version, didn't it?

A: Yes. They paid for a port. I don't know that they knew that it came from the VAX.

Q: I see. So you're not even sure if the Government knew what source of the port was?

A: I would imagine that Jack Rugh [Jack S. Rugh, Assistant Director, EOUSA Office of Management Information Systems and Support] knew. I don't know beyond that. But I don't know.

Q: Now with respect to this port to VAX that you've testified about, that was privately funded, wasn't that port to VAX in fact charged to INSLAW's computer center?

A: Yes, it was.

Q: And do you know whether or not—that isn't an R & D account, is it?

A: No. It was just a source of funding, but the project itself was R & D because it was a software project, a software division project.

Q: So basically, that project was funded out of INSLAW's computer center—in other words, a port to VAX was funded out of INSLAW's computer center?

A: The funding came from the computer center, yes.

Thus, INSLAW ported the PDP 11/70 version of PROMIS to the VAX, charging the costs to the computer center, which was supported by DOJ funding, and then deliberately chose to port the VAX version to the PRIME, using DOJ funding, because it was cost effective.

---

**22.** Michael E. Snyder, an EOUSA employee who served as the Contracting Officer's Technical Representative (the "COTR") on the 1982 Contract, testified:

The docket and reporting system was a computer-based system that was maintained in Washington that had limited data about the case load in each [USAO]. And so when an office was converted to PROMIS, either timesharing or—well, if it was one of the offices that was on timesharing, what happened was the D&R data was converted so that it could be loaded into the PROMIS database so there would be at least a skeleton record of the pending cases, so you wouldn't have to go back in and start from ground zero.

**23.** In his expert report, Dr. DeLutis defines "tailoring" as the process by which INSLAW caters its PROMIS software to the "individual and unique" requirements of the user, both initially and once it becomes operational.

### 2) *Batch update*

Mr. Hamilton explained that the "batch update subsystem is designed to take data that are in a different computer system[s] and input those data in a batch. That's where the name batch comes from." Batch update is a "generalized subsystem that can be used irrespective of how many different ways you have tailored PROMIS. Or how many different ... pre-existing computer systems you're taking data out of." Ms. Holton described batch update as allowing a user to add computerized information to an existing database in batches; therefore, the user is relieved from having to enter data manually. Mr. McKain testified:

> Batch update is an I[NSLAW] tool that it allows for pseudo–code or simple instructions to be inserted, and those instructions are then translated by a generator to provide the proper interface to I[NSLAW]'s edit manager program and database manager program. So it relieved the need for a programmer to code a stand-alone interface to those programs or to write a program from scratch to read docket reporting data and to include it into the PROMIS database.

INSLAW licensed this product for both single and multiple uses. INSLAW claims that this program was developed pursuant to a contract with the New York City Law Department, and, according to Mr. McKain, it existed prior to INSLAW's work on the 1982 Contract.

INSLAW used the batch update system in its contract performance. Mr. McKain testified that "INSLAW used the batch update program for each one of the 20 [USAOs] in which INSLAW installed PROMIS. INSLAW used the batch update program to transfer data from the Government's computerized Docket and Reporting database for each of these offices to the PROMIS data base." He took the position that INSLAW did not need to use the batch update system for the 1982 Contract, but

> could have written something from scratch, either to, I guess the most basic level would have been just to write the date to PROMIS, but that would have required extensive knowledge of the proprietary database structure and the pointers that are used in the PROMIS database.

> As a level tip from that, you may have written your own interface to our edit and update manager programs. That would entail satisfying a dozen or so parameters required for each call of the program, and those things the batch update did automatically.

None of these alternative methods would have been as easy, efficient, or cost effective as running INSLAW's batch update system.

### 3) *Database adjustment system*

Mr. Hamilton wrote to one of INSLAW's attorneys on January 27, 1986, explaining that INSLAW used "the data base adjustment program to reorganize the data bases for the 10 U.S. Attorney's Offices on time-sharing to the data base designs requested by the Government for the in-house computer versions of each of these 10 offices...." Essentially, database adjustment ("DBA") refers to "rewriting the data base when its structure changes as 'Data Base Adjustment' in PROMIS," according to Dr. Davis. Mr. Hamilton explained in his January 27 letter:

> The data base adjustment program makes it possible to convert a data base developed in one version of PROMIS, i.e., in a version of PROMIS that was 'tailored' to a particular set of specifications, to a new PROMIS data base design, i.e., to a version of PROMIS that was 'tailored' to a different set of specifications.

Ms. Holton provided an example. If a person wants to expand an address in her address book that includes a person's name, address, and phone number so that it also includes the person's zip code, she would use database adjustment. DBA would realign the entries of the address book and create a field for zip code entry.

The use of this program was essential to the project. Indeed, Ms. Holton admitted that the 1982 Contract "called for data base adjustment as part of the task for each of the offices that were [operating] on the [VAX] equipment and for the two automated types and pilot project." Furthermore, INSLAW stated that it would use its proprietary DBA

program in performing the contract. INSLAW represented in its Technical Proposal for the 1982 Contract, which was incorporated into the contract by Art. I 6: "INSLAW will adjust the original data by utilizing its proprietary DBA software so that all previously entered data conforms to the new design."

#### 4) *Discrete enhancements*

Mr. Hamilton explained that discrete enhancements are also known as "sewn in" enhancements. "These enhancements either make the base software application of PROMIS easier to user, or they introduce new features and functions into it, or they make it operate more efficiently, faster on the computer; usually one of those three things." INSLAW made these enhancements from May 1981 through the third quarter of 1984, and plaintiffs claim a total of 106 discrete proprietary enhancements in this litigation.

INSLAW determined that these enhancements were proprietary by examining the PROMIS source code and tracing the contemporaneous documentation to which the source code leads. The document trail, however, fails to link the change number for a claimed enhancement to an account or charge code to which INSLAW billed work. When Ms. Holton testified in 1987, *see supra* note 9, she had been associated since 1980 with PROMIS, the Institute, and INSLAW. She has a unique understanding of the inner-workings of the company. Plaintiffs rely on Ms. Holton's unique corporate perspective in an attempt to prove that plaintiffs' claimed enhancements are proprietary.

#### 2. *How did INSLAW protect these enhancements?*

To maintain the confidentiality of its alleged proprietary enhancements, Mr. Hamilton claimed that INSLAW "fixed a copyright legend to the source code and . . . documentation"; "entered into licensing agreements with the customers," obliging them to maintain the source code as a trade secret; and "entered into" employer-employee "non-disclosure and confidentiality agreements." INSLAW had such a confidentiality agreement with the Land and Natural Resources Division of DOJ.

Mr. Hamilton claimed that the copyright legend "was included every time [INSLAW] furnished [PROMIS] to anyone." The legend details the year the changes were added, the latest year changes were added, and the copyright year. The copyright is "entered into the source code itself and it's also affixed to the documentation for the software." Mr. Hamilton did not know, however, if a copyright existed for any, or all, of the claimed proprietary enhancements at issue in this case, and Dr. DeLutis testified that he only found copyright notations in a "select number of modules."

Mr. Hamilton admitted that INSLAW had entered into contracts that contained provisions giving customers, not INSLAW, ownership of the software that INSLAW produced. Mr. Hamilton could not specify the number of such contracts in existence; rather, he stated that he had examined the contracts at issue in the 1987 trial and their various data rights clauses and determined that an enhancement was created pursuant to federal funding. He caveated: "I can't be sure that I caught everyone [sic] of them. I read a lot of them. We're talking about over a hundred contracts, I think."

INSLAW's then attorneys discovered at least three of Mr. Hamilton's oversights when they started to review the contracts, examining the data rights clauses. Mr. Hamilton testified:

[INSLAW's counsel] advised us there were approximately—excuse me. I'm going from broad recollections now. It is my recollection that out of approximately 100 contracts that they looked at, there were three of them that had data rights clauses, federal data rights clauses. And I had missed all three of them because all although I understand the concept, I was not expecting with our state and local, these are state and local government contracts, I was not expecting [the] Federal Government to insert itself through those data rights clauses. I forgot about how that happened sometimes that federal funds are passed from the Federal Government to a state or local government.

These errors occurred because Mr. Hamilton had failed to note that local governments in those instances were funded by federal funds. Ten years later INSLAW still had not culled out the contracts that utilized federal funds, and failed to produce a considerable number of these contracts in discovery. Nevertheless, Mr. Hamilton was of the view that, because of the close relationship between INSLAW and DOJ during the relevant time period and because DOJ personnel knew the cognizant INSLAW personnel, any omissions or inconsistencies should not be cited as a failure of proof. While not discounting plaintiffs' evidence, the record does not reveal which program modules INSLAW copyrighted, which program modules are subject to data rights clauses, or which program modules were funded privately or whether INSLAW retained data rights in the missing contracts. INSLAW produced many of the contracts, but it is presenting a copyright claim, and, unfortunately, Mr. Hamilton's testimony is insufficient to establish that claim. *See* J. Thomas McCarthy, *McCarthy's Desk Encyclopedia of Intellectual Property* 355 (2d ed.1995) (quoted *supra* note 17).

 Assuming that INSLAW held copyrights to the claimed enhancements, plaintiffs insist that "copyrights for software developed by a private contractor with funds provided by the United States will inure to the contractor rather than the government." Plfs' Br. filed Jan. 30, 1997, at 14. 17 U.S.C. § 105 (1994), allows the Government to hold a copyright transferred to it by contract. *See M.B. Schnapper v. Foley*, 667 F.2d 102, 109 (D.C.Cir.1981) ("Without laying down a broad rule, we are reluctant to cabin the discretion of government agencies to arrange ownership and publication rights with private contractors absent some reasonable showing of a congressional desire to do so. . . . Section 105, therefore, is not . . . subverted by assigning to the Government the copyright in a commissioned work that is neither produced by current or former employees nor

related to the official duties of any Government employee.") (cited with approval by *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 443 n. 23, 104 S.Ct. 774, 789 n. 23, 78 L.Ed.2d 574 (1984)). Such is the effect in this case of Clause 74(b)(1), the Unlimited Rights Clause. *See* 17 U.S.C. § 106 (stating that owner with exclusive rights may "reproduce the copyrighted work," "prepare derivative works based upon the copyrighted work," and "distribute copies . . . of the copyrighted work to the public").

James F. Kelley, INSLAW's former General Counsel, negotiated the 1982 Contract for INSLAW. Mr. Kelley was called as a defense witness. Mr. Hamilton fired Mr. Kelley, and the witness left INSLAW's employ in November 1982. This circumstance was explored fully at trial. The court carefully observed this witness, scrutinized his testimony, and could discern nothing but candor and equanimity in this witness. There were no hard feelings; he is not a disgruntled former employee. Mr. Kelley was straightforward in his testimony that DOJ negotiated for unlimited rights in the PROMIS software to be installed and "that's what we gave them." [24]

3. *Did plaintiffs prove that INSLAW had propriety rights in its claimed enhancements?*

 Plaintiffs rely on the methodology developed by Dr. DeLutis, Ms. Holton, and Bellie Ling, INSLAW's former Chief, Accounting System and currently its Controller, to prove that 1) plaintiffs created proprietary enhancements; 2) that INSLAW had sufficient non-federal funds to cover the costs of the enhancements; and 3) that those non-federal funds can be linked to specific proprietary enhancements. The court found Dr. DeLutis and Ms. Ling to be credible witnesses. Both witnesses testified in an honest and forthright manner; however, they made several assumptions in their analyses. These assumptions do not withstand scrutiny. The

---

24. Mr. Kelley explained the context of the negotiations with respect to data rights:

[T]here was a great pressure to get this contract done. I[NSLAW] was on the very short fuse. They were running out of money. They needed the infusion of these funds from this contract desperately to survive. Therefore, there was a lot of pressure on both—the negotiators on both sides to get this thing done and signed.

analysis of Ms. Holton is riddled with ambiguities and guesswork, which plaintiffs term "institutional knowledge." Institutional knowledge may be taken into account, but Ms. Holton's analysis requires that the court bridge evidentiary gaps in order to justify plaintiffs' claim of proprietary enhancements. While noting that Dr. DeLutis found her assumptions reasonable, the court must take exception for three reasons: 1) the thorough analysis undertaken by Dr. Davis, *see infra* at 79, as opposed to the limited analysis for which Dr. DeLutis was retained; 2) the nature of the task INSLAW assigned to Dr. DeLutis; and 3) the fact that INSLAW planned prior to submitting its response to the Request for Proposals to "make available," *i.e.*, include without informing DOJ, proprietary enhancements in DOJ's software. INSLAW knew prior to execution of the 1982 Contract that it must be prepared to prove its proprietary enhancements if it wanted to receive payment for them. This fact, known uniquely to INSLAW, is the centerpiece of plaintiffs' claims.

### 1) *Ms. Ling's analysis*

Mr. Hamilton testified that INSLAW developed proprietary enhancements from

> the revenue from the fixed price software upkeep and upgrade contracts that we began entering into in May of 1981; mostly with state and local governments, but over time with some federal agencies as well. And it would have been the venture capital that came into the company, the 750,000, approximately, in May of 1983. It would have been the money provided by computer hardware manufacturers so that the software could be demonstrated effectively on their machines. It would have been capitalized R&D work if the company would have been—retained profits.

In total Mr. Hamilton estimated that INSLAW had approximately $7 million available to create enhancements.

According to Mr. Hamilton, the funds for the port-to-VAX and DBA stand-alone enhancements came from his and his wife's capital; Mr. Merrill's and his wife's capital; capitalization of research and development costs; venture capital; contracts with computer hardware manufacturers; and loans with commercial lending institutions. He stated that INSLAW also had funds available through a line of credit established with First American Bank in Washington, DC, for $750,000.00, although by May 1981 this line of credit had been fully utilized. Once EOU-SA awarded INSLAW the 1982 Contract, the Bank of Bethesda assumed the First American line of credit and increased it by $500,-000.00 to $1.2 million. Thus, by increasing its line of credit, INSLAW increased its available funds.

Mr. Hamilton maintained that some of the funds for INSLAW's claimed enhancements came from contracts with computer hardware companies, *e.g.*, IBM and Burroughs, which wanted INSLAW to use their hardware to "show off" its capabilities. Mr. Hamilton, however, could not remember the dates of the contracts, nor did he know if the contracts had been turned over to DOJ during discovery.

Interestingly, Mr. Hamilton's testimony is contradicted directly by Ms. Ling. If the court were to credit Mr. Hamilton's testimony, it would be required to find that INSLAW had insufficient income to cover the costs of all of the discrete enhancements and two stand-alone enhancements, the DBA and batch update enhancements, for the period beginning May 1981 and ending March 1985. Ms. Ling testified that the costs of all of INSLAW's enhancements for that time period, excluding the port-to-VAX enhancement, totaled $8,328,883.00, whereas Mr. Hamilton approximated INSLAW total available capital at $7 million. Any discrepancy is overlooked because plaintiffs' position, through Ms. Ling, was that a total of $12,998,076.00 in revenues was available from private sources, which she characterized as "Private Funding Sources."

Ms. Ling utilized INSLAW's general ledger and the reports generated therefrom, *i.e.*, the project or cost control reports. She then determined whether the monies to support the project or the costs incurred on that project were Federal Government or private (including state or local governments) based upon the name of the contract. Ms. Ling's minimal analysis of the contractual data

rights clauses renders her analysis highly questionable. Only occasionally did she review the actual contract or the data rights clauses in examining whether any federal monies paid for the enhancements developed. In fact, no one at INSLAW considered whether federal funds paid for work under a non-federal contract.

> Q [By defense counsel]: And by the way, while we're on the subject of cost codes, isn't it also true that I[NSLAW] did not even track whether its non-federal customers were paying with federal funds?
>
> A [By Murray W. Hannon, INSLAW's then Controller]: That's true. If the State of New York received a grant, we did not check with them as far as the source of their funds. As far as we were concerned, they were New York State funds.

The failure to go to the contract represents a significant omission in INSLAW's analysis.

Ms. Ling utilized PX 224, a document created by Ms. Holton that lists all of INSLAW's proprietary enhancements to the PROMIS program through the agreed-upon cut-off date of June 7, 1984. *See INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X (Fed.Cl. Nov. 8, 1996), *amended by INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X (Fed.Cl. Feb. 21, 1997). Ms. Ling examined that exhibit to determine the date of implementation of the last claimed proprietary enhancement. Thus, she could determine within which time period INSLAW's revenues and expenses should be examined. Once Ms. Ling determined the relevant time period, she then calculated INSLAW's direct and indirect expenses for all non-federal government customers related to enhancements and codified her results into a summary sheet introduced into evidence as PX 230A. Her worksheets were introduced as PX 230B.

Ms. Ling then attempted to show that sufficient private funding was available to cover the costs of INSLAW's claimed proprietary enhancements. Thus, Ms. Ling created a second summary sheet, PX 231, detailing INSLAW's private funding sources and the amounts from each source. For purposes of explaining the summary sheet, plaintiffs labeled Ms. Ling's worksheets and copies from INSLAW's general ledger exhibits as PX 231B and 231C, respectively.

Although plaintiffs produced the summary sheets to defendant, they failed to supply all of the underlying documentation, including approximately one third of the underlying contracts/agreements. The court therefore excluded the evidence under Fed.R.Evid. 1006 as the "originals or duplicates [were not] made available for examination or copying, or both, by parties at reasonable time and place." However, the court did allow plaintiffs to proceed with the examination of Ms. Ling and to introduce the documents as an offer of proof under Fed.R.Evid. 103(a)(2).

INSLAW's expenses relating to enhancements are detailed in Ms. Ling's charts, PX 230 and PX 230B, which identified nine categories of funding: 1) maintenance subscribers;[25] 2) technical service contracts for non-federal government customers; 3) license sales; 4) stockholders' contribution; 5) advances from two law firms; 6) advances from computer hardware companies; 7) increase of borrowing; 8) increase of other payables; and 9) earned management fees.

Plaintiffs took the position that INSLAW developed the enhancements listed on PX 224 between May 1981 through March 1985 from private, non-federal funds. Ms. Ling divided her analysis into three time periods: May 1981 through February 1982; March 1982 through September 1984; and October 1984 through March 1985. Although the date of the last claimed proprietary enhancement in this case was June 7, 1984, Ms. Ling explained that she went beyond the cutoff date because INSLAW performs other cost-incurring functions on a program after its completion date and must accumulate enhancements prior to doing a release,[26] which

---

**25.** Maintenance subscriber money represents the annual fees paid by the maintenance subscribers to INSLAW. These monies fund maintenance projects such as bug fixes. These codes are generally identified as beginning with "90."

**26.** Ms. Holton defined a release as "a composite of all upgrades to the software from a given date from the prior release, all developments that have taken place since the earlier release to our maintenance subscribers."

also increases INSLAW's expenses.[27] Ms. Ling further testified:

> The cost related to the enhancements it's not just the direct salary dollars and other direct dollars such as the expenses for travel. And also we have allocation, cost allocations, fringe benefit allocation, and indirect allocation and a computer center allocation. Those cost allocations, we—the actual allocations run like each fiscal year after the year end closing, then we run the actual cost allocation. So usually it's not that, like we can cut off that day and say the work's done and every cost is already recorded. According to our accounting procedures system, there's no way we can do that.

Because INSLAW released the PRIME version of PROMIS after June 7, 1984, to at least some of the USAOs, some of the costs extending past June 7, 1984, properly are considered in the cost of an enhancement.

INSLAW did not incur any research and development costs until March 1982, the month the 1982 Contract was signed by IN-SLAW and DOJ. All of INSLAW's research and development costs were incurred after the 1982 Contract was signed. This begs the question: To what enhancements were the research and development costs applied, considering that DOJ constituted approximately 75–80% of INSLAW's business, as Mr. Hamilton estimated.

Problems surfaced with the underlying documentation for Ms. Ling's summary exhibits. First, PX 230, Ms. Ling's analysis of costs INSLAW incurred relating to enhancements in connection with non-federal government contracts, represents a much broader universe than the enhancements involved in this proceeding. Ms. Ling included monies received for specific enhancements which may or may not have been included in the PRIME version of PROMIS at issue in this case. Indeed, Ms. Ling did not know what enhancements were at issue in this litigation. When Ms. Ling calculated INSLAW's incurred costs for privately-funded enhancements, she did not know which change num-

bers on PX 224, the list of enhancements, were covered by the total $8.3 million in costs for all enhancements. She did not know how much the changes listed on PX 224 cost.

Ms. Ling's reliance on the general ledger may also have been misplaced. The general ledger denotes all financial transactions; however, the accuracy of the statements in the general ledger must be verified. Ms. Ling's testimony merely related that a transaction occurred, not the accuracy of the underlying transaction. For example, DX 223 is one of Mr. McKain's time sheets. A time sheet does not contain a space to indicate what work was done during the time period specified; it merely states that work was done and lists a charge code. Thus, one cannot determine whether an expense was associated properly with a charge code. Ms. Ling admitted that "I[NSLAW]'s accounting system would not have the cost for each change, but ... there may be some indication that this is for a particular enhancement or particular bug fixes." The problem arises where no indication of the correlation exists.

Ms. Ling could not testify as to how much of the total funds available covered IN-SLAW's expenses for privately-funded enhancements. She ignored all of INSLAW's other expenses and the funding sources for those expenses. She also could not testify as to which software changes related to the almost $12 million of expenditures for contracts with the Federal Government.

Ms. Ling did not factor the port-to-VAX enhancement as part of her analysis. She stated:

> I believe the reason we didn't include it as the cost for port to VAX, ... VAX port was charged to computer center during the May '81 through October '81. And at the time I—personally, I don't know why that was charged to computer center. But at this time we cannot extract how much exactly, you know, related to the VAX port. So I did not include that cost in my cost incurred table.

Releases are not made on the same date as an enhancement is made.

---

27. Ms. Ling explained that a release is a newer version of the software; it is an update that provides the customer with more functionality.

Other problems with the underlying documentation surfaced. Defendant established that INSLAW failed to produce approximately 120 maintenance contracts. Ms. Ling testified that INSLAW did not always get a maintenance agreement signed by the customer, but there should be at least one signed contract on record. When defense counsel represented that 120 cash receipts did not have an underlying contract to which each could be traced, Ms. Ling was not surprised. Rather, she stated that INSLAW had documentation to prove that it received the payment and that at least one contract with a customer should be on file.

Despite Ms. Ling's best efforts, some of the contracts containing provisions that they would be paid for with federal monies were included in INSLAW's count of private funding. For example, a maintenance agreement with the State of Hawaii stated that its funding source was "Federal Grants," but Ms. Ling included it in her summary sheet as private funding. Defendant also demonstrated that several of the technical service agreements were missing, making it impossible for defendant to analyze INSLAW's data rights clauses with other customers. Examination of these clauses would have confirmed whether INSLAW had a proprietary interest in an enhancement or whether the contract was paid for with any federal monies. For example, to demonstrate the private funding for its proprietary enhancements, INSLAW introduced its contract with AT&T Communications, Inc. This contract makes all software deliverable under the contract AT&T Communications' exclusive property. Without engaging in guesswork, the court cannot discern, based on Ms. Ling's exhibits, whether the enhancements developed pursuant to the AT&T Communications' contract are claimed as proprietary to INSLAW in this proceeding.

Ms. Ling included a contract from the State of Alaska on her list of privately-funded contracts. Article 13 of this contract provides:

All designs, drawings, specifications, notes and other work developed in the performance of this agreement are and remain the sole property of the State of Alaska and may be used by the State for any other purpose without additional compensation to the Contractor.

Ms. Ling did not know what work was performed pursuant to this contract. Once again, the court is at a loss.

Defendant also drew the court's attention to a contract between INSLAW and the City of Detroit. That contract provides:

The parties acknowledge that should the performance of this Contract result in the development of new proprietary and secret concepts, method, techniques, processes, adaptions, discoveries, improvements and ideas, same shall be promptly reported to the City, belong solely and exclusively to the City without further consideration and without regard to the origin thereof, and the Contractor will not, other than in the performance of this Contract, make use of or disclose same to anyone. At the City's request the Contractor shall execute all documents and papers and shall furnish all reasonable assistance requested in order to establish in the City all right, title and interest in such inventions, discoveries and improvements or to enable the City to apply for United States patents thereon, if the City elects to do so.

This contract was included in Ms. Ling's analysis of funding, and Ms. Ling did not know if any of these enhancements were listed on PX 224. Nevertheless, Ms. Ling recalled that INSLAW might have rejected this contract in bankruptcy court. Despite her misgivings about the contract, INSLAW included it as a source of funding.

INSLAW also could not provide several underlying contracts with technical service agreements. Ms. Ling explained:

Yeah, see, it's my understanding, you know, some of the customer have bought not just one license, but, you know, two or three different licenses. Then in accounting record we have to record, you know, license sales for PROMIS, license sale for DOCKETRAC, or, you know, whatever. Then—but it's under one contract. So that's why I'm saying, you know, could be one entry has document available, and that could also cover couple other entries. [L]ike the New York JJIS, I think I—I'm

talking about New York Juvenile Justice, I remember they had another contract somewhere in here. They bought, you know, two or three different licenses[ ] like SCREENPAC, and let's see, the PROMIS. This may be true, but INSLAW must demonstrate that an underlying contract, letter, or some memorialization exists. Although Ms. Ling also testified that INSLAW had money for developing privately-funded enhancements from a stock transaction, she testified that the transaction was "before [her] time." INSLAW failed to provide any documentation underlying this assertion.

INSLAW also failed to furnish proof for some of its claimed funding from law firms. Of the $460,000.00, a $100,000.00 cash receipt from Milbank, Tweed, Hadley & McCloy was missing. Ms. Ling testified that the sum was "an investment that the two law firms made to I[NSLAW] for I[NSLAW] to develop the software." However, these advances were for contracts to provide certain services for Sullivan & Cromwell and Milbank, Tweed. The money furnished pursuant to these contracts was not for general software development, but payment for work pursuant to a contract.

Ms. Ling also cited a contract between INSLAW and AT&T Information Systems as a funding source. This contract, however, was not entered into until after the date of the last claimed enhancement. Although INSLAW may have expenses relating to enhancements completed on or before June 7, 1984, funding for enhancements pursuant to contracts subsequent to June 7, 1984, is not probative of whether INSLAW had sufficient funding to develop proprietary enhancements on a prior date.

Plaintiffs also claimed that INSLAW increased its borrowing to get more funds for enhancements. Although they introduced copies of general ledger transactions to demonstrate the occurrence of the loans, plaintiffs did not provide copies of the notes demonstrating the debts. As defense counsel stated: "[T]here is no way of knowing what the purpose of these loans were for; if they were for particular software development, if they were to pay their bills generally, if they were to pay their rent or their payroll or any other circumstance, Your Honor. The purpose of the borrowing has never been testified to."

Plaintiffs add that INSLAW had money to spend from earned management fees, most of which INSLAW earned pursuant to contracts with the Federal Government, specifically the 1982 Contract. Ms. Ling explained that any of the money earned from the EOUSA contract with respect to INSLAW's fee may be utilized for whatever INSLAW wishes.

After the conclusion of Ms. Ling's testimony, the court ruled:

On Friday, I admitted Ms. Ling's testimony with respect to Plaintiff[s'] 230 and 231, and that would include 230B and 231B as well, under Federal Rule of Evidence [103(a)(2) ], offer of proof. . . .

The direct examination of Mr. Tomlinson and the cross-examination of Mr. Rivera were very helpful in learning more about both these documents. Mr. Rivera has renewed his objection to the evidence, which isn't necessary because they had been excluded. However, now is the time when I either revise or reaffirm my earlier ruling.

I am going to revise it. I am going to admit Plaintiff[s'] Exhibit 230 and 230B. The problems that have been identified go to the weight, not the admissibility of this document.

With respect to Plaintiff[s'] 231, I am revising the ruling. I am finding some of it excludable. There are additional problems with the weight to be accorded this exhibit. However, for purposes of excludability based on Mr. Rivera's cross-examination, there were insufficient contracts or other backup information required under the Court's order of February 21, 1997, with respect to the following categories: technical service contracts, stockholders contribution, $100,000 of the advances from two law firms, and increase of borrowing. Those amounts must be deducted from the $12,988,076 that is the total available listed on Plaintiff's 231.

The specific deletions are: For technical service contracts, $3,405,334; for stock-

holders contribution, $814,866; $100,000 deleted from the amount in Category 5, advances from two law firms; and $1,128,129 deleted from No. 7, increase of borrowing.

The Court is aware that the effect of these deletions is to make the total available in the order of $1 million less than the total reflected on Table 1 of Plaintiff's 230, the privately funded expenditures by time period. However, that is the consequence of the ruling, and the other problems noted by Mr. Rivera will be evaluated in weighing the admissible portions of Plaintiff's 231.

The court finds that, at most, $7,549,747.00 was available to fund proprietary enhancements. Thus, plaintiffs fall short by $779,136.00, the cost of the proprietary enhancements developed from May 1981 through March 1985, excluding the port-to-VAX stand-alone enhancement. Even if plaintiffs had proved that INSLAW had ample non-federal funding for developing the proprietary enhancements, plaintiffs did not prove that the available funding was linked to any of the discrete enhancements claimed in this litigation as listed on PX 224.

C. Michael Mayer, defendant's expert in government contract accounting and cost accounting standards, discussed another flaw in Ms. Ling's analysis: It failed to take into account indirect costs that were "so substantial that it would be almost impossible for some part of I[NSLAW]'s work not to have been funded by these indirect costs paid by the Government." The failure to consider indirect costs may result in a finding that the Government funded an enhancement or project.

In *Bell Helicopter Textron*, ASBCA No. 2119, 85–3 BCA ¶ 18,415, the Armed Services Board of Contract Appeals held that " 'at private expense' means entirely funded without any Government reimbursement, direct or indirect, other than through IR&D [independent research and development] cost allocations." *Id.* ¶ 18,415, at 92,434. The ASBCA held:

IR&D costs which are reimbursed in part through indirect cost allocations to Government contracts nevertheless represent "private expense" for purposes of the data rights clause. Any other Government reimbursement, however, as a direct or indirect cost, of some of the costs of developing an item, component, or process would mean that that item, component, or process was not developed "at private expense."

*Id.* ¶ 18,415, at 92,423. Plaintiffs do not offer any good reason why the court should not apply *Bell Helicopter.* The court finds Mr. Mayer's position reasonable and the ASBCA decision highly persuasive. Therefore, in order to prove private funding, INSLAW must demonstrate that the Government did not reimburse INSLAW for its indirect costs, other than *de minimis* indirect costs, with the exception of independent research and development costs. INSLAW failed to make such a showing.

Ms. Ling explained that at the time of the 1982 Contract INSLAW included in its indirect costs "administration, salaries or the rent, the telephone cost, anything which is not attributable directly to the project, it was booked as indirect cost." She also testified that DOJ's share of indirect costs was 51.32%. Ms. Ling explained that her computation was "the only way that [she] kn[e]w [was] correct."

Mr. Mayer calculated DOJ's indirect rate as 92%; however, he was willing to adopt Ms. Ling's figure of 51.32%. Mr. Mayer commented:

My point made consistently was that the methodologies advanced in this case for pricing the enhancements never addressed the indirect costs; and that a substantial amount of indirect costs, a very large number, were paid by the Government. By Ms. Ling's admission, a million and a half dollars of indirect costs were paid by the Government, and that represents half of all the indirect costs that I[NSLAW] had that year.

And so whatever number used, 51 percent is a large portion of indirect costs. And under those circumstances I maintain that it is almost impossible that the Government did not to some extent reimburse

some of the indirect costs that were applied to these enhancements.

The court agrees with Mr. Mayer's analysis. By Ms. Ling's own admission, the Government paid for 51.32% of INSLAW's indirect costs. These funds were not restricted to independent research and development and are not *de minimis*. Plaintiffs cannot make the showing required by *Bell Helicopter*.

Ms. Ling's analysis establishes that INSLAW had revenues to pay for proprietary enhancements, assuming that the $7,549,-747.00 was not used to cover any other expenses, which is a baseless assumption. Revenues available do not equate automatically to funds available. Even if *no shortfall* were present, she fails to account for that portion of the $8,328,883.00 cost for the claimed enhancements, excluding port to VAX, that came from the Government's payment of indirect costs. The court cannot ascertain which enhancements should be excluded by the $779,136.00 shortfall or, if the shortfall found by the court is put aside, by the indirect costs. Ms. Ling's proof is not reliable.

### 2) *Ms. Holton's analysis*

While Ms. Ling attempted to supply the analysis that sufficient non-federal funds were available to cover the cost of the claimed enhancements, Ms. Holton attempted to correlate specific enhancements to non-federal funding. In doing so, Ms. Holton examined INSLAW's "Report of Bugs and Suggested Changes/Enhancements" ("report forms") to correlate a software change to a programmer's Time and Attendance Report ("time sheet") in order to demonstrate that the programmer billed his time to a non-federal account. Ms. Holton also relied on annotations within the source code for the PROMIS software, which described each change in the software.[28] She stated:

> To begin with, within the source code there is a chronology of all the changes that have been applied to each source code module, the module being the particular grouping of lines and given a particular name, and these modules may be a program or they may be a substantive programs to make up the program.

> The chronology of changes are each identified by a date and number assigned to that change, and that would correspond to th[e] report form.

> I reviewed all the history sections from the version of the [PRIME] software. That was turned over to the Executive Office in 1985. And reviewed the change numbers.

Contained within the source code is a change number followed by a description of that change. INSLAW placed "book ends," also known as "label markers" or "change markers"—a combination of asterisks and greater-and-lesser-than signs—to signal where a change occurs. In that manner, at least theoretically, if a customer decided that it did not want change 270, INSLAW could search for the book ends designating the change and delete them. Ms. Deroy cautioned that this may prove problematic, because one never knows how a change in a line of source code will affect the rest of the source code.

Ms. Holton explained her methodology:

> Again I was matching the report form. We have a user support center where users will call in requests for software changes, either enhancements or corrections to problems they have encountered.

---

28. INSLAW made changes in the PROMIS code pursuant to INSLAW Problem Reports. Mr. McKain defined a problem report as "a submission by a person, whether it's a user in the field or an I[NSLAW] employee, that describes a condition that has been discovered in one of the programs or one of the processes of PROMIS." People may refer to these problem reports as a "bug report." To understand a problem report, a few terms from the bug report sheets must be understood. First, a bug is something that causes the program not to work in the manner designed. Second, a unit test "is a test of a stand-alone change, a single change that a pro-grammer is trying to accomplish in a particular program or area of the system. A programmer would make their change and unit test just that part of the system that their change affected." A "system test" "is [a] kind of getting all these stand-alone or single changes, gathering them together into a full-blown system, and then testing them all over again in mass." The bug report sheet lists a date where the programmer may designate the date of the unit test; however, the system test date is not listed. Thus, work may take place well after the completion date listed.

And these forms are completed based on what the user has asked or reported.

The user may also be someone within the company who is testing different versions of the system.

I reviewed the master book of all these report forms and matched them to these change numbers.

Once Ms. Holton identified the change number in the source code, she matched the change number against a report form. The report form was divided into two parts. The top part "is the actual reporting part, giving a report date, the INSLAW contact [the person with whom the customer spoke or the INSLAW employee who reported the problem], the person making the comment, ... and a description of the request." The bottom part "is the follow-up by the programmer giving the programmer's name and the date of the completion and the programs affected by this change." If the "INSLAW contact" part of the form was left blank, Ms. Holton assumed that the report came from a person in-house.

Ms. Holton then analyzed the report dates and the completion dates. If they were the same, she pulled the time sheets from the corresponding time period and examined what project codes the programmer billed on the day involved.

The time sheets list the employee's name, the project codes, and the hours billed to each project code over a two-week period. The time sheets were reviewed by the Project Director on major projects, but, at the least, they are signed by the Division Director, who verified that the project code charges were correct. Ms. Holton examined the project codes and determined which project codes applied to the work performed as described in the report form. For example, she assumed that a billing to a 9000 code signified maintenance or research and development and that such funding did not come from the Federal Government.

Ms. Holton performed this analysis for all the claimed discrete proprietary enhancements. She prepared a summary sheet, which was PX 224. This document identifies the "dates and programmer that came from the report f[orm], charge code [from the time sheets], and [her] analysis of the change [based on the source code and report form]." The summary sheet contains the charge number,[29] change number,[30] report date, change date, programmer, and program module.

Ms. Holton considered various factors, all of which she attributed to her "institutional knowledge," including: Who the programmer was (based on how the coding looked, Ms. Holton may identify the programmer), whether the programmer was in the maintenance pool, how many changes were being done at one time, and whether the report date and the completion date differed. In short, where documentation was lacking, Ms. Holton improvised:

THE [BANKRUPTCY] COURT: [H]ow did you arrive at the conclusion that Charge Code 9001 is applicable to Change No. 174[?]

THE WITNESS [Ms. Holton]: Well, just looking at the summary right here, 174, 175, and 176 are three individual changes applied to the same program, so those indicate, first of all, that they would be through maintenance task. They were done within the same time period by Dan Lazarre.

And certainly, the change 176 would not have been required for the Executive Office because they would not have encountered this problem. The 175 was not recorded by them. 174—

THE COURT: How can you tell it was not recorded by them?

THE WITNESS: I know that they did not have that problem. I actually can't say that they did not report it, but I feel confident that they did not report it be-

---

**29.** Ms. Holton stated: "The change number column is the four-character identifier for the particular change that comes from the documentation itself."

**30.** Ms. Holton explained: "The change number also comes from the report log. The number would be written in the upper left corner of the night supervisor." This number was written there only about 95% of the time.

cause I worked on that project and we never encountered this problem.

The Change 174, again, there are five files in the master database, and there was sufficient records in the database to assign records to all five files. So they also never encountered that.

The major flaw in Ms. Holton's analysis is that she made an assumption, based on the change date on the report form, as to when an enhancement or program module actually was completed. She assumed that it was completed close to the time of the completion date listed on the report form, but the completion date only represents when the PROMIS program ran a test on the new program module. The module could have been developed and in the PROMIS program for months, awaiting its test, because a higher priority item arose. Unfortunately, this assumption is not the only one Ms. Holton made that brings into question the validity of her methodology.

Ms. Holton not only had to guess when the change was completed, but the number of hours necessary to make the program module. She considered her knowledge of programming, her subjective knowledge of the programmer's experience, and the description of the program change in order to determine how long it took an individual programmer to make a change:

I looked at the programmer who made the change. I looked at the module on which the change was applied. Took into consideration whether or not the programmer had been acquainted with that particular routine, source code. If they had worked on it before, then I most likely narrowed the scope of my search because it would take them less time to make the change. If they were a junior programmer, then I gave them allowance for a little bit more time. And, also knowing too, who were the junior programmers at the time and what programs they had been exposed to.

Ms. Holton acknowledged that her methodology was based on "assumptions, really, just from being there, and being through it over the years." Regrettably, the court was unable to hear this witness. Her 1987 trial testimony reveals her to be a knowledgeable,

capable individual, fully conversant in the PROMIS technology and history. Had she appeared at this trial, Ms. Holton may have provided justification for all the assumptions defendant pointed out. The court cannot perform this reconciliation on its own.

Ms. Holton also identified as enhancements program modules that existed in the pilot version of PROMIS, which was in the public domain. On this basis alone, defendant was able to demonstrate conclusively that her analysis was incorrect. Ms. Holton testified that her source documents listed the dates on which the enhancements were completed, which were after the delivery of the LEAA version. However, Dr. Davis established that the PROMIS program itself contained the modules in question when it was delivered in the earlier public domain version of PROMIS. According to Ms. Holton's analysis, this is impossible, as her source documents told her that the changes were not completed until later.

Ms. Holton testified that if work was billed to maintenance, the work would not have been performed with federal contract funds, but the maintenance pool charge, whatever that was. However, some of the charge codes Ms. Holton identified as maintenance had at least some federal subscribers, including maintenance code 9001. The Government thus could have paid for a bug fix or enhancement listed on PX 224.

Additionally, if the vendor/jurisdiction space on the report form was left blank, Ms. Holton assumed that the request for the fix or enhancement originated in-house. Defendant demonstrated the inadequacy of this assumption by leading Ms. Holton through a series of examples, after which she stated: "The funding showed that they were done for the Executive Office project." Although Ms. Holton took issue with whether INSLAW held these enhancements out as proprietary, the incorrect assumption made in her methodology must be considered in determining the weight the court accords Ms. Holton's testimony.

Plaintiffs retained Dr. DeLutis, an expert in information technologies, to (1) "[a]ssess the value of the privately-funded major en-

hancements and other privately-funded changes to the PROMIS software"; (2) "[r]eview the documentation of changes used by INSLAW"; and (3) "[r]eview and assess the strategies and procedures used in accounting for the changes and the way they were reconstructed by Ms. Holton." Dr. DeLutis was charged with evaluating Ms. Holton's methodology and determining if DOJ received the proprietary enhancements claimed in this litigation.

This expert had also testified in the bankruptcy trial. In performing his assignment for this trial, Dr. DeLutis reviewed Ms. Holton's and his testimony, depositions, exhibits, and work notes. He consulted with IN-SLAW technical employees, Ms. Ling, and the Hamiltons and reviewed source and object codes and INSLAW documents, including contracts, funding documents, programmer time sheets, and change sheets. Dr. DeLutis concluded:

> 1. Enhancements were made by IN-SLAW to PROMIS using private funds which afford significant increased functionality to the PROMIS software product; [and]
>
> 2. Procedures employed by Ms. Holton to identify privately funded changes to PROMIS were appropriate for the purpose of correlating PROMIS software change numbers with INSLAW charge numbers appearing on INSLAW staff time records.

In forming his opinions, however, Dr. DeLutis relied in large part on the work performed by Ms. Ling and Ms. Holton. Once again, the problem resurfaces: Ms. Ling and Ms. Holton made many assumptions, and Dr. DeLutis relied on these assumptions. Dr. DeLutis had to make those assumptions his own and justify them at trial, but he declined to do so: "What I was asked to do was to check the methodology that she used. I was not asked to check whether or not what she did was correct or not correct." In his opinion all of Ms. Holton's assumptions were reasonable.

Dr. DeLutis could not confirm the validity of Ms. Holton's methodology. Indeed, his testimony highlighted another defect in her analysis. Dr. DeLutis concluded that, according to Ms. Holton's methodology, the earliest time that a programmer could have worked on a change was the report date of the preceding change. This procedure was not always followed, or, at least, was not always documented correctly. Dr. DeLutis attempted to explain the discrepancies, stating that they all occurred with one programmer or that the source document was illegible. Nevertheless, the methodology failed in at least three instances.

Cross-examination of Dr. DeLutis revealed that the documentation on which Ms. Holton relied, the report forms and time sheets, do not include an unbroken chain, because the time sheets do not identify specific change numbers and the report forms listing the changes do not include a specific project code or charge code. He accepted as valid her assumptions to bridge the gaps. Therefore, the weight of Dr. DeLutis' testimony is diminished by the defects in Ms. Holton's assumptions that have been noted.

Dr. DeLutis testified as to the industry standards with respect to the documentation of software changes.

> Q: [By plaintiffs' counsel]: Dr. DeLutis, at this point in time were there industry standards with regard to the documentation of software changes?
>
> A: I am personally not aware of any standard that would be applicable to [tying] a specific change to a time sheet.

It was Dr. DeLutis' expert opinion that "the manner in which the documentation of changes associated with the ongoing maintenance of the product were reasonable"; that INSLAW's handling of time sheets was also reasonable; that INSLAW also had reasonable procedures for documenting its changes; and that what INSLAW did in this regard was "very excellent." In response to the court's question whether he was aware in 1983–84 if any methodologies were in place that would have reported more specifically the time spent on individual changes, Dr. DeLutis stated that he was not required on his time sheets to record any "direct linkage" to changes that he made in his software.

Dr. DeLutis' high opinion related to the manner in which INSLAW's programmers documented their software changes in the

code. He was able to "identify the total change history" of the PROMIS software since 1981. The "thoroughness in which the changes were documented continually in the software" greatly impressed Dr. DeLutis, which is what he considered to be "very excellent." The court agrees with Dr. DeLutis that the source code was well documented; but that does not signify that INSLAW's methodology to account for the claimed proprietary enhancements was reasonable.

The court cannot accept Dr. DeLutis' opinion of INSLAW's record keeping. Prior to performing the contract, INSLAW knew that it had one version of PROMIS that it operated; INSLAW also knew that it was planning on using its proprietary enhancements to implement the 1982 Contract. Although INSLAW's record-keeping procedures may have been acceptable in the early 1980s environment of nascent computer operations, they were not adequate to the specific task that INSLAW undertook in performing the 1982 Contract on its own terms, *i.e.*, in furnishing and installing PROMIS with enhancements not required by the contract that DOJ subsequently would be asked to purchase or decline. INSLAW's own employees testified that INSLAW could have documented its software development and forged a complete paper trail that would have enabled it to track the costs of each claimed enhancement. For example, Ms. Holton readily admitted that INSLAW easily could have adapted its documentation to demonstrate its proprietary enhancements without greatly increasing its administrative burden.

Q: [By defense counsel]: Would that have imposed any kind of onerous burden upon you if you had to fill out an additional blank on the report form that showed which account you did the work for?

A: I'm not sure I would call it onerous. It would certainly be another line to fill out and you would have had it available at the time you were completing this form. I don't think it would have been a lot of trouble. We just didn't require it.

Dr. DeLutis' also helped to define "bug" and "enhancement." Ms. Holton undertook an analysis to determine which discrete enhancements constituted bug fixes and which constituted enhancements.[31] She identified the enhancements in terms of their nature, *i.e.*, did they provide a new functionality, did they increase user-friendliness, or did they increase the efficiency of the system? The remainder of the claimed proprietary enhancements constituted bug fixes. Ms. Holton could not testify as to whether DOJ requested those bug fixes.

Ms. Holton codified her results into a chart, introduced as PX 228, an exhibit identifying bugs and enhancements. The chart does not depict the port to VAX because the "port is all of PROMIS, all of this would be part of the VAX port. All of these programs would have been within that port, had they been available at that time." DBA originally was developed on the VAX. Plaintiffs contend that INSLAW developed other proprietary enhancements that are not claimed in this litigation around the time of the 1982 Contract. Based on her testimony in the bankruptcy court trial and PX 228, the parties entered into a stipulation filed April 4, 1997, which identifies each enhancement that Ms. Holton classified as a bug or an enhancement.

According to Dr. DeLutis, Ms. Holton was more conservative than necessary in identifying a change as an enhancement as opposed to a bug fix. Unfortunately, plaintiffs did not retain Dr. DeLutis to engage in any such analysis, so he did not opine beyond that observation. He did define an enhancement:

I would like to answer that by saying in the industry there continues to be an ongo-

---

31. According to Ms. Holton, a " 'bug' would be a problem within the source code that stops the program from executing, or generates the wrong results," whereas

[a]n enhancement would be a change that would expand the capability of the program. Whether or not it was a new function, whether it was just to increase the scope of what the program was to do, or to add further docu-

mentation, more error messages. The design will always change, and that doesn't—or the coding will change as the program is used.

That doesn't necessarily mean that it's a "bug" wants something is, is—comes up. It may be that the original intent did not include that, and in that category I would put those enhancements.

ing discussion of the term "enhancements." I use the term "enhancements" to mean a broad spectrum of—potentially a broad spectrum of additional functionality to a product. And they could either fall into the class of major enhancements or they could fall in the class of minor enhancements, or cosmetic enhancements.

Dr. DeLutis agreed that a bug fix is "something that shouldn't have gone wrong, but did and it's fixed." In software of this size, Dr. DeLutis testified that "approximately [7%] of the total defects in the software would not be detected at the time that it was released to the public."

Dr. DeLutis previously had testified that PX 224 contained product defects:

What I said is that what is in 224 are, and a good term to use, is elimination of defects in the product. And elimination of defects in the product could have, could fall into one of four different categories. And these categories are common. One is the defect could be critical in that it causes the program to stop executing. The defect could be severe, classified as severe. In which case it may have one subsystem not operating correctly or be impaired. It could be minor in terms of causing no inconvenience to the operation of the system. Or it can be classified as being cosmetic in which it's adding features to the software which are not considered to be major features. All four of those categories of defects are considered to be within the realm of maintenance.

A defect is the "lack of something necessary for completeness; deficiency; shortcoming;" or "an imperfection or weakness; fault; flaw; blemish." *Webster's New World Dictionary* 361 (3d ed.1988). In other words, it is something that should not be wrong, but is. Dr. DeLutis' testimony could be susceptible to an interpretation that all of the software changes in PX 224 could be classified as bug fixes.

Dr. DeLutis compared the PRIME version of PROMIS to the pilot version, explaining that an enhancement may increase software reliability or functionality. The three stand-alone enhancements increased functionality over the pilot version. The changes on PX 224 increased functionality over that in the pilot version; thus, the changes may be classified as minor enhancements, rather than bug fixes. However, on cross-examination, Dr. DeLutis stated that an enhancement is something not called for by the contract specifications:

I would say that if the contract that said I need—that you are to develop software with these specific specifications and I'm going to pay for that software and what's delivered is exactly what the specification called for. Then you're right. Whatever's incorporated into that for in this case let's use the USA, that that would not have enhancements in it if you paid for everything that was there.

In rendering its decision, the court must undertake an examination and determine whether the contract called for the three stand-alone enhancements and the 106 discrete enhancements.

Defendant's expert, Dr. Davis, approached this analysis from a technical standpoint. Testifying as an expert in computer software, he was one of the three experts on the expert panel established during the discovery stage of this proceeding. Dr. Davis analyzed the PROMIS code while on the expert panel. Dr. Davis also had prior experience analyzing PROMIS for an FBI investigation, also related to the dissemination of PROMIS.

In his role as defendant's software expert, Dr. Davis reviewed the manuals and source code; received live demonstrations of the software; consulted with INSLAW personnel; used PX 224 "as a way of focusing my attention on specific pieces of this fairly large body of software"; read deposition and trial transcripts, contract documents, manuals, and legal documents; conducted telephone interviews; and examined the source code for both the discrete and supplemental enhancements. Dr. Davis brought considerable clarity to the proceedings.

The court finds Dr. Davis' analysis the most thorough and exacting analysis performed on the PROMIS data rights claims. In comparison to Dr. Davis' expert report, that of Dr. DeLutis was cursory and summary. Unlike Dr. DeLutis, Dr. Davis was

retained to examine the exact nature of the alleged enhancements and to analyze each of the 106 discrete enhancements and three stand-alone enhancements. Dr. Davis undertook his own examination of PX 224, plaintiffs' list of claimed enhancements, and thoroughly reviewed Ms. Holton's methodology. He traced through Ms. Holton's procedures and found INSLAW's internal procedures were not always followed. For example, both Ms. Holton and Dr. DeLutis testified that INSLAW assigned each software change a unique number and that the number could be found in the history section of the source code. Dr. Davis discovered

> that [he] had to refer to changes by both the change date and the change number. Because in a few cases, not a lot, but in a few cases, the change numbers are not unique. That is the identical change number shows up in several different places in the code on several different change dates, labeling several functionally different changes. So to be precise here, we need to talk not only about change number, but the concatenation of change date and change number which by the way is the textual marker that's found in the code.
>
> Q: [By defense counsel]: Did any of the change numbers in PX 224 get used for different changes on different dates?
>
> A: Yes. The one, there are several examples. The one that comes to mind immediately is 9999 which shows up in I believe seven different places in the program on several different change dates for seven different purposes in seven places.
>
> Q: And any other examples?
>
> A: I believe it's the one called ALO1 shows up in several places and 324 1 believe shows up at least twice.
>
> Q: So when you were going through the code to look for these PX 224 changes, you could not just look for the change number, is that right?
>
> A: That's the impact of this, yes. You had to be more precise than just a change number.

The premise of Ms. Holton's entire analysis was that each change number was unique and that the change number was an accurate means to trace through the time sheets and solve the proprietary funding. Dr. DeLutis endorsed Ms. Holton's assumptions; he also testified that INSLAW assigned change numbers sequentially. If this were the case, Dr. Davis would not have found the same change number with different change dates.

In order to determine whether work technically was required under the contract, Dr. Davis analyzed the contract, Ms. Holton's testimony, all the forms completed by INSLAW employees, annotations on the forms, and the code itself. Dr. Davis examined these forms to determine why the change was made. "[I]f it was made generally speaking because the program wasn't doing what it was supposed to do, what it was reasonably expected to do, then I would call that a bug." Mr. Hamilton agreed with this definition and defined a bug fix: "[I]n theory [it is] supposed to repair a latent defect." Dr. Davis stated that the program was to be kept in error-free condition under the contract. Dr. Davis cited the Contract Statement of Work:

> 3.2.4.3. The Contractor shall maintain all PROMIS software implemented pursuant to this contract in operational, error-free condition throughout the term of this contract. The Software shall be considered to be error free if the Contractor addresses and corrects each reported software error ("bug") in its thrice yearly maintenance support, except in cases where the COTR [Contracting Officer's Technical Representative] certifies that the error is of a critical nature wherein the Contractor will take immediate corrective action.

Section 3.2.5 of the Contract Statement of Work also provides: "Following delivery of a computer system, the Contractor shall install and test the PROMIS enhancements developed during the 1980–81 pilot and assure that the [USAOs'] version of PROMIS is properly implemented on the selected vendor's equipment." Dr. Davis explained that for something to be properly implemented, it must be bug-free. He examined each of the 106 discrete enhancements to determine whether a given software change was made to fix a problem.

Dr. Davis relied on the description of the change as it appears on PX 224, his own understanding of how the PROMIS program was to operate, PROMIS' capabilities as represented in INSLAW's manuals, and his examination of the code. Of the 106 discrete enhancements, Dr. Davis found 94 bug fixes, eight major enhancements, and four minor enhancements.

The 1982 Contract requires INSLAW to keep the software in error-free condition. This error-free condition is defined as free from all reported errors. However, Ms. Holton testified that she could not say for certain who reported many of the "errors" or "enhancement requests," even when the proper space was completed on INSLAW's report form. Mr. Gizzarelli, INSLAW's former Special Counsel and Project Manager for the 1982 Contract, considered that IN-SLAW had an obligation under the 1982 Contract to keep the software operating error-free, even without the bug fix clause within the Statement of Work. The parties' April 4, 1997 stipulation concerning Ms. Holton's bug fix/enhancement testimony demonstrates the incomplete nature of her analysis. A review of Ms. Holton's testimony and exhibits reveals that she was not consistent in identifying enhancements and bug fixes. Dr. DeLutis did not make any independent analysis of the discrete enhancements, but did state that the contract specifications must be reviewed to determine if a software change is an enhancement or a bug fix. The court accepts Dr. Davis' analysis and finds that 94 of the 106 discrete enhancements were bug fixes, which were required under the 1982 Contract.[32]

### 3) The stand-alone enhancements

#### a) Port to VAX

INSLAW's Technical Proposal, which was incorporated by Art. I ¶ 6 into the contract, states:

Given the Government's decision to convert any of the pilot systems to operate on equipment selected for the other automat-

ed or word processing districts, INSLAW will develop and execute a conversion plan to transfer data from the PRIME and Lanier equipment to that of the new vendor.

INSLAW's proposal continues:

For the automated systems, the level of effort and time required to complete the task will depend on whether PROMIS operation on the selected equipment is currently supported by INSLAW. For example, as noted in Task III, the USAO version of PROMIS will currently run on the following hardware: DEC VAX, Burroughs 1800 series, Wang VS, IBM with CICS, and PRIME 550 series or larger.

This new machine, under the 1982 Contact, could be any of the five machines specified in INSLAW's Technical Proposal.

INSLAW contends that it could not put the pilot version of PROMIS onto the VAX system, because the VAX system had a 32–bit architecture, whereas the computer upon which the pilot version of PROMIS operated had a 16–bit architecture. However, Dr. De-Lutis testified that he analyzed the various changes between the 1970s DEC PDP 11/70 version of PROMIS and the 1980s VAX version of PROMIS. Some of the software changes were made solely to take advantage of the new and improved technology, specifically, the 32–bit technology, as opposed to the 16–bit technology. Dr. DeLutis stated, in effect, that many of these changes probably were not necessary to make PROMIS run on the VAX: "If it had been written for the PDP 11/70 [16–bit architecture], it would most likely be able to execute on the 11/780 [the VAX]." In response to the Request for Proposal, INSLAW represented in its Technical Proposal:

INSLAW'S Computer Center has two VAX 11/780s (Digital Equipment Corporation), running under the VMS system, which will be used to support the time-sharing needs of the 10 [USAOs], as well as the software development requirements.

---

**32.** While acknowledging that Dr. Davis initially identified other software changes as "enhancements" in defendant's Supplemental Response of the United States to Plaintiffs' Reformulated Requests for Interrogatories and Admissions, Inter-

rogatory No. 9, the court accepts Dr. Davis' testimony that he continued to perform software testing in order to refine his analysis for his trial testimony.

These two computers, with 32–bit virtual memory capability, are configured identically.

(Emphasis added.) Thus, INSLAW committed itself to using the VAX machine for the timesharing and the software development required under the 1982 Contract. Even Dr. DeLutis, plaintiffs' expert, recognized that pursuant to this provision, INSLAW was "going to provide" the timesharing on its VAX computers.

Mr. Hamilton took the position that porting the pilot PROMIS to the VAX was impractical for two reasons: 1) The pilot PROMIS ran on a 16–bit machine, and 2) the pilot PROMIS did not have the capabilities required for the timesharing service. He stated:

> No, it had to be PROMIS to satisfy criminal prosecution and legal process debt collection. There was at that time no such PROMIS. We had to create one. That was not what was in the pilot offices.

This impracticality demonstrates, in Mr. Hamilton's view, that INSLAW could use whatever PROMIS version it wanted in providing timesharing. The problem with Mr. Hamilton's argument is that the contract required INSLAW to base the PROMIS developed pursuant to the 1982 Contract on the pilot study.

The parties dispute whether the contract required INSLAW to port the pilot PROMIS to the VAX computer. The Contract Statement of Work 3.1–3.1.1 required:

> 3.1. *General.* The Contractor shall furnish all personnel, materials, equipment and facilities, except as otherwise specified herein, required to develop and implement a case management and collections system for 89 U.S. Attorneys' Offices ... and the Executive Office of U.S. Attorneys ..., using PROMIS software and procedures in certain offices and word processing based procedures in other offices. Some word processing district may have an independent automated collections subsystem in those instances where the collections caseload is so large as to justify use of computerization. In such cases, the independent collections subsystem will be housed at the computer facilities of a designated large PROMIS district and operated by the PROMIS district for the recipient word processing district. *All computer based and word processing based systems shall be based on the PROMIS software and procedures and word processing procedures developed for the [USAOs] environment during the 1980–1981 pilot project* discussed in Appendix A. The PROMIS system developed during the pilot project operates on PRIME 550 computers using the [PROMIS] operating system. All district systems shall contain three subsystems: a criminal caseload management subsystem, a civil caseload management subsystem, and a collections subsystem.

> 3.1.1. *These systems shall be operated on Government furnished equipment located in the USAO's, with the exception of the PROMIS based criminal subsystem for certain districts specified in Appendix C which shall be installed initially on Contractor furnished computer equipment at a Contractor site. The criminal subsystem shall continue to be operated by the Contractor at his facility for these districts until such time as Government furnished equipment is installed and the subsystem is converted to the permanent equipment configuration,* The contractor shall provide the computer facilities and personnel, remote terminals, and telecommunications facilities required to operate the criminal subsystem for these specified districts on an interim basis. Government personnel will be responsible for remote terminal operation. The interim period is expected to extend from six (6) to nine (9) months for individual offices.

(Emphasis added.) The Contract Statement of Work 3.2.2.3.1 also states:

> The Contractor shall initially implement the criminal subsystem in specified districts using Contractor provided computer facilities and personnel to be located on the Contractor's premises....

Modification 1 dated March 15, 1983, incorporates the legal process debt collections subsystem into this provision.

The contract, as modified, required INSLAW to use the PROMIS system developed

pursuant to the pilot study. Mr. Hamilton, however, distinguished the criminal subsystem and the legal process debt collections subsystem from the pilot program. He testified: "[T]he pilot version included the criminal prosecution, civil litigation and legal process debt collection. What INSLAW was asked to provide on a[n] interim time sharing service is a version that would address criminal prosecution and legal process debt collection." Asserting that the contract did not require INSLAW to port the pilot PROMIS to the VAX, Mr. Hamilton stated:

> [W]hat we were required to do was provide a service for criminal prosecution and legal process debt collection on one of our computers. It nowhere said that we were to use the pilot version of [PROMIS] which, of course, wouldn't have worked.

With respect to the VAX timesharing portion of the contract, Mr. Hamilton explained that INSLAW had the option to decide which software it would utilize; however, for the on-site installations, INSLAW was required to use the pilot project version of PROMIS, plus the five BJS enhancements. Mr. Hamilton maintained: "[T]iming is important. We ported PROMIS to the VAX before the RFP came out from the [DOJ] and before we submitted our proposal." Although Mr. Hamilton's statements may be true, the Contract Statement of Work 3.1 expressly provided that the PROMIS to be utilized for timesharing was to be based on the pilot PROMIS.

The 1982 Contract recognized that the pilot PROMIS required modification. That is why it required all software to be based on the pilot study, and did not simply require the pilot study PROMIS be implemented on the VAX or in the USAOs specified by the contract. Mr. Hamilton correctly stated:

> And we had to, whether we started with A, B, C or D, we couldn't use any version of PROMIS that was running in a single version of the [USAOs]. It had to be changed so that you could have segregated databases, so that the [USAO] in Los Angeles would not inadvertently stumble into the cases of the [USAO] in the Southern District of New York.

The pilot version of PROMIS is not set up for that.

However, INSLAW was required to operate in accordance with the 1982 Contract by making the pilot version of PROMIS operational within contractual parameters. The enhancements made to the pilot version of PROMIS were work product that DOJ was entitled to under Article XXX, which allowed the contracting officer to request, at any time during the contract performance, a copy of materials required or developed under the contract, including a copy of computer programs. Clause 74(a)(4) of the 1982 Contract defines a computer program as "a series of instructions or statements in a form acceptable to a computer, designed to cause the computer to execute an operation or operations."

Contract Statement of Work 3.1.1 required INSLAW to convert to the government-furnished equipment the criminal subsystem and, under Modification 1, the legal process debt collections subsystem used in the timesharing portion of the contract. Not only was DOJ entitled to the versions of these systems under Article XXX, the contract explicitly called for their delivery.

Mr. Hamilton's views on what software the 1982 Contract required varied according to the question asked. He claimed that INSLAW was required to produce the pilot version, combined with the BJS enhancements, and to port it to the government-furnished equipment. However, Mr. Hamilton also stated that no version of PROMIS operated the legal process debt collections and criminal subsystems, so that INSLAW had to develop such versions in performance of the contract. INSLAW was required to perform substantial modifications to the pilot version in order to implement the 1982 Contract.

Defendant argues that INSLAW was to use PROMIS based on the pilot study and that the contract therefore contemplated that INSLAW would modify the pilot version of PROMIS to conform to the contract requirements. In order to perform the contract, INSLAW was required to enhance PROMIS, essentially creating a new version. Indeed, according to Mr. Hamilton, that is exactly

what INSLAW did. DOJ funded this new version in order to guarantee its unlimited rights under the contract.

b) *Batch update*

The Contract Statement of Work, as well as INSLAW's Technical Proposal, specify that INSLAW is to develop some type of software to perform functions similar to that of the batch update subsystem. The Contract Statement of Work 3.2.2.7 provides:

3.2.2.7. *Transfer of Data from U.S. Attorney's Docket and Reporting System.* The Contractor shall develop procedures and software to transfer a district's active criminal, civil, and collections caseload as contained in the U.S. Attorney's Docket and Reporting System to a district's new PROMIS system or word processing based system in the appropriate format to establish a district's initial data base.

*See* Contract Statement of Work 3.2.2.3(d) ("The Contractor shall transfer each district's active caseload, as contained in the Docket and Reporting System to Government furnished equipment.... "); Contract Statement of Work 3.2.2.3.1 ("In so doing, the Contractor shall transfer the district's active caseload, as contained in the Docket and Reporting system and provided by the COTR on magnetic tape to the Contractor furnished equipment."). No INSLAW personnel informed any of the government employees administering the contract, Mr. Brewer, who, as Director of EOUSA's Office of Management Information Systems and Support, was Project Manager; Jack S. Rugh, EOUSA's Assistant Director, Office of Management Information Systems and Support; Michael E. Snyder, the Contracting Officer's Technical Representative; or Contracting Officer Videnieks, that INSLAW would use a proprietary enhancement to perform the transfer. In fact, INSLAW's Technical Proposal expressly states that INSLAW would develop some type of software to perform the contract.

Several other contract provisions demonstrate that INSLAW was required to develop software to perform a function similar to the batch update. The Contract Statement of Work 3.1.3 provides:

3.1.3. Upon installation of each PROMIS or word processing based system, the Contractor shall deliver office procedures manuals, training materials, and an initial supply of input and output forms. The Contractor shall also conduct training courses for systems managers, administrative officers, attorneys, docketing personnel, collections personnel, and secretaries. Technical documentation manuals, PROMIS software conversion to the permanent equipment configurations, conversion of the active Docket and Reporting System caseload (including the development of software and procedures for such conversions), and data conversion of the criminal caseload data housed temporarily on Contractor furnished equipment is also involved. Technical assistance in the operation of the system from time of installation throughout the contract period is also required. Additionally, systems maintenance and support shall be furnished by the Contractor for all installed systems throughout the term of the contract.

The Contract Statement of Work 3.2.2.3.2. also provides: "The Contractor shall transfer the districts active criminal, civil, and collections caseloads, as contained in the Docket and Reporting System to the Government furnished equipment." INSLAW's Technical Proposal provides, in pertinent part:

The transfer of data from the D & R System to a district's PROMIS system is basically a two-step process.... Since no other data have been furnished to the D&R System by the district than have been required by the EOUSA, essentially the same information is available for all the automated districts. *For the extraction step we will write a general program for all these districts, rather than develop a unique program for each district.* By utilizing the data correlation, this program will process the D&R file and create the major output file containing records in the EOUSA data base.

Plaintiffs' expert, Dr. DeLutis, agreed on cross-examination that the contract required INSLAW to develop and deliver software to convert the docket and reporting caseload. Although he viewed the batch update as an

enhancement beyond the contract requirements, his opinion was that developing the required software would have been more time consuming and expensive than using INSLAW's batch update. Assuming that INSLAW had proved that the batch update enhancement was proprietary to INSLAW, the contract provided for INSLAW to develop and deliver software similar to the batch update subsystem. Thus, if INSLAW chose not to create software specific to this contract, but, to save time and expense, utilized existing software that may have been superior to what was required, DOJ cannot be held liable for INSLAW's unilateral decision. In such circumstances INSLAW was acting as a volunteer.

### c) *Database adjustment*

Ms. Holton testified that INSLAW developed the database adjustment system ("DBA") pursuant to research and development work in "late 1983, or beginning in August and going on through '83." INSLAW developed two DBA systems: One INSLAW claimed was proprietary; one INSLAW claimed was developed with federal funds. The differentiating feature between these "enhancements" was the number of program modules. The earlier version consisted of two modules and was developed using federal funds. The allegedly proprietary version consisted of nine modules, two of which were the same modules developed with federal funds. Ms. Holton's testimony that the proprietary version was coded from scratch was not convincing in view of Dr. Davis' more persuasive expert report and testimony. Dr. Davis ran a computer program to compare the lines of source code in the two modules with the source code in the nine modules, demonstrating significant duplication. Dr. Davis found that the programmers "borrowed in literal fashion some of the code of the original version of the database adjustment." His conclusion that the verbatim overlap establishes that the two-module DBA served as the basis for the nine-module DBA is well supported. The court finds that, because part of the DBA enhancement was developed with federal funds, INSLAW cannot claim that the nine-module DBA was proprietary.

Another problem with this particular claim is that Dr. DeLutis, Ms. Holton, and Dr. Davis testified that DOJ did not receive the nine-module DBA program. As the program was not delivered, the court need not undertake an analysis of whether the contract required it. However, in the interest of providing a full and accurate report to Congress, the court finds that the contract calls for the DBA service, but not for the delivery of the DBA software.

Dr. Davis, Dr. DeLutis, and Ms. Holton testified that the contract called for INSLAW to retailer the PROMIS database. The Contract Statement of Work 3.2.4.1. provides:

> Every system installed by the Contractor shall be subject to evaluation and review by the government based on operational experience with the system. *The Contractor shall assist the users with modifications to their systems which have been approved by the COTR. This will result in an average of one PROMIS retailoring for every automated office each year.*

(Emphasis added.) Mr. Rugh stated that the database needed to be adjusted on a yearly basis. Dr. Davis agreed with this analysis:

> If the data base is restructured, all the existing records *must* be reformatted correspondingly, or the entire program can simply cease to work properly.... Hence when INSLAW agreed as part of the contract to carry out an annual restructuring of the databases, it inevitably took on the responsibility of providing the service of reformatting the existing records.

INSLAW committed itself in its Technical Proposal to performing a "general retailoring and Data Base Adjustment just prior to transfer of the criminal subsystem to on-site computers, and our cost estimate includes one for each of the 10 districts." (Footnote omitted.) Its general, retailoring would be done on INSLAW'S VAX. Although Mr. Hamilton's position was that the statements in the Technical Proposal amounted to an offer and were not binding on INSLAW unless accepted by DOJ, he agreed that the 1982 Contract incorporated the Technical Proposal by reference. Even if Mr. Hamilton was correct in asserting that the Techni-

cal Proposal constituted an offer only binding upon acceptance, the representations made by INSLAW would be important in determining whether DOJ had a reasonable basis for considering that PROMIS running on a VAX machine was part of the 1982 Contract. Indeed, it was. Even Mr. Hamilton recognized that "[t]he proposal says that we're going to do the time sharing on the VAX. A VAX is a 32–bit machine." INSLAW thus agrees that the 1982 Contract called for the DBA services; DOJ did not receive the enhancement, only the service. For the first time in the INSLAW matter, DOJ received exactly what it contracted for.

### 4) *Summary*

According to contract specifications, although INSLAW's PROMIS may have been improved significantly or have added functionality, the port-to-VAX and batch update stand-alone enhancements were required under the 1982 Contract. The alleged proprietary nine-module DBA program was never delivered to DOJ, as Ms. Holton admitted, so DOJ cannot be liable for it.

In summary, INSLAW was required to furnish software based on the pilot study, with any necessary bug fixes, the BJS enhancements, and the civil, criminal, and legal process debt-collections subsystems, to the government-furnished equipment. INSLAW also was required to retailer PROMIS prior to its delivery. Once INSLAW delivered the PROMIS called for by the contract, even Mr. Hamilton agreed that nothing in the 1982 Contract "prevented the government from installing the PROMIS software called for by the contract anywhere it wanted to, including the [USAOs] that did not receive the software from [INSLAW]."

The court finds that plaintiffs failed to prove by a preponderance of evidence that INSLAW funded the universe of claimed enhancements, excluding the port to VAX, with non-federal funds. The court also finds that beyond the 12 discrete enhancements discussed in connection with Dr. Davis' testimony, plaintiffs failed to prove by a preponderance of evidence that the discrete enhancements were not bug fixes called for by the 1982 Contract. Further, the court finds and concludes that the 1982 Contract called

for INSLAW to provide the stand-alone enhancements. The failure to prove that the enhancements were proprietary is stunning. It signifies that plaintiffs have no legal right to any claimed enhancement that could have been infringed by the Government. In other words, if the court erred in excluding plaintiffs' legal claims based on data rights due to the bar of a statute of limitations, these claims were tried as the basis for liability in equity and failed. INSLAW did have a right to have the 1982 Contract administered according to the standards imposed on the Government, and plaintiffs have an equitable right to seek redress for unjustified governmental act—defined as negligence or wrongdoing that caused damages to plaintiffs.

### III. *Contract administration*

The issues for trial involving contract administration undergird plaintiffs' data rights claims. Plaintiffs charge that DOJ threatened to withhold advance payments in order to force INSLAW to turn over its PROMIS software. According to plaintiffs, DOJ obtained PROMIS wrongfully by refusing to consider INSLAW's proof of proprietary enhancements and by impeding and frustrating that proof. DOJ's threatened withholding of advance payments and wrongful withholding of payments due under the 1982 Contract exacerbated INSLAW's financial situation, ultimately driving it into bankruptcy. Finally plaintiffs defend against DOJ's set-off for overpayment of computer center costs by asserting that DOJ refused to consider in good-faith INSLAW's claim for payment of these costs and wrongfully withheld payment.

Plaintiffs contend that Mr. Brewer, EOU-SA's Project Director for the 1982 Contract, coordinated an all-out assault against INSLAW and Mr. Hamilton in order to exact revenge for Mr. Hamilton's having terminated Mr. Brewer's employment with the Institute. The court had the opportunity to observe carefully the demeanor of both men. Other witnesses corroborated both Messrs. Hamilton's and Brewer's testimony. However, to rule on plaintiffs' contract administration claim requires the court to do more than

assess the witnesses. The court must examine each event that is at issue in this case to determine whether Mr. Brewer's actions, or those of any other government official or employee, constitute an equitable wrong.

Plaintiffs charge bias and breach of contractual duties. The former principally is predicated on federal regulations; the latter, on case law. Once DOJ became aware of Mr. Brewer's alleged bias, plaintiffs argue that DOJ had a duty to remove him from overseeing the contract. The failure to do so, plaintiffs maintain, violated several federal regulations, including 28 C.F.R. 45.735(1)(b) (undated), 5 C.F.R. 735.201(a) (1986), 48 C.F.R. 3.101–1 (undated), and 41 C.F.R. 105–735.202(c) (undated).[33] Plaintiffs pursue damages for the violation of these regulations.

Defendant accuses plaintiffs of "apparently seek[ing] to create a tort of 'bias [or] failure to recuse.'" Def's Br. filed Feb. 18 1997, at 13 (quoting Plfs' Br. filed Jan. 30, 1997, at 6–8). Defendant insists that the regulations cited by plaintiffs are inapplicable because they do not create a private right of action, but only give the Attorney General power to discipline employees through criminal sanctions. *See, e.g.,* 18 U.S.C. § 208(a) (subjecting federal officials to criminal penalties for certain violations of conflict of interest regulations); 28 C.F.R. § 45.735–4(a) (prohibiting employee from participating "in a criminal investigation or prosecution if he has a personal or political relationship"); 28 C.F.R. § 45.735–4(d) ("This section [§ 45.735–4] pertains to agency management and is not in-

tended to create rights enforceable by private individuals or organizations."); 28 C.F.R. § 45.735–7a (authorizing Assistant Attorney General to discipline federal employees for violating 28 C.F.R. § 45.735–1(c)).

The only applicable regulations the court should examine, according to defendant, are 28 C.F.R. part 45 and 28 C.F.R. § 3.101–1 (undated). In order to resolve plaintiffs' claims, the court must explore each regulation cited by the parties to determine its applicability to the instant case.

Plaintiffs interpret 41 C.F.R. § 105–735.202(c) to require DOJ to recuse an employee who fails to act properly.[34] The regulation applies only to General Services Administration employees; it does not bind DOJ employees and does not confer a private right of action. Plaintiffs also cite 5 C.F.R. § 735.201a (1986), which states: "An employee shall avoid any action, whether or not specifically prohibited by this subpart, which might result in, or create the appearance of: ... (d) Losing complete independence or impartiality." Plaintiffs argue that this standard is binding upon DOJ, as 28 C.F.R. § 45.735–1(a) adopted its regulation governing conduct in conformity with 5 C.F.R. ch. 1, part 735. DOJ regulations do not adopt this precise formulation of § 735.201a(d), because the regulations are directed to conflicts of interest. Indeed, 5 C.F.R. § 735.201a(d) itself sets forth the quoted standard in the context of regulations addressing conflicts of interest. Another regulation is 28 C.F.R.

---

**33.** Both parties failed to give the year of the regulations upon which they rely. The court applies the regulations applicable during 1983–85 and also has consulted the 1996 version.

**34.** Plaintiffs rely on *Center for Auto Safety v. FTC,* 586 F.Supp. 1245 (D.D.C.1984), for the proposition that if a duty to recuse a partial employee exists and the employer or employee fails to recuse, then "the courts can condemn the failure to recuse as an abuse of discretion." *See* Plfs' Br. filed Jan. 30, 1997, at 7. *Center for Auto Safety* dealt solely with the issue of whether the appearance of a conflict of interest existed, such that the official should have recused himself. 586 F.Supp. at 1246. Plaintiffs misconstrue the court's explanation of "abuse of discretion." *Id.* at 1250. *Center for Auto Safety* recognizes that the court has the power to require an official to

recuse if the official's decision not to recuse was an abuse of discretion. The remedy plaintiffs sought in that case was a retroactive recusal of the official, not a determination of liability or award of damages. *Id.* at 1246.

Plaintiffs also cite to three ethical advisory opinions to support their claim that a duty to recuse a partial official is recognized. All three ethical opinions dealt with the issue of whether the officials should recuse themselves if the officials benefited financially. *See* Office of Government Ethics Informed Advisory Opinion Nos. 86x19 (Dec. 15, 1986) (Acts Affecting Personal Financial Interest—Use of Position), 85x14 (Sept. 23, 1985) (Acts Affecting Personal Financial Interest—Appearance of Impropriety), and 83x18 (Nov. 16, 1983) (Acts Affecting Personal Financial Interest—Child's Interest).

§ 45.735(*l* )(b), which plaintiffs posit as a "government-wide standard of conduct incorporated into DOJ regulations." Plfs' Br. filed Jan. 30, 1997, at 6. Plaintiffs' citation is incorrect, and the court could locate no such regulation within 28 C.F.R.

Lastly, plaintiffs cite to 48 C.F.R. ("FAR") 3.101–1, which states, in pertinent part:

Government business shall be conducted on a manner above reproach and, except as authorized by statue or regulation, with complete impartiality and with preferential treatment for none. Transactions relating to the expenditure of public funds require the *highest degree of public trust and an impeccable standard of conduct.* The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships.

(Emphasis added.) Defendant agreed in closing argument that FAR 3.101–1 is applicable to the instant case.

 In considering plaintiffs' equitable claims, the court looks to legal standards for imposing liability. *See INSLAW,* 35 Fed. Cl. at 308. The foregoing regulations set forth legal standards, most of which are facially irrelevant or do not create a private right of action. FAR 3.1–101–1 is relevant, but does not create a private right of action. The question becomes whether it nonetheless is to be regarded as included within the concept of an unjustified governmental act, the standard for an equitable claim. Case law has equated this act to negligence or wrongdoing on the part of government officials. *See INSLAW,* 35 Fed. Cl. at 302; *see also Kochendorfer,* 193 Ct.Cl. at 1055 (including for first time negligence as form of unjustified governmental act). Because it is an elevated legal standard that is higher than wrongdoing or negligence, the court rejects "the highest degree of public trust and an impeccable standard of conduct" as inapplicable in guiding its evaluation of the evidence pertaining to plaintiffs' equitable claims.

The court also has examined the application of legal standards in the case law to

ascertain whether they provide any guidance in adjudicating plaintiff's claims. The Federal Circuit recognizes that every party to a contract has a duty of good faith and fair dealing, and this obligation "is no less required in contracts to which the Government is a party, than in any other commercial arrangement." *Maxima Corp. v. United States,* 847 F.2d 1549, 1556 (Fed.Cir.1988); *see Restatement (Second) of Contracts* 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). The duties of good faith and fair dealing are imposed explicitly upon government officials in FAR 1.602–2(b), which states, "Contracting officers shall (b) [e]nsure that contractors receive impartial, fair, and equitable treatment. . . ." 48 C.F.R. 1.160–2(b) (1984) [35]; *Texas Instruments Inc. v. United States,* 991 F.2d 760, 764 (Fed.Cir.1993).

 The analysis of whether the Government acted in bad faith "must begin with the presumption that public officials act 'conscientiously in the discharge of their duties.' " *Haney v. United States,* 230 Ct.Cl. 148, 152, 676 F.2d 584, 586 (1982) (quoting *Librach v. United States,* 147 Ct.Cl. 605, 612 (1959)). Plaintiff must provide " 'well-nigh irrefragable proof' to induce the court to abandon the presumption of good faith dealing, . . . and the necessary 'irrefragable proof' has been equated with evidence of some *specific intent to injure the plaintiff."* *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 198–99, 543 F.2d 1298 (1976) (citing *Knotts v. United States,* 128 Ct.Cl. 489, 492, 121 F.Supp. 630, 631 (1954)); *see Gadsden v. United States,* 111 Ct.Cl. 487, 489–90, 78 F.Supp. 126, 127 (1948) (requiring plaintiff to prove "motivation alone by malice" or conspiracy on part of government to prove bad faith); *Hoel–Steffen Constr. Co. v. United States,* 231 Ct.Cl. 128, 141, 684 F.2d 843, 851 (1982) "[B]ad faith is rejected as a ground of decision except in compelling cases such as those where a specific intent to injure is shown.".

Although plaintiffs' legal claims are barred, the case law describes the standards for administering government contracts.

---

**35.** Title 48 was created in 1984; therefore, this regulation, which the parties do not cite, applies

to the 1982 Contract, which was administered through March 15, 1985.

These standards enable the court to determine whether a governmental act is unjustified, if negligence has been shown in the performance of duties, or if other wrongdoing has been committed. Thus, the appropriate question is whether Mr. Brewer, in his capacity as Project Manager, committed an unjustified act—a negligent act or other wrongdoing with the specific intent to injure plaintiffs; whether his superiors did so in hiring him and retaining him after INSLAW objected to his conduct; or whether other DOJ officials and employees who were involved with administering the contract did so in respect of the 1982 Contract.

### 1. *Termination of Mr. Brewer's employment with the Institute*

■■ Mr. Hamilton hired Mr. Brewer, a former Assistant United States Attorney, as the Institute's General Counsel for an 18-month period beginning November 1974 and ending April 1976. Mr. Brewer replaced Mr. Gizzarelli, who left the Institute to become an Assistant United States Attorney. According to Mr. Hamilton, the Institute's General Counsel acted as a "hypothetical lawyer" and provided "a bridge between the people at the Institute of a technical orientation, and the practitioners in the local district attorneys' offices." Although the General Counsel was not a corporate officer, he reported to Mr. Hamilton directly and was involved in the Institute's management and officers' meetings.

After approximately six months, Mr. Hamilton met with Mr. Brewer to discuss his role at the Institute. Messrs. Hamilton and Brewer discussed whether or not Mr. Brewer was a good fit for the Institute's General Counsel position. Both men agreed that it was not a good fit. Messrs. Hamilton and Brewer met again approximately six months later. At this second meeting, Mr. Hamilton stated that he told Mr. Brewer that "it was important that we have a date certain for him to leave." Mr. Brewer stayed at the Institute for another six-month period. Shortly before he left in April 1976, Mr. Hamilton gave Mr. Brewer a raise to allow him to return to the United States Attorney's Office at a better pay scale, although Mr.

Brewer's employee file reflects that this raise was based partially on merit.

Mr. Hamilton represented that the decision to terminate Mr. Brewer's employment was thorough and deliberate. He spoke with other Institute personnel concerning the decision in order to ensure that his perceptions of Mr. Brewer were accurate and complete. He also spoke with several government officials in order to ensure that the Institute would not suffer some retaliatory backlash for terminating Mr. Brewer's employment, as Mr. Brewer was a former United States Attorney.

The relationship between the two men at the Institute was always amicable and friendly. Mr. Brewer's departure from the Institute was on good terms; no letter of dismissal was included in his employee file. In fact, Mr. Hamilton's secretary served as a reference for Mr. Brewer in an FBI investigation and stated that he was a fine employee. After Mr. Brewer became Project Manager for the 1982 Contract, he referred business to Mr. Hamilton on at least two occasions.

Even though Mr. Hamilton never used terms like "you're fired" or "for cause," the evidence demonstrates that INSLAW terminated Mr. Brewer's employment. Mr. Brewer may have believed that it was advisable to leave the ship and may have been amenable to leaving, but he was told to set sail and to furnish the date of departure.

As of March 16, 1982, when the 1982 Contract was executed, Mr. Hamilton knew that Mr. Brewer would be involved in contract administration. Mr. Hamilton did not notify DOJ that he had fired Mr. Brewer, but defendant failed to establish by credible evidence that, when asked, Mr. Hamilton voiced no objection to Mr. Brewer's serving as Project Manager. No one at INSLAW objected to Mr. Brewer's involvement prior to the execution of the 1982 Contract. Indeed, four hours after Mr. Brewer accepted the position, Mr. Gizzarelli called Mr. Brewer to congratulate him.

Mr. Gizzarelli supports plaintiffs' contention that Mr. Brewer was biased against INSLAW. The court found Mr. Gizzarelli to be a forthright and honest witness. Mr.

Gizzarelli met Mr. Brewer while the former was an intern at the United States Attorney's Office, but he also worked with Mr. Brewer as a colleague subsequent to Mr. Gizzarelli's being admitted to the bar. The two had a friendly relationship. In fact, Mr. Gizzarelli, the Institute's then Special Counsel, helped Mr. Brewer get his job as General Counsel of the Institute. After the Institute hired Mr. Brewer, Mr. Hamilton asked Mr. Gizzarelli to assist in familiarizing Mr. Brewer with the position. Mr. Gizzarelli met with Mr. Brewer and explained that the position was not a real attorney's position, because there was very little "general counseling" to do. If a problem arose, the Institute hired outside counsel. The Institute's General Counsel acted more as a liaison between attorneys and technical personnel. Mr. Gizzarelli did not believe that Mr. Brewer ever accepted his role as a hypothetical attorney.

Eventually, Mr. Gizzarelli recommended that Mr. Hamilton find a way to have Mr. Brewer voluntarily resign so as not to offend Mr. Brewer's dignity or his professional pride or standing. Mr. Gizzarelli testified: "And my belief is that eventually after much prompting, he did resign."

After Mr. Brewer returned to the United States Attorney's Office, Messrs. Gizzarelli and Brewer did not have much contact with each other while they overlapped. Every time they saw each other, however, Mr. Gizzarelli claims that Mr. Brewer made pejorative comments about Mr. Hamilton. These comments included: "Is Hamilton still crazy?" "Are they trying to put him away?" and "Hamilton is an M.O.," a prosecutor's term used for someone requiring mental observation.

In September 1981 Mr. Brewer accepted the position of EOUSA's Director, Office of Management Information Systems and Support, to serve as Project Manager for the 1982 Contract. He entered on duty in January 1982. Mr. Gizzarelli's contact with Mr. Brewer resumed once DOJ awarded INSLAW the 1982 Contract. Mr. Gizzarelli served as INSLAW's Special Counsel and Project Manager. According to Mr. Gizzarelli, Mr. Brewer made too many derogatory remarks to count about INSLAW and Mr.

Hamilton during this time period. Mr. Gizzarelli testified that Mr. Brewer and he would meet for drinks after work; only weeks after the contract was signed, Mr. Brewer would "rant" and become "rabid" concerning Mr. Hamilton and INSLAW, saying that Mr. Hamilton was crazy and that INSLAW was perpetrating a fraud against the United States Government.

Mr. Gizzarelli testified that Mr. Brewer's comments and actions continued throughout the course of contract administration. Because of Mr. Brewer's distaste for Mr. Hamilton, INSLAW made a conscious decision to keep Mr. Hamilton as far removed from the 1982 Contract as possible. Mr. Gizzarelli testified that this strategy appeared to backfire:

> I guess in trying to defuse it, we made it worse because it seemed to me that his goals was to get directly—confront Bill Hamilton directly rather than through me which he was doing very effectively. He gave me an ulcer. And I'm not saying that jokingly. I have—I got an ulcer.
>
> . . . .
>
> [Mr. Brewer] would produce problems . . . that appeared to be only soluble by dragging Bill Hamilton into the equation. The most salient one of those was cutting off the advanced payments which was a contractual arrangement we've had with the [DOJ] for years. Once they did that, of course, it put an organization such as ours with no capital reserve in a terrible position. And they finally brought Bill directly in to the maelstrom of administering the contract.

Despite threats to cut-off these payments, DOJ never terminated the advance payments under the 1982 Contract.

Mr. Gizzarelli also testified concerning an increased administrative burden. For example, he cited that INSLAW's travel requirements changed. When INSLAW traveled at DOJ's expense, INSLAW had to detail who was traveling, why they were traveling, and when they were traveling. Employees of Mr. Brewer went out in the field to observe INSLAW's people in the various USAOs;

once this practice started, Mr. Brewer's employees harassed the INSLAW personnel.

Mr. Snyder, the EOUSA employee who served as the Contracting Officer's Technical Representative (the "COTR") on the 1982 Contract, explained that site inspections were required under the contract. The Contract Statement of Work provides:

3.2.2.1. The contractor shall visit each district to review existing office procedures and work flow, and to identify caseload information requirements, operational requirements, security requirements, and data capture locations which must be considered in the systems design to assure accommodation thereof in the development of the new software/systems procedures or word processing based procedures....

He testified that EOUSA personnel would accompany INSLAW personnel in order to allow the EOUSA personnel to "sell the project" by informing USAO personnel about the project, as some were distrustful. They also could inform USAO personnel that this project would benefit them and "will help [them] manage [their] office better and be more productive." INSLAW hired a lot of new and very young personnel who "were not always familiar with the USAOs ... so we went out kind of to help out in that regard as well." Moreover, Mr. Brewer thought it was a good idea for Mr. Snyder to go, as he was a lawyer, and "lawyers like to talk to lawyers."

Mr. Gizzarelli memorialized his concerns in a handwritten note to his immediate supervisor, Mr. Merrill, INSLAW's Vice President, on July 1, 1982. Mr. Gizzarelli stated: "Brick [Brewer] made no secret of his dislike of Bill Hamilton," and noted his views about how Mr. Brewer would involve Mr. Hamilton in the 1982 Contract. Mr. Brewer wanted to show Mr. Hamilton that Mr. Brewer "would call the shots, that he would decide what this company would do and whether it would survive or not." When he told Mr. Brewer that INSLAW would be required to lay off half of its staff if DOJ did not award IN-SLAW follow-on work or renew the advance payments provision, Mr. Gizzarelli related that Mr. Brewer said: "That's exactly what I intended."

Mr. Gizzarelli testified that, at INSLAW's behest, Associate Deputy Attorney General Stanley E. Morris recused Mr. Brewer from the data rights issue. Mr. Brewer's responded to this development: "Hamilton shot himself in the foot this time. I can't do anything about this data rights thing any more."

Prior to award of the 1982 Contract, Mr. Gizzarelli knew that Mr. Brewer would be the Project Manager and expressed his misgivings to both Messrs. Hamilton and Merrill. However, neither thought anything about it. When Mr. Brewer left the United States Attorney's Office to become the Project Director for the 1982 Contract, plaintiffs created speculation that Mr. Brewer had sought the position; however, not one of plaintiffs' witnesses testified to that fact. Mr. Gizzarelli used the term "sought," but could not define the steps Mr. Brewer took to obtain the position. Instead, Mr. Gizzarelli only stated that Mr. Brewer left the United States Attorney's Office to join EOUSA voluntarily.

The relationship between INSLAW and DOJ was, at times, strange and perverse. INSLAW routinely claimed that DOJ officials were biased against INSLAW. However, DOJ claimed that INSLAW personnel lost their temper with DOJ, as well. Mr. Gizzarelli grew annoyed with "incompetent" DOJ personnel. He acknowledged that "[t]empers flared on both sides." Mr. Snyder, the COTR, testified:

Well, we were talking about the rejection of the deliverable, and I did reject that deliverable. And there was an emergency or a meeting called at I[NSLAW], and John Gizzarelli was there, ... and Gizzarelli went ballistic because I had rejected this deliverable, and basically told me that I was incompetent, and that nobody was competent in the Government to review his software.

I mean he—and looking back on it, I mean, it was just—I mean, he had a lot riding on this and, you know, I rejected the first deliverable to his boss, and he was upset, and vented on me that—I mean, after that we got along fine. I mean, I thought he was a good project manager,

but my initial impression of him was this guy is out of control. But actually Brick was there and I don't know who calmed things down, but they did get calmed down. And Brick had a volatile temper too, but I don't remember him really getting involved in this.

And after that Gizzarelli and I had a good relationship. Look, I'm sure I got frustrated with I[NSLAW]. They got frustrated with me. There were—there were—you know, it was a complex operation. We were trying to get computer rooms built, and hardware installed, and we had to change schedule for doing that, and I[NSLAW] was trying to do planning, and there were times when both sides became frustrated.

But I never saw an extraordinary amount of frustration either on the part of INSLAW with Brewer or with anyone else, or on our part with anyone at IN-SLAW.

Prior to the 1982 Contract, Mr. Brewer had no experience as a project manager on a government contract and admitted that he was not "a computer person," but flatly rejected the idea that he sought the position. Rather, EOUSA's Deputy Director, Lawrence McWhorter, contacted Mr. Brewer on August 7, 1981, concerning the position. This approach occurred prior to issuance of the Request for Proposals; by this time it was already known that PROMIS would be the software implemented in the USAOs and the EOUSA. It was Mr. Brewer's understanding that he was contacted about the position because a former INSLAW employee, James McMullen, had told Messrs. McWhorter and William P. Tyson, EOUSA's Director, about Mr. Brewer.

Mr. Brewer stated that Messrs. Tyson and McWhorter

were looking for someone who believed in the usefulness of PROMIS software, who could act as a translator explaining the technology and, more important, the—the management uses of the system to hard-nose prosecutors, to U.S. attorneys and supervisory assistant U.S. attorneys. And they were looking for someone who had good communication skills and could speak

to people and coordinate things and get this project done.

Mr. Brewer explained his qualifications for this job:

We had used PROMIS in the U.S. Attorneys Office, Your Honor. It was developed in the District of Columbia U.S. Attorney's Office which is I guess how I got to the institute in the first place. Commencing I guess in late 1970, the process got started and it was—the system was operational when I was an assistant U. [S]. attorney in the Superior Court division.

And when I went back to the U.S. Attorneys Office in 1976, the District of Columbia District Court was using a variation of PROMIS. And we could—and I think this is what Mr. Tyson was most pleased about. We could tap in from the federal case and get a complete history of any pending cases in Superior Court involving the same Defendant.

And I explained to Mr. Tyson that we had just had an incident where I had watched as an assistant who was handling a very poo[r] bank robbery case; poor only because it was based solely on identification. There was no money recovered; [no] weapon recovered. But the assistant went in and used PROMIS and tapped in and discovered that this same Defendant had a pending case in Superior Court involving a gun of the very same description that had been used allegedly in the bank robbery. It was a distinctive pearl handled weapon.

And the two got married up and we suddenly had a very good case, where before we had a couple of not so good cases. Mr. Tyson was excited and—in any event, we had a very good interview.

Ultimately, Mr. Brewer took the position because it was an "tremendous career opportunity," a "challenge," and the position had incredible "responsibility." Mr. Brewer wanted to prove himself capable; he wanted to bring the project to a huge success within the timeframe provided and within the budget allotted.

Mr. Brewer did not believe that his prior experience at the Institute would prove to be a problem because there was a "commonality

of interests." Mr. Brewer stated: "I viewed myself as being totally committed to making this work on time, at budget, but work. I believed in it. And I didn't think that anything I felt about anybody would in anyway impede that goal. It seemed to me that everybody wanted that done." After all, the 1982 Contract was part of the largest procurement effort that DOJ had ever undertaken.

Although Messrs. Tyson and McWhorter knew that Mr. Brewer had worked for the Institute, they did not know that Mr. Brewer held strong feelings concerning Mr. Hamilton. Hiring Mr. Brewer, who Messrs. Tyson and McWhorter should have known was a terminated former employee of INSLAW, demonstrated an exquisite poverty of judgment. These DOJ officials, who did not testify, are responsible for what any competent manager could have predicted—that INSLAW would ascribe problems with contract administration to Mr. Brewer's vengeful motives.

Mr. Brewer became the Project Manager sometime in January 1982. At that point, INSLAW was a finalist in the competitively-awarded contract, and a call for best and final offers had been made. Although he acknowledged at the time that he was "pretty certain that INSLAW would get the contract," Mr. Brewer did not play any role in the contract process until the third negotiating session.

Mr. Brewer defined the Project Manager's role as the "Trail Boss."

I was sort of just the overall supervisor. It was my job to serve as liaison on this project and later on all office automation or information issues to Mr. Tyson, the director, and as his person with other components in the Department.

I was the overall supervisor of progress for the effort with I[NSLAW], the effort to acquire computers which was a different contract, the effort to acquire word processing equipment which was yet a third contract, and the various ancillary tasks that were involved in implementing this installation; building the computer rooms around the country, hiring computer experts, training and probably most impor-

tant, getting the U.S. Attorneys involved in the process and supporting it.

Mr. Brewer's official duties are set forth in internal department memorandum dated December 11, 1981. In this document the Project Manager was charged with "total responsibility for the implementation and development of PROMIS from the Management Services and Information Systems Staff of the Executive Office."

The project actually comprised three contracts: 1) the 1982 Contract, the so-called implementation contract that implemented the installation of PROMIS in the USAOs and the EOUSA; 2) the acquisition of computers for the larger USAOs; and 3) the acquisition of word-processing machines for the smaller USAOs. Mr. Brewer was the Project Manager for all of these contracts. Thus, INSLAW's contract represented only part of Mr. Brewer's responsibilities. Mr. Brewer estimated that by 1983, he spent approximately 25% of his time on the INSLAW contract. Mr. Snyder, the COTR, and Mr. Rugh, who was Mr. Brewer's Assistant Director, testified that Mr. Brewer was not involved in the day-to-day administration of the contract. Peter Videnieks was the full-time Contracting Officer for the larger project, not just the 1982 Contract with INSLAW. Mr. Brewer did develop a close relationship with Mr. Videnieks. For example, Mr. Brewer asked that Mr. Videnieks, an employee of the JMD, move his office into Mr. Brewer's area because Mr. Videnieks was spending a lot of time commuting between the two offices, and project activity was increasing.

Mr. Videnieks was employed by the JMD, not the EOUSA. Mr. Snyder, the COTR, reported to Mr. Videnieks, although he worked for the EOUSA, and Mr. Rugh was Mr. Snyder's supervisor. Mr. Rugh, Mr. Brewer's subordinate, provided Mr. Brewer with technical assistance. Plaintiffs contend that Mr. Brewer had control over Mr. Videnieks. Mr. Brewer denies that Mr. Videnieks was under his control; he was not in Mr. Brewer's chain of command. Plaintiffs cite Mr. Videnieks' handwritten notes of March 29, 1982, in which Mr. Videnieks states that Mr. Brewer " 'forbade' 'Mod' " but said "S/A

is acceptable to him(?!!?)." Mr. Videnieks explained that Mr. Brewer was against signing a contract modification to obtain the PROMIS software before INSLAW installed it. Mr. Brewer favored a supplemental agreement, which is a type of contract modification; therefore, Mr. Videnieks entered the question marks and exclamation points in his notes as a "sarcastic annotation for myself."

Mr. Videnieks also was against a contract modification. In his personal notes, Mr. Videnieks stated: "Why do you need a signature if you got the goods?" Plaintiffs contend that this statement demonstrates a bias against INSLAW. Mr. Videnieks explained:

> I mean that since we, the government, could order copies of work in process under the data requirements article of the contract simply by an order, a letter, we did not need a contract modification to effect that delivery. If a contractor would not comply with that request, he would without having to review the contract I'm saying [be] in default. See we had a—the contract provided for such action. We did not need a modification. That's what I meant.

The court was in a unique position to observe the demeanor and personality of the witness. Mr. Videnieks, who testified as an adverse witness, showed himself to be taciturn and obdurate. Although he was more forthcoming when questioned by defense counsel, he relied on the words he stated so long ago in the documentary trail. Mr. Videnieks was a creature of the contract, calling for black letter law and rigid compliance. The court credits his testimony on this, point, especially considering the extraordinary documentary trail wherein Mr. Videnieks made his demands pursuant to contract terms. Indeed, no one can fault Mr. Videnieks for disagreeing with entering Modification 12, a solution that almost every witness for the parties disclaimed. Mr. Videnieks' rigidity was vintage Videnieks.

Mr. Brewer did not infect his staff or Mr. Videnieks. Mr. Brewer testified that he did not have the power to forbid Mr. Videnieks to do anything. Mr. Snyder testified that Mr. Brewer encouraged him to be fair, honest, and thorough. Mr. Brewer testified that he did not double check the work of his technical adviser, Mr. Rugh, but simply ratified it. At most, Mr. Brewer testified that he only encouraged Mr. Rugh to be fair and thorough; Mr. Brewer did not have any technical input. Mr. Gizzarelli respected both Messrs. Snyder and Rugh, who, he said, "worked with Mr. Brewer as a consummate professional technician."

At some point during contract administration, several people told Mr. Brewer that Mr. Hamilton thought that Mr. Brewer was biased against him. These complaints were also made to Associate Deputy Attorney General Morris, Assistant Attorney General for Administration Kevin D. Rooney, EOUSA Director Tyson, and EOUSA Deputy Director McWhorter. Because of these complaints, Mr. Brewer was occasionally removed from direct supervision of INSLAW.

For example, sometime during spring 1982, probably around May 27, 1982, because of allegations of bias against Mr. Brewer, Mr. McWhorter became the point person on INSLAW's request to market PROMIS to other customers as INSLAW's proprietary product. Mr. Brewer stated that he was only out of the loop until "the Department responded to INSLAW's—or Mr. Hamilton's request for verification that there was—that they had some proprietary rights perhaps in software." Mr. Brewer believed that he was excluded because he

> had stated that [he] wouldn't acquiesce, wouldn't recommend such action; that if the attorney general wanted to make a concession like this, he could do so. I wasn't going to recommend it. They wanted me to recommend that the Department acquiesce at [INSLAW's] request, and I wasn't going to do it. Someone else at a higher level had the authority to do that.

Mr. Hamilton again met with Mr. Tyson to discuss the bias problem on May 4, 1983. Subsequently, on December 6, 1983, Mr. Brewer received a telephone call from Mr. Hamilton wherein Mr. Hamilton stated that he did not trust Mr. Brewer. Mr. Brewer notified his superiors of the event. Thereafter, in July 1984, a meeting took place during

which Irving Jaffe, a former DOJ attorney then representing INSLAW, accused DOJ officials and personnel of dealing in bad faith with INSLAW. Mr. Brewer's superiors attended this meeting.

INSLAW also complained regularly about Mr. Videnieks. Consequently, Mr. Brewer voiced the opinion that, throughout the life of the contract, both his team and he were accused of bias against Mr. Hamilton and INSLAW and bad faith with respect to issues confronting the PROMIS project. Nonetheless, Mr. Brewer remained the Project Manager during performance of the 1982 Contract and beyond, until the bankruptcy court entered a permanent injunction barring Mr. Brewer from any future involvement.

The court finds that Mr. Brewer's conduct and attitude toward INSLAW and Mr. Hamilton should be characterized as intense negative feelings not amounting to bias. As discussed in the next section of this opinion, these feelings were more attributable to Mr. Brewer's anger at Mr. Hamilton's efforts to market PROMIS as INSLAW's proprietary product than to any lingering ill feelings over Mr. Brewer's termination by the Institute. Even though Mr. Brewer injected personal feelings in administering the 1982 Contract, they did not reflect a predetermined response to the issues that arose. Mr. Brewer became difficult, distrustful, and irascible. DOJ should not have put Mr. Brewer in a position to manage his former employer's contract. Sensitive to plaintiffs' concerns, given Mr. Brewer's intense negative feelings, the court scoured the record for evidence of bias, negligence, malfeasance, nonfeasance, conspiracy, and any management actions by Mr. Brewer or others that frustrated or impeded INSLAW's contract performance or interfered with INSLAW's contract rights. Such evidence is not present.

### 2. INSLAW's decision to market enhanced PROMIS and DOJ's reaction

Prior to INSLAW's formation, the Institute had a co-marketing agreement with IBM. In order to continue this co-marketing relationship, Mr. Hamilton believed it necessary to get a "sign-off" letter from DOJ, stating that the Government "would not object" to the arrangement. Mr. Hamilton consulted with his attorneys Messrs. Hills and Rogers. Pursuant to Mr. Hills' direction, Mr. Hamilton drafted a memorandum, dated April 1, 1982, to Mr. Rogers, in which Mr. Hamilton described the history of PROMIS and the software packages that the for-profit INSLAW would seek to market. Specifically, INSLAW sought to maintain current PROMIS software, continue research and development, and create a new, enhanced PROMIS. However, the memorandum also stated:

> Once enhancements are loaded into an original software package, they become an integral part of the package, and cannot be separated from the original package. Thus, it is difficult to license users only to use the enhancements. This is the case with PROMIS 82;[36] the enhancements so materially altered the package that it in effect has become a new package and it is now necessary to protect the entire package.

Mr. Hamilton also asserted that "INSLAW no longer maintains supports, or distributes those earlier versions of the PROMIS technology."

Mr. Hamilton's memorandum was the backbone of Mr. Hills' submission dated April 2, 1982, to DOJ in support of INSLAW's request. INSLAW's assertions led to considerable controversy. DOJ officials grew concerned about what potential impact the new operating procedure described in Mr. Hamilton's April 1, 1982 memorandum would have on INSLAW's performance un-

---

**36.** As Mr. Rogers explained in a letter dated May 26, 1982, to Associate Deputy Attorney General Morris, PROMIS 82

is the sum of only three parts:
(1) the "Original PROMIS," that is, the public domain software as of May 15, 1981 as memorialized in tapes delivered to the Bureau of Justice Statistics;

(2) enhancements undertaken by INSLAW at private expense after the cessation of LEAA funding; and
(3) the so-called "Printed Inquiry" enhancement, which was created under contract to the Bureau of Justice Statistics and delivered to the Department of Justice on May 17, 1982.

der the 1982 Contract. Mr. Brewer, in particular, was concerned about the impact of enhanced PROMIS, as described in Mr. Hamilton's memorandum, on the Government's unlimited rights in the earlier LEAA pilot version contract and in the 1982 Contract. Although Mr. Hamilton's memorandum announced that INSLAW had an enhanced PROMIS called "PROMIS 82," he insisted that, despite its claims that prior versions of PROMIS no longer existed, IN-SLAW could deliver the PROMIS version "implemented on [PRIME] computers in two [USAOs] in a [pilot study] contract between the [EOUSA] and the [I]nstitute that was then novated to INSLAW."

The parties refer to the software developed pursuant to the earlier LEAA contract as the pilot project version or the pilot version of PROMIS, and it "operated on PRIME computers in those two offices," according to Mr. Hamilton. Pursuant to the 1982 Contract, INSLAW was then to "take five enhancements that we were still developing at the time of the Executive Office contract and add them to the pilot version of PROMIS and make them operable on whatever government furnished computer the government chose to furnish to us," as Mr. Hamilton summarized. Plaintiffs contend that none of the stand-alone enhancements or the discrete enhancements were required under the 1982 Contract. It was Mr. Hamilton's position that, if the EOUSA did not want the proprietary enhancements, IN-SLAW would have delivered the pilot version, added the five BJS enhancements, and "import[ed] . . . the new version of the government furnished equipment," by which he referred to the delivery of PROMIS to a 32–bit machine. He therefore concluded that the 1982 Contract did not call for PROMIS 82.

Mr. Brewer and other DOJ officials voiced their concerns at an April 19, 1982 meeting attended by representatives of both IN-SLAW and DOJ. Ms. Deroy, INSLAW's Vice President for Software Development, and Mr. Kelley, INSLAW's General Counsel, recorded these concerns in a memorandum dated April 21, 1982. According to the Kelley/Deroy memorandum, Mr. Brewer stated

1. [that Mr. Hamilton's] memo was typical of I[NSLAW] and Bill Hamilton that it was self-serving and unnecessary.

2. that how did they know that we might say work was not finished under our government contracts and the next week copyright the work and begin selling it back to [DOJ].

3. that the press release about the contract award was not accurate in that it described [W]est Virginia as a successful implementation when in fact, they had spent an additional 20K on the project and Lanier was doing all the work.

4. that the memo had caused then to question our ability to perform on the Executive Office contract due to additional overheard marketing expenses.

5. *that all of the software had been developed under government funding and what right did INSLAW have to sell it.*

6. that why did we write the memo in the first place, why didn't we just go ahead and do what we were going to do anyway.

7. that the memo had caused all kinds of problems in [DOJ] and had many people upset.

8. that if you ask Namely, Illinois Criminal Justice Coordinating Council, Michigan Prosecuting Attorney's Association, Andy Voight and others, they would tell you that INSLAW did not do good or successful work.

9. that Bill Hamilton started the PROMIS system as an employee of the D.C., U.S.A.O. and that all of the software was developed with federal funds and what right did Hamilton have to try to claim ownership of the software.

(Emphasis added.) [37] This contemporaneous record reflects that Mr. Brewer asserted

---

**37.** The memorandum also stated: "[T]hose comments were based [sic] with an obvious dislike of Bill Hamilton and a resentment for the success of INSLAW personified in him." The court does not give this statement any credence. Mr. Kel-

ley, one of the authors, did not recall making or writing the statement. Ms. Deroy was not allowed to testify about Mr. Brewer's alleged statements because they were outside the scope of her direct examination by defendant. Because it was

DOJ's position that INSLAW had not developed any proprietary enhancements and that all funding for enhancements came from federal funds. Mr. Brewer's comments demonstrated his distrust of Mr. Hamilton and INSLAW.

After the meeting ended, Ms. Deroy and Messrs. Kelley, Rugh, Videnieks, and Brewer stayed to discuss a topic the memorandum fails to address—the BJS enhancements. Previously, on February 25, 1982, DOJ had learned that INSLAW would be short of funds in finishing the BJS enhancements. DOJ therefore decreased the scope of work to be performed under the outstanding LEAA contract, lowering contract cost by $60,000.00. In March 1982 INSLAW stated that it might need another $120,000.00 to complete the work for the BJS enhancements. When Mr. Brewer heard this, he admitted that he "lost his temper." Mr. Brewer claimed that he became angry because

> during the course of this explanation, Ms. Deroy either could not or would not explain how far along they were with these projects. I think she was probably unable to. But there were no answers. And there were no answers as to why there had been this cost growth between February 25th and Mr. Hamilton's letter of $120,000.00. And here it was mid-April, just a few weeks later. There simply wasn't any explanation. And as I listened to this, I could see big trouble for the much more involved contract to install PROMIS in the [USAOs].

Eventually, in June 1982 INSLAW completed the BJS enhancements as pared down by DOJ, and DOJ paid INSLAW $120,000.00 for the work completed out of the installation costs associated with the 1982 Contract.

The memorandum of the April 19 meeting also fails to address adequately Mr. Brewer's concerns with Mr. Hamilton's April 1 memorandum. First, Mr. Hamilton stated in his memorandum that LEAA funding came to an "abrupt halt" and that "[n]o LEAA funds were available for the year commencing May 15, 1981. " The LEAA contract, however,

actually expired in May 1982. DOJ paid $650,000.00 into the effort subsequent to May 1981 and decreased the scope of work required by another $60,000.00. On this basis Mr. Brewer deemed INSLAW's representation that funding ended as of May 1981 a complete "fabrication," especially considering that DOJ constituted 90% of INSLAW's business, in Mr. Hamilton's estimate.

Mr. Hamilton worried about the events of the April 19 meeting and concluded that Mr. Brewer's comments were not valid. He "asked [his attorney] Roderick Hills to tell Associate Deputy Attorney General Stanley E. Morris that I had fired ... Brewer in 1976 for cause. And that I thought his behavior in this contract was probably related to the fact that I had dismissed him years earlier."

Mr. Brewer was angry; this project was his responsibility. It would make or break his career. He wanted it implemented successfully, on time, and under budget. Mr. Hamilton's April 1, 1982 memorandum posed a threat. However, Mr. Hamilton's actions after April 19, 1982, did not alleviate Mr. Brewer's concerns; Mr. Hamilton assumed that Mr. Brewer was out to get him. Thus began the love-hate relationship between DOJ and INSLAW that resulted in a strange minuet. These men were both allies and archrivals. Mr. Hamilton and Mr. Brewer had their view of how the contract should proceed. Mr. Brewer wanted the project to succeed as detailed by his supervisors and the contract and its specifications. Mr. Hamilton was fascinated by his technology and wanted to show DOJ what PROMIS could do. His goal was to enhance and expand PROMIS. These goals sometimes collided. Mr. Brewer displayed intense negative feelings against INSLAW and Mr. Hamilton, but he was not biased against the 1982 Contract. No evidence supports an inference that Mr. Brewer wanted INSLAW to fail; failure of the 1982 Contract would jeopardize his career and undermine his goals. Similarly, Mr. Hamilton was extremely defensive about Mr. Brewer; he fought Mr. Brewer and his directives. He

---

Mr. Hamilton's policy to edit memos before they went to the file, the court cannot find that these

witnesses recorded the statement contemporaneously.

readily accepted broad conspiracy allegations.[38] Consequently, other individuals had to unite the two fronts and make progress.

For example, Mr. Kelley, INSLAW's General Counsel at the time, sent Contracting Officer Videnieks a letter to allay Mr. Brewer's concerns as discussed in the April 19 meeting. Mr. Kelley stated:

> As I told you in the meeting and now want to put in writing the proposed action described in the memo will have no impact or effect on our performance of the Executive Office Contract or its deliverables.

The action proposed in the memo is designed only to insure the continued existence of the PROMIS Technology outside of our present Executive Office Contract. The strategy outlined in the memo, if successful, can only enhance INSLAW'S efforts to control costs to you under the contract.

Thus, Mr. Kelley informed the Government: 1) Costs would be controlled, and 2) the deliverables under the contract would not be affected by INSLAW's marketing of enhancements.

**38.** Mr. Hamilton has claimed that he was given information about his case in cloak and dagger fashion. For example, Mr. Hamilton asked to observe or have Mr. McWhorter, EOUSA's Deputy Director, observe meetings because of Mr. Brewer's behavior:

> [Mr. McWhorter] also said to me that Brewer was not my only problem, that there was a Presidential appointee in the current administration who was so biased against PROMIS and I[NSLAW] that he has to maneuver to keep him from the meetings of the U.S. attorneys for fear that the whole project would be tainted.

Mr. Hamilton did not ask the identity of this presidential appointee because he did not want Mr. Tyson, EOUSA's Director, "to be embarrassed by my asking him who he was referring to." Mr. Hamilton did not remember that this conversation had taken place until approximately three years after it occurred, upon waking up in the middle of the night. Mr. Hamilton claims that one day at work he read notes on his old desk calendar of another meeting with a different person who had said essentially the same thing, and that this meeting lead him to remember the incident with Mr. Tyson. Mr. Hamilton stated:

> I don't know about three years, but the meeting took place in early May 1983, and I remembered it at some point after we retained Dickstein, Shapiro and Morin, because Leigh Ratiner had asked me to go through my desk calendar for the years of the contract and find anything pertinent, and I found notes that I had taken of a meeting John Shenefield had had in August 1984, with Mr. Tyson, where he made substantially the same statement to Mr. Shenefield.
>
> And it was because my memory had been refreshed that Mr. Shenefield coming out of the meeting had called me and told me of this, that night I woke up and remembered Tyson had told it to me too.

Mr. Hamilton also admitted that he relied on a number of confidential sources in making allegations of wrongdoing by the Government and, in particular, by DOJ. Although these allegations were beyond the scope of this proceeding, Mr. Hamilton interjected the subject of anonymous sources during his direct examination. During the Dwyer investigation, see supra note 3, Mr. Hamilton told Assistant Associate Attorney General Dwyer that he had eleven confidential sources. Mr. Hamilton related that he spoke with each of these confidential informants personally and found their stories to be reliable and the people to be credible. Mr. Hamilton did not release their names because "the sources were fearful of reprisal by [DOJ] and were unwilling to allow us to reveal their names to the DOJ." Nevertheless, according to this confidential information, Mr. Hamilton identified some DOJ officials by name, accusing them of wrongdoing, including fraud and cover-ups. These sources were revealed only during discovery in this litigation. At least some of the witnesses have denied the allegations Mr. Hamilton attributed to them in the Dwyer report. For example, one witness was alleged to have close connections with people in senior level CIA positions. When deposed, she stated that she had no such connections.

Mr. Hamilton has also relied on convicted felons to obtain his information. He relied on Mr. Riconosciuto, convicted of manufacturing and selling methamphetamine, and Mr. Hayes, someone so incredible that plaintiffs agreed not to produce him as a witness against the United States ever again and who, Mr. Hamilton agreed, has been convicted in a murder for hire scheme. Mr. Hamilton nonetheless

> found him very believable. I observed him with others in that little town of Nancy, Kentucky, with whom he associated on a regular basis. I found him rational, intelligent, and for some inexplicable reason he had a detailed real time knowledge of what was going on in this case in Washington, D.C., which I could not account for.

Mr. Hamilton attempted to explain that the Government also had found Mr. Hayes credible as it brought him in to testify in two other proceedings concerning this case. However, the Government only brought Mr. Hayes in after Mr. Hamilton named him as a source. In Mr. Hamilton's own words: "I said they took him seriously enough that they brought him to Chicago to testify before the Grand Jury, and everything he said is deleted from the [Bua] report." See supra note 3.

On May 24, 1982, Associate Deputy Attorney General Morris sent Mr. Rogers, INSLAW's attorney, a letter stating that he had the opportunity to review INSLAW's proposed marketing plans (contained in the April 1, 1982 memorandum to Mr. Rogers); that he had discussed the issue with DOJ staff members; and that had identified two areas that gave him concern: 1) How costs were allocated, and 2) whether certain elements of software were indeed in the public domain.

On May 26, 1982, Mr. Rogers replied to Mr. Morris' letter concerning the "sign off." In this correspondence, Mr. Rogers attempted to respond to Mr. Morris' letter:

First, I agree that the issue of marketing costs can be taken care of in a variety of ways, as you suggest. INSLAW does not intend that the expenses of marketing PROMIS 82 should increase the allowable overhead under the March 16 contract, so I am sure we can readily arrive at a satisfactory means to ensure this does not occur.

Mr. Rogers explained that PROMIS 82 is the sum of

(1) the "Original PROMIS," that is, the public domain software as of May 15, 1981 . . . delivered to the [BJS];

(2) enhancements undertaken by INSLAW at private expense after the cessation of LEAA funding; and

(3) the so-called "Printed Inquiry" enhancement, which was created under contract to the [BJS] and delivered to the [DOJ] on May 17, 1982.

Mr. Rogers represented that, if DOJ had a problem with the inclusion of the Printed Inquiry enhancement, INSLAW would remove it from PROMIS 82 and replace it with a privately-financed enhancement. Mr. Rogers also represented: "I hope that these representations assuage the [DOJ's] concern about the use of enhancements developed but undelivered under government funding. No such enhancements are involved."

Mr. Morris responded by letter dated August 11, 1982:

We agree that the original PROMIS, as defined in your letter of May 26, 1982, is in the public domain. We also agree that the "printed inquiry" enhancement is in the public domain. To the extent that any other enhancements to the system were privately funded by INSLAW and not specified to be delivered to the [DOJ] under any contract or other arrangement, INSLAW may assert whatever proprietary rights it may have.

IBM and INSLAW accepted this letter as the requested "sign off."

This letter does not acknowledge any proprietary rights; it simply informs INSLAW that it may assert any proprietary rights that it may or may not have, as confirmed by Mr. Rogers at trial. Mr. Hamilton incorrectly interpreted this letter as recognizing INSLAW's rights. He wrote one of INSLAW's attorneys on January 8, 1987:

Second, when INSLAW took on the EOUSA contract, it was on the explicit assumption that it would be built on the chassis of the second PROMIS product in the three product sequence and that INSLAW reserved its proprietary rights to that instrumentality.

Third, that the Office of the Deputy Attorney General, purporting to act on behalf of all bureaus and divisions of the Department and following 5-plus months of discussions, recognized INSLAW's rights to do precisely what I described under my second point.

Mr. Rogers, however, testified that DOJ was not affirming any particular proprietary rights in INSLAW's PROMIS 82. In fact, based on Mr. Morris' letter, Mr. Rogers testified that he understood that DOJ subsequently could take action against INSLAW if it later determined that INSLAW's representations were not valid.

The central fact that emerges from the events of April 1, 1982, to August 11, 1982—Mr. Hamilton's proposal to market enhanced PROMIS and DOJ's sign-off—is that INSLAW obtained DOJ's sign-off based on explicit assurances from INSLAW's counsel that its marketing plans would not interfere with INSLAW's deliverables under the 1982 Contract.

3. *INSLAW's attempt to use micro-computers instead of word processors and DOJ's decision to install PROMIS in computers instead of word processors*

In 1979 the Institute conducted an EOUSA-sponsored feasibility study for improving case management and collections in USAOs, as well as a "pilot project" to test PROMIS at two large and two small offices. Mr. Hamilton explained that the Institute was to "pilot test the real PROMIS software on real computers in two very large [USAOs] which they chose as Southern District of California, that's San Diego, and the District of New Jersey in Newark." The Institute also

> was to develop using the computing facilities available on a government furnished word processing machine a case management system that would mimic the capabilities of PROMIS that could be used by small U.S. Attorneys Offices that could not afford to have their own computers, and that could only afford to have word processing machines.

After completion of the pilot project, as memorialized by an August 13, 1981 memorandum from Assistant Attorney General for Administration Rooney and then Acting Director for the EOUSA Tyson to Deputy Attorney General Edward C. Schmults, EOUSA and JMD agreed to a joint proposal for "providing improved case management support and collections management to the U.S. Attorneys" and to install and customize the PROMIS software in select USAOs on a time-sharing basis and, ultimately, on micro-computers, or on word-processing equipment. This was the genesis of the 1982 Contract.

Prior to issuance of the Request for Proposals for the 1982 Contract on November 2, 1981, Mr. Hamilton became aware of EOUSA's intent to take the pilot project PROMIS from Newark and San Diego, add the five BJS enhancements, put it in another 20 USAOs, and take the word-processing version based system already operating in Maine and West Virginia and put it in "60 or 70 small" USAOs. Mr. Hamilton considered that the use of the word-processing machines would be "disastrous;" consequently, he arranged a meeting with EOUSA's Director and Deputy Director Tyson and McWhorter in May 1981.

Mr. Hamilton attempted to dissuade Messrs. Tyson and McWhorter from proceeding with the project as designed, or, alternatively, to split the contract in two to "let INSLAW bid on the part of that [contract that Mr. Hamilton] believed was doable." Messrs. Tyson and McWhorter informed Mr. Hamilton that the project would proceed as planned.

Still not satisfied with that response, Mr. Hamilton tried to persuade someone else. To that end, Mr. Hamilton "sought and obtained an appointment with the White House Office of Management and Budget with the Associate Director Harold Steinberg." Mr. Hamilton testified:

> President Reagan had already announced that he was going to make improvements in the collection of debts so the United States government, a government-wide priority for his new administration. And that the Office of Management and Budget had the responsibility for coordinating this new initiative.
>
> And the Associate Director for Management within OMB had that government-wide responsibility. I went down and met with him and explained to him that I had had a very good relationship for many years with the [EOUSA] and with [DOJ] in general.
>
> But I had been unsuccessful in explaining to them that this was going to be a mistake and the he had a vested interest in it not being a mistake because the [USAOs] are one of the principle conduits for collecting the debts owed to the United States government.
>
> And perhaps the people I was talking to in the Executive Office could be persuaded with some technical help from inside the government. And I asked him if he would have his staff review it. And if he agreed with me if he would attempt to persuade the government.
>
> And we had several meetings to demonstrate the legal process debt collection version of the [USAOs] version of PROMIS to them and to his staff. And it was my understanding from talking to him and his

staff that they did attempt to persuade the [DOJ] to do what I had recommended. DOJ, nonetheless, adhered to its original plan.

Request for Proposal No. JMUSA–82–R–002 (the "RFP") summarized DOJ's position with respect to the word processing-based and computer-based systems in the RFP Statement of Work:

[O]ver two-thirds of the districts have less than 25 attorneys assigned to them. While it is technically possible to connect the smaller districts to computer hardware located in a larger district, it might be prohibitively expensive to give the smaller districts all of the features available in the larger ones because of the telecommunications costs. The pilot plan therefore includes the development of a smaller-scale system for smaller offices using word processing equipment rather than mini-computers in those smaller offices. This concept is worth testing because of the success many offices are having at the present time using this sort of equipment to manage their caseload and collections activities. The two districts selected for this "semi-automated" test are the Southern District of West Virginia (Charleston) and the District of Vermont.

Despite Mr. Hamilton's disagreement with DOJ's rationale, INSLAW bid on the RFP and was awarded the contract.

The Government began to withhold IN-SLAW's fee associated with the word-processing portion of the contract around the spring or summer of 1983, according to IN-SLAW's Controller Murray W. Hannon. Prior to the withholding of fee, INSLAW had been paid a target fee of 8%, even though progress on the word-processing portion of the contract was poor at best. As of October 25, 1983, the COTR, Mr. Snyder, notified Contracting Officer Videnieks that INSLAW was not making adequate process on the word-processing portion of the 1982 Contract:

The contractor has not delivered the software for a word processing version of the collections subsystem, which as you know is an integral part of this project. Consequently, no word processing site has been completely implemented and only one additional site, the District of New Hampshire, has been partially implemented since my August 16 memo. In other words, only two word processing sites have been partially implemented even though only 12 months remain of the 30 month implementation period. According to the original contract schedule approximately 40 sites should have been implemented by now.

Mr. Snyder on this basis recommended that DOJ continue to withhold that portion of INSLAW's incentive fee for poor performance. Messrs. Brewer and Rugh concurred in his recommendation. At trial Mr. Snyder amplified:

Well, we were having enormous problems getting this word processing system developed. We had been to Maine and tried, and we had simplified the design, and we had—at some point, I think it was before this—well, I'm not 100[%] sure. But we had standardized to say we were going to have—originally, the word processing-base system was supposed to work, work on two kinds of equipment; a shared logic system and a stand-alone system. We had simplified it to the—to just the one kind of system.

Initially, the word processing versions were supposed to be able to tailor the— tailor the system to their specific needs. We had standardized that. So we had, by this time I believe we had taken steps to streamline and simplify the requirement, but we still were not making progress, and I became concerned, everyone was concerned about whether we were going to get these word processing systems implemented by the time the contract ended.

And this memo I wrote to Pete [Videnieks], but I realized that this memo had serious financial implications, so it wasn't, it wasn't something that I wanted to send on my own stick. So I drafted it and talked about it with Brick [Brewer] and Jack [Rugh], and got them to sign off on it before I sent it to Pete.

I mean, sitting here today—I mean, everybody was—I wasn't the only one who was concerned about their failure to make progress. Everybody was. But I was the

COTR and it was my job to take some sort of step to try to induce them to progress, and this is what we did.

In another attempt to dissuade the Government from implementing the word processing-based systems on December 22, 1983, Mr. Hamilton, together with Elliot L. Richardson, former Ambassador, Attorney General, and Secretary, who served as Chairman of the Board of the not-for-profit Institute, and Harvey G. Sherzer, INSLAW's government contracts attorney, met with EOUSA's Director Tyson and Assistant Attorney General for Administration Rooney.[39] Mr. Hamilton testified that he considered the meeting constructive and that Mr. Rooney would pursue his suggestion. However, approximately ten days later, on January 5, 1984, INSLAW received a show-cause notice, which requested that INSLAW set forth reasons why the word-processing portion of the contract should not be terminated. INSLAW responded on January 13, 1984.

INSLAW maintained that the delay in the word-processing portion of the 1982 Contract resulted from DOJ's delay in obtaining the word-processing hardware until the eleventh month of the contract. To countermand any effects from the delay, DOJ authorized IN-SLAW to install the word-processing equipment in those USAOs already possessing Lanier word-processing equipment. Thus, DOJ altered the order of performance to allow for the delay in hardware procurement. Modification 4, dated June 24, 1982, also revised the schedule for the word-processing system installation. According to this schedule, INSLAW was to install the word-processing software within five months of the contract award in the District of Maine, an office which already had Lanier hardware. DOJ therefore did not fail to furnish the word-processing equipment in Maine and did not prevent INSLAW from installing the word-processing PROMIS in 1982.

Although DOJ partially was responsible for the delays in the word-processing portion of the contract, DOJ was not wholly responsible. In fact, DOJ took several steps to minimize the delays by 1) proposing contract modifications, 2) standardizing the word-processing software design, and 3) reducing the scope of work by combining deliverables. INSLAW itself proposed alternative implementation schedules, but failed to meet them. Overall, by the time the show-cause notice was issued, INSLAW partially had implemented the criminal subsystems in only five USAOs and had failed to deliver the collections subsystem. The significant problems that the delivered software contained were addressed in a memorandum dated January 27, 1984, from Mr. Snyder to Mr. Videnieks, characterizing INSLAW's Maine implementation on March 28, 1983, as a "disaster." Mr. Snyder noted that the

> procedures manuals used to train the docket clerks contained many inaccuracies and the software had not been throughly tested and debugged. Apparently the contractor had tested individual programs but had not tested these programs as part of the integrated system. It took three months and several visits to the site to install a version of the software that worked even adequately. As of January 1984 a number of minor problems continue to plague the partial system installed in Maine.

The evidence also demonstrated that inadequate development work had been performed on the collections subsystem. Thus, the court agrees with Mr. Snyder's assessment expressed in his January 27, 1984 memorandum: "The Government bears some responsibility for the delay in the delivery of the collections software as discussed immediately below, but a much greater share lies with INSLAW."

On February 13, 1984, the word-processing portion of the contract was terminated for the convenience of the Government. Mr. Snyder had recommended a termination for default, but was overruled.

After the partial termination, Mr. Brewer informed Mr. Hamilton that DOJ intended to work with the manufacturer of the word-processing machines, Lanier, to complete the word-processing portion of the contract. In

---

**39.** Mr. Rooney was responsible for the JMD, which is in charge of computer system procurement.

February 1984, the same month as the termination for default, Mr. Hamilton again attempted to alter the project and submitted a proposal to install computers with PROMIS in the smaller offices. Messrs. Brewer and Videnieks rejected the unsolicited proposal in April 1984.

Mr. Hamilton submitted another unsolicited proposal in April or May 1985 to Deputy Attorney General D. Lowell Jensen, through Associate Deputy Attorney General Jay B. Stevens. INSLAW proposed "to supplant the word processing planned implementations with computer based PROMIS implementations." DOJ rejected this proposal and began the process of developing new word-processing software with technical assistance from Lanier. Within months of the partial termination, DOJ itself implemented word-processing systems in the smaller USAOs.

Mr. Hamilton testified that after each proposal or meeting in which INSLAW proposed to implement computer-based PROMIS, rather than the word-processing packages, he was informed that DOJ intended to place only the word-processing packages in the smaller offices. He was not informed prior to 1985 that DOJ planned "to implement the computer based software at any of the offices beyond the 20 plus the pilot." Mr. Hamilton was told only that DOJ planned to implement word processing-based PROMIS in its smaller offices during the term of the 1982 Contract. However, DOJ officials did not represent that DOJ had no plans to implement computer-based programs in the future.

INSLAW did not want to perform the word-processing portion of the 1982 Contract, and it did not. Upon partial termination of that portion of the contract, DOJ permissibly contracted for implementing the software to be used on the word-processing equipment at the smaller USAOs and installed the computer version of PROMIS at others. INSLAW dismissed its appeal before the DOTCAB contesting this termination, and plaintiffs are barred from pursuing it as a legal claim. *See supra* note at 2–3. Considered as an equitable claim, plaintiffs have shown no unjustified governmental act—negligence or wrongdoing that caused damage to them.

DOJ did not install word-processing PROMIS in all of the USAOs originally scheduled to receive the word-processing PROMIS. Mr. Snyder stated in an August 13, 1984 memorandum to Mr. Brewer:

> It now appears that an additional 15 offices are candidates for the computer version of PROMIS, owing to increased caseloads which exceed the capacity of the word processing equipment. In other words, when INSLAW's contract ends, the computer version of PROMIS will be operational in 20 USAOs and there will be 25 USAOs remaining in which the computer version of PROMIS must be implemented.

DOJ therefore developed a proposal for implementing PROMIS on computers in the remaining offices with in-house resources.

As evidenced by Mr. Richardson's March 19, 1985 letter to Mr. Jensen, INSLAW became aware of DOJ's plan to disseminate computer-based PROMIS to other USAOs. Mr. Hamilton commented in his September 9, 1985 letter to Assistant Attorney General for Administration W. Lawrence Wallace: "I am extremely disturbed and disappointed to learn that the Executive Office for United States Attorneys has begun to manufacture copies of the PROMIS software for customization and installation in additional United States Attorneys Offices, specifically those in St. Louis, Missouri, and Sacramento, California."

 INSLAW posits that DOJ's dissemination of the computer-based PROMIS to USAOs not originally scheduled to receive the PRIME PROMIS was in violation of Modification 12. If INSLAW had complied with the 1982 Contract, DOJ would have received a version of PROMIS to which it would have unlimited rights, and DOJ could disseminate the PROMIS computer software to other USAOs. However, because INSLAW furnished an enhanced version of PROMIS pursuant to Modification 12, INSLAW contends that the Government did not have unlimited rights.

Plaintiffs' claims to the proprietary enhancements arose in the context of Modification 12, which provided, in pertinent part:

The Government shall limit and restrict the dissemination of the said PROMIS computer software to the Executive Office for United States Attorneys, and to the 94 United States Attorneys' Offices covered by the [1982] Contract, and, under no circumstances shall the Government permit dissemination of such software beyond these designated offices, pending resolution of the issues extant between the Contractor and the Government under the terms and conditions of the [1982] Contract . . . .

In exchange for DOJ's assurances, INSLAW agreed to provide DOJ with the PRIME, VAX, and non-computerized word-processing versions of PROMIS. Once DOJ terminated the word-processing portion of the contract for convenience, INSLAW takes the position that the offices slated to receive the word-processing version of PROMIS dropped out of the picture. Plaintiffs' argument is internally inconsistent.

Assuming, *arguendo*, that Modification 12 covered all three versions of PROMIS, the modification expressly allows the Government to disseminate the PROMIS covered by the modification to any/all 94 USAOs specified in the contract, whether or not a given office was scheduled to receive PROMIS installed in PRIME computers or the non-computerized version for word-processing software. Thus, as of the date on which the modification was executed, according to INSLAW, the Government could disseminate the versions of PROMIS covered, *i.e.*, VAX, PRIME, and word-processing, to the 94 USAOs specified in Appendix B to the RFP, which was incorporated into the 1982 Contract. INSLAW did not introduce any evidence that PROMIS was disseminated beyond those 94 USAOs. Because the word-processing version of the contract subsequently was terminated for the Government's convenience, the offices slated to receive word-processing software dropped out, but

only insofar as INSLAW was excused from further performance on the word-processing portion of the contract. The termination did not affect the plain language of the bilateral modification.

Modification 12 altered the rights of the parties until the issues extant were resolved. By its plain language, the modification is applicable to 94 USAOs and allows the Government to distribute the PROMIS computer software to any of those offices. The fact that INSLAW no longer was required to deliver word-processing software to certain offices is wholly irrelevant in interpreting the plain language of the modification.

### 4. *INSLAW's financial condition and the threat to withhold advance payments*

■ Plaintiffs contend that DOJ knew that INSLAW was a small business and that DOJ knew the extent to which INSLAW relied on DOJ to make its payroll. They charge that Mr. Brewer applied financial pressure in an attempt to force INSLAW to surrender its proprietary enhancements under Modification 12 and withheld contract payments, thereby forcing INSLAW into bankruptcy.[40]

When the contract was negotiated, DOJ officials knew about INSLAW's precarious financial condition. INSLAW had an open-book policy, and the Government could examine or audit INSLAW at any time.

Article XXXI of the contract was an advance payments clause. Under this provision, once the contractor satisfied certain conditions, the Government set up a special bank account allowing the contractor to draw on the account, much like a line of credit with the bank. According to Mr. Hamilton,

I[NSLAW] would submit a voucher for work that was completed and accepted by the Government. At which point Mr. Videnieks as the contracting officer would sign a check, co-sign a check with I[NSLAW] that allowed I[NSLAW] to draw the funds to pay that voucher from a bank account kept at the Bank of Bethes-

---

**40.** The court addresses *infra* at 405–408 of this opinion plaintiffs' claim that DOJ unjustifiably withheld the monies due for computer center costs effective May 26, 1983. Plaintiffs agree that this issue is separate from their claims concerning Modification 12.

da, a non-interest bearing bank account. So the Government kept some funds in that account which I[NSLAW] could not use unless Mr. Videnieks as the contracting officer on each checked co-signed it and allowed us to draw the funds.

He also testified that INSLAW "did not receive the money until the work was completed and accepted by the Government."

No one agreed with Mr. Hamilton's characterization of the advance payments mechanism. Mr. Gizzarelli, INSLAW's Project Manager on the 1982 Contract, testified:

I do know that advanced payments are a common contractual vehicle whereby the government funds projects where the vendor is not able to fund then themselves in effect.

So rather than using a capital reserve and then billing the government in arrears, you in effect establish a rate and predict what you're going to be spending the next month and they pay you now. And then the adjustment is made at the end.

So rather than billing in arrears, you're billing in advance is what it amounts to. It's probably not as simple as I've described it, but that's essentially what happens.

Thus, payment is secured prior to performance of the work. Mr. Sherzer, INSLAW's government contracts counsel, explained:

But an advance payment is different from a progress payment in that an advance payment under the Government contract principles provides just what it says, an advance. It's more in the nature of a working capital line of credit that a smaller company generally speaking would obtain as opposed to a progress payment that the small to large companies obtain, and is— that is, the progress payment is geared more to physical progress, performance under the contract.

Mr. Hannon, INSLAW's Controller from early 1981 through March 1984, also disagreed with Mr. Hamilton's characterization.[41]

Mr. Hannon agreed with defense counsel that the advance payments clause operated like a "revolving line of credit."

Q [By defense counsel]: And the way it worked under the advance payment clause was that you'd come in with an invoice, you'd have a check prepared in the amount that you were seeking and the CO would counter sign the check and you could draw down that money from the Bank of Bethesda while the invoice was being processed in the normal course of business, right?

A: That's correct. Then when the payment was made against the invoice, the actual payment, then those fund[s] would be deposited back into the advance account.

Q: Right. So it was like a revolving line of credit?

A: Yes.

If DOJ had not processed an invoice within 30 days, according to Mr. Hannon, INSLAW might not have any funds on which to draw because INSLAW often depleted the account.

INSLAW requested the advance payments provision because, as Mr. Hamilton explained:

The contract was going to represent something like 75 or 85 [42] percent of the revenues of the company ... we needed to receive more prompt payments, and we would not have been able to finance several months of receivables under a contract that accounted for that large proportion of the company's revenue.

To be eligible for advance payments, INSLAW certified that it could not finance the work under the 1982 Contract on its own and could not obtain commercial financing at reasonable rates. INSLAW sent Contracting Officer Videnieks a letter dated February 19, 1982, representing:

Efforts have been made to secure private financing for this contract, however the best rate available to INSLAW, Inc. is 1 1/2 points above prime on receivables bor-

---

41. Mr. Hannon's duties included accounting and budgeting responsibilities and contract administration.

42. Mr. Hamilton previously had asserted that DOJ accounted for 90% of INSLAW's business, but explained this apparent discrepancy by differentiating the time periods involved.

rowing. With the present prime rate at 17%, this requires INSLAW, Inc. to pay 18 1/2% for this money. With our fixed fee at less than 10%, the drain on the corporation's resources is obvious. Thus, borrowing is not reasonably available as a solution to INSLAW's cash flow problem.

In order to make INSLAW more stable, DOJ extended advance payments, which, according to Robert A. Whiteley, the JMD auditor for INSLAW, are unusual and discouraged in the federal procurement regulations.

Despite the provision for advance payments, INSLAW claimed to have trouble receiving prompt payment on two invoices, so INSLAW assigned the revenue for these two invoices to the Bank of Bethesda in exchange for a line of credit. One month after INSLAW made the certification that it could not obtain commercial financing, it obtained commercial financing. Mr. Hamilton testified that he considered this violation inadvertent, because "you make so many certifications on a federal government contract about so many things that it is possible to overlook some of them."

Mr. Hannon's testimony partially supported that of Mr. Hamilton. Mr. Hannon testified that INSLAW obtained a line of credit from the Bank of Bethesda around the time that the contract was executed. At some point INSLAW assigned receivables under the 1982 Contract to the Bank of Bethesda. Because Mr. Videnieks stated that invoices submitted for fees due under the contract could not be submitted pursuant to the advance payments clause, Mr. Hannon considered the fee invoice a separate invoice and used it for collateral. Mr. Hannon also might assign a receivable under the 1982 Contract if DOJ had not replenished the advance payments account in sufficient time for INSLAW to draw on it.

Whereas Mr. Hamilton claims that INSLAW was solvent as of 1982, Mr. Whiteley testified that INSLAW was insolvent, or, at least, in an extremely poor financial condition. Mr. Whiteley worked as a government contract auditor with both the Institute and INSLAW beginning in 1973 and ending in 1983. He was the Auditor in Charge or "the line auditor who's responsible for seeing that the audit work is performed."

Mr. Whiteley testified that at the time the 1982 Contract was awarded, INSLAW was in dire financial straits:

> [D]uring the period when we were negotiating with I[NSLAW] on the audit proposal, I[NSLAW] was asking us to please complete the negotiations as quickly as possible because they needed a completed negotiation agreement to take it to the bank in order to make payroll that Friday.

Mr. Whiteley further explained that INSLAW needed advance payments, which are generally associated with an organization in extreme financial difficulty.[43]

A memorandum from Steve Claggett, an INSLAW Vice President, dated February 14, 1984, details INSLAW's financial condition from October 1, 1983, through January 31, 1984. The memorandum reveals that INSLAW's planned pretax loss for the four-month period was $44,000.00; however, its actual pretax loss was $288,000.00. The report indicates that the 1982 Contract costs were very lose to planned.

Although the 1982 Contract also contained an anti-assignment clause, Mr. Hannon testified that INSLAW assigned its receivable under the 1982 Contract. When Mr. Whiteley discovered the line of credit during a routine audit of INSLAW's books, he knew the issue had to be raised and notified Mr. Hannon. Once Mr. Whiteley notified Contracting Officer Videnieks, the latter issued a show-cause letter asking why advance payments should not be stopped. The Novem-

---

**43.** Mr. Whiteley testified as of the end of 1982 he concluded that INSLAW's financial condition was worsening. Although Mr. Whiteley could not tie his concern to any one particular contemporaneous document, all of the witnesses testifying on the issue explained that Mr. Whiteley had full access to INSLAW's financial records. Thus, when Mr. Whiteley stated that he was concerned about INSLAW's financial status, recognizing that DOJ knew INSLAW was a financially questionable contractor from day one, it is reasonable that discussions would have taken place at DOJ concerning INSLAW's finances. Mr. Whiteley testified to this effect, and the court found no reason to doubt him.

ber 10, 1982 letter stated that INSLAW had violated "Paragraph L, Prohibition Against Assignment, of Article XXXI, Advance Payments, of the subject contract by assignment of invoices." INSLAW must cure the violation or "the Government will take action to protect its interests in accordance with Article XXXI." Mr. Whiteley acknowledged that the risk to the Government was minimal in continuing the advance payments provisions, although the violation was citable.

INSLAW's Controller, Mr. Hannon, responded to this letter by requesting that a contract modification be signed "to assure that" future invoices would not be delayed. Mr. Hannon also furnished DOJ with a copy of the Commercial Time Note that "was used to assign two invoices to the Bank of Bethesda." INSLAW represented that it would furnish a copy of the paid note as soon as INSLAW received it.

As a result of INSLAW's violation of the contract clause prohibiting assignments, DOJ grew concerned about INSLAW's financial condition. Mr. Brewer outlined DOJ's views in a December 9, 1982 memorandum to Mr. Tyson:

In preparation for negotiations with IN-SLAW, Inc., concerning rates to be charged for service during the coming months (i.e., fiscal year 1983), JMD auditors have ascertained the following:

(1) INSLAW has, since April 1, 1982, incurred substantial indebtedness. Specifically, the company has obtained a line-of-credit in the amount of $1.2 million with the Bank of Bethesda. As of December 1, INSLAW owes the bank $975,000. They anticipate borrowing approximately an additional $200,000 later this month. The interest charges on the various loans that comprise this indebtedness constitute a substantial drain on INSLAW's resources and threaten the very existence of the company.

The existence of the loan arrangement itself presents other substantial problems for INSLAW. As you know, the Department has, at INSLAW's request, arranged for "advance payments" to the company in order to assist INSLAW with its cash flow problems. INSLAW is the only contractor with the [DOJ] which has such an arrangement. A statutory condition of such an arrangement is that the recipient will not incur other indebtedness because the privilege of advance payments based upon the premise that the contractor is unable to secure conventional, commercial funding. By establishing the line of credit, IN-SLAW has violated the statutory condition. In fact, to obtain the most recent loan, INSLAW pledged our invoices as collateral. The Department may be forced to cease these payment-in-advance arrangements. Such action would have a substantial impact on INSLAW's operations because, in essence, INSLAW has to borrow approximately $300,000 per month from us, as advance payments, to meet its cash flow demands. We have asked INSLAW to prepare an estimate of the effects of cessation of advance payments.

The desperate nature of INSLAW's indebtedness is illustrated by the following: one item of INSLAW's fringe benefit package is a five percent contribution to the pension/profit sharing plan of employees. *We pay this* to INSLAW as a portion of fringe benefits on each and every invoice. During the past nine months, INSLAW reprogrammed $100,000 of this money and *spent it.* As the company cones to the end of its fiscal year, this sum must be "put back"—that is, put into the retirement fund (or, it must be paid back to the government). This obligation is one of the reasons for the additional indebtedness contemplated this month.

(2) INSLAW has apparently engaged in accounting practice which raise substantial questions concerning fraud. One item carried on INSLAW's books is a payment of $100,000 to INSLAW, Europe, Ltd., a subsidiary of INSLAW, Inc., physically located in Dublin, Ireland. This payment is reportedly carried as compensation for certain software development ("the PRIME version of PROMIS"). In that such version of the PROMIS software was developed under circumstances other than the representations made on INSLAW's books, this accounting notation is not accurate. To the extent that such notation was

intended to affect the payments to IN-SLAW, by the government, the notation and supporting documentation may require an investigation of INSLAW by the Office of Professional Responsibility.

Allegations concerning other accounting practices may also give rise to investigation. The [JMD] auditors will have more information about these problems and the course of action they will take by the end of December.

The practical effect[ ] of these problems is a fear, expressed by [JMD] auditors, that INSLAW may not be financially viable, and thus, unable to complete this contract.

We have done the following in order to protect our interests:

(1) demanded, as is our right, from IN-SLAW copies of *all* software documentation and *all* data on their computer, on a regular basis; and

(2) commenced planning for carrying on this project, in-house, by Executive Office employees, in the event of trouble.

Although DOJ's concerns regarding IN-SLAW's financial condition arose from DOJ auditors, not Mr. Brewer, he certainly expressed them.

In his testimony Mr. Hamilton disputed all of DOJ's characterizations. With respect to the first point, Mr. Hamilton explained:

[W]e had a preexisting $750,000 line of credit with First American Bank before this contract began. And one month or so after the award of the March 1982[C]ontract the Bank of Bethesda agreed to take over that line of credit from the First American Bank and increase it by another $500,000. That means increase I[NSLAW]'s borrowing capacity by and extra $500,000. That doesn't mean we automatically borrowed it, just so that we would have the possibility of borrowing.

So Mr. Brewer is incorrect in his characterization of our just having incurred $975,000 in new debt.

Mr. Hamilton also took issue with Mr. Brewer's statement that "INSLAW has to borrow approximately $300,000 per month from us, as advance payments, to meet its cash flow demands." Because the payments were not really advance payments, but expedited payments, Mr. Hamilton considered that the work already had been performed and accepted by DOJ. Mr. Hamilton's characterization is incorrect, as Messrs. Hannon and Whiteley testified.

As for Mr. Brewer's comments concerning the "desperate nature of INSLAW's indebtedness in connection with INSLAW's fringe benefit package," Mr. Hamilton responded that Mr. Brewer did not understand accounting. DOJ paid a contribution to INSLAW's pension/profit sharing employee plan. IN-SLAW "reprogrammed $100,000 of this money and spent it." Mr. Hamilton countered that the payment was not due; therefore, INSLAW could spend the money in any manner it wished so long as the payment was made on time.

With respect to the second point, Mr. Hamilton stated that INSLAW transferred $100,000.00 from INSLAW in Washington, DC, to its wholly-owned subsidiary in Dublin, Ireland, "to purchase from the subsidiary some work it had done." The transaction was reflected on the company's books and was approved by Arthur Young, INSLAW's independent accounting firm. Despite Mr. Hamilton's assertions to the contrary, the court must determine whether DOJ's position was reasonable. Whether Arthur Young accepted a particular accounting practice is irrelevant.

The Federal Procurement Regulation explicitly recognizes the unique nature of advance payments in the Government contract setting. 41 C.F.R. § 1.30.404 (1982). In order to qualify for advance payments, the contractor cannot secure more traditional financing. Thus, when INSLAW's violation occurred, DOJ was obligated to evaluate whether the advance payments were still necessary. Although DOJ officials acted appropriately, the issue concerning the advance payments clause and INSLAW's financial problems surfaced at the same time as the issue of INSLAW's claimed proprietary enhancements. With INSLAW's increased financial instability, DOJ became concerned about whether it would ever receive the software for which it was paying.

By letter of November 19, 1982, COTR Snyder invoked Article XXX, which gave DOJ access at any time to "all computer programs and supporting documentation developed for or relating to this contract," and demanded that INSLAW deliver all copies of PROMIS, based on and tailored to INSLAW's version on VAX. The list was comprehensive:

1. All computer programs and documentation which constitute the base U.S. Attorneys' version of PROMIS, including all enhancements funded by the [EOUSA] through OJARS Contract J–LEAA–006–79.

2. All computer programs and documentation which constitute tailored versions of PROMIS as implemented for the Boston, Los Angeles and Seattle [USAOs] on a time-sharing basis.

3. All computer programs developed for or in the process of being developed for the extracting and converting of data from U.S. Attorney word processing based systems or computer based systems and maintaining the EOUSA Central PROMIS System.

4. All computer programs and documentation which constitute the tailored version of PROMIS defined as the EOUSA Central System.

5. All computer programs and documentation used to convert the Docket and Reporting data base into PROMIS format for all offices (word processing and computer) for which those programs have been developed or are in the process of being developed.

6. All computer programs and documentation, except for Digital Equipment Corporation licensed software, used in or planned for use in the performance of this contract but not named above.

7. The latest available versions of the Los Angeles, Seattle, and Boston data bases.

To the greatest extent possible this information should be provided on magnetic tape using standard VAX utilities to create the tape files from the corresponding disk files. Computer programs should be provided in at least source and object code formats. All operating system command files, system configuration parameters, and other information used to tailor and operate all above mentioned programs must be included.

In other words, the information provided pursuant to this request must include everything necessary to transfer all above mentioned operation versions of PROMIS to a different VAX computer with a minimum of effort, and to further develop, tailor, and implement PROMIS software to the extent contemplated in this contract on a different VAX computer.

This letter should not be construed to change the statement of work and/or terms and conditions of the contract or to provide a basis for claims for increases in target cost or fee.

If INSLAW declared bankruptcy, Mr. Snyder feared that DOJ would have nothing to show for the millions of dollars spent on PROMIS development. The letter was designed to get the software for the sites that had been implemented, which were the few sites operating the VAX timesharing version of PROMIS. "[W]e were trying to get the software and the data that was running on the VAX computer at I[NSLAW] with respect to the software, both the source code and the object code and the latest version of the data." Mr. Snyder testified:

So I had some discussions first with Brick [Brewer], and later with Jack [Rugh], and we discussed what position the Government would be in if I[NSLAW] could no longer perform on the contract. And so we decided that, as a kind of—we didn't want to be in the position where we were—it wouldn't have been me, but it would have been Brick, we had to go to Bill Tyson, who was the head of the EOUSA, and say, "Look, we have a number of these sites up and running, but we're sorry, we can't—you know, we are not going to be able to use this system anymore because our contractor went bankrupt."

Mr. Rugh's testimony was consistent. The court finds that DOJ demanded the material based on the apprehension that INSLAW'S unstable financial condition might result in

bankruptcy. Mr. Snyder testified that he drafted this letter with Mr. Rugh after Mr. Snyder saw some financial data from IN-SLAW that caused him to question IN-SLAW's viability. At the same time none of the DOJ officials was aware that INSLAW claimed any proprietary enhancements in its software.

INSLAW did not dispute DOJ's entitlement under Article XXX of the 1982 Contract,[44] but maintained that the COTR lacked the proper authority to make such a request. Consequently, Mr. Videnieks sent the same letter on December 6, 1982. INSLAW claims that it never received the December 6 letter, but did receive a subsequent letter from Mr. Brewer making the same demand and dated January 6, 1983.

On February 2, 1983, INSLAW's James C. Dimm, Acting Project Manager, and counterpart to COTR Snyder, sent a letter to Mr. Videnieks advising that INSLAW would produce some tapes and documentation pursuant to DOJ's demand under Article XXX. However,

> [i]n producing these tapes, INSLAW and the [DOJ] will have to reach an agreement on the inclusion or exclusion of certain proprietary features which INSLAW has been making available to [USAOs] that utilize its time sharing service. These features are normally included only on tapes produced pursuant to licensing agreements.

**44.** Defendant has the right to a copy of any computer software originated or developed as part of the contract, or necessary to implement it, during the time of the contract. Article XXX.A. and B. provide that upon request of the contracting officer, the contractor shall provide all reports, data, and recorded information necessary to explain computer programs developed under the contract. Clause 74 of the 1982 Contract defines a computer program as

> a series of instructions or statements in a form acceptable to a computer, designed to cause the computer to execute an operation or operations. Computer programs include operating systems, assemblers, compilers, interpreters, data management systems, utility programs, sort-merge programs, and ADPE maintenance/diagnostic programs, as well as applications programs such as payroll, inventory control and engineering analysis programs.

Defendant claims that DOJ never received this document, or, at least, did not receive the document when sent.

### 5. *DOJ's demand for the PROMIS software*

As a result of INSLAW's violation of the Advance Payments Clause, Mr. Videnieks sent Mr. Hannon a letter on January 26, 1983, stating that "the Government intends to withhold further withdrawals from the Special Bank Account and withdraw the balance in the Special Bank Account after expiration of thirty days from the date of this letter." Importantly, based upon the information presumably submitted to DOJ by IN-SLAW, "it appears that INSLAW has been in continuous violation of the covenants, conditions and warranties of Article XXXI since one month following contract award."[45] As of January 28, 1993, Mr. Videnieks summarized the situation:

> On November 1, 1982, INSLAW notified DOJ that INSLAW is assigning two invoices to their bank in violation of the advance payment provision of the contract. On November 10, 1982 the Contracting Officer requested that INSLAW terminate the assignment by December 12, 1982 and notified the Contractor that otherwise the Government would proceed to protect its interests in accordance with Article XXXI. On November 16, 1982, INSLAW furnished to the Contracting Officer a copy of the instrument of assignment but did not terminate the assignment as requested.

> Computer programs may be either machine-dependent or machine-independent, and may be general-purpose in nature or design to satisfy the requirements of a particular user.

Mr. Hamilton accepted this definition of a computer program. Article XXX.B, cross-references to Clause 74(b)(*l*)(ii), which states: "The Government shall have unlimited rights in computer software required to be originated or developed under a Government contract, or generated as a necessary part of performing a contract." Based on this provision, INSLAW could not dispute DOJ's right to the copy of the requested PROMIS software.

**45.** There are gaps in the chronology as the record does not include a complete documentary trail. For example, the January 26, 1983 letter refers to a letter from the Bank of Bethesda to INSLAW dated April 13, 1982, which was not introduced into evidence.

Prior to proceeding with further action, the Contracting Officer and cognizant auditor felt that a discussion with INSLAW's Controller should be held. The conference took place on December 3, 1982 at the Office of Management Information Services Staff (OMISS), ... (EOUSA). The following individuals were present: C.M. Brewer, R. Whiteley, M. Hannon (INSLAW Controller) and the undersigned [Videnieks]. At this conference, Mr. Hannon furnished a copy of the April 13, 1982 Bank of Bethesda letter to INSLAW offering a $1,200,000 line of credit secured by INSLAW assets and accounts available. Mr. Hannon stated that this arrangement was currently in effect. DOJ asked Mr. Hannon to project the impact on INSLAW of discontinuation of advance payments. Mr. Hannon stated that if advance payments were discontinued at this point, INSLAW's line of credit at Bank of Bethesda would be exceeded by the end of the month and the December payroll would be $150,000 short.

Subsequent to the above meeting, the [DOJ] took the following steps to protect the Government's interests: requested INSLAW to provide copies of all automated PROMIS software (on December 6, 1982) and copies of all word processing software (on January 21, 1983). To date, INSLAW has not complied with these requests, made pursuant to the Data Requirements clause of the contract.

On January 19, 1983 INSLAW requested a meeting with Kamal Rahal [JMD Director, Procurements and Contracts Staff] to discuss administration of the subject contract and complained about harassment by the Contracting Officer and project personnel. The meeting took place on January 21, 1983. INSLAW agreed to improve reporting under the contract.

On February 4, 1983, the parties held a meeting, Mr. Hamilton contends that this meeting was to discuss the advance payments issue only.[46] Instead, the advance

---

46. Meetings between INSLAW and DOJ officials took place on February 4 and March 10, 1983. At the February 4 meeting, Messrs. Brewer, Videnieks, and Rugh all stated that DOJ "did not want those privately financed enhancements, and that [INSLAW] should not ... include[ ] them in the time sharing service." This meeting was chaired by William J. Snider, JMD's Administrative Counsel.

Mr. Hamilton testified that there was emotional opposition to INSLAW at this meeting because he

offered during the meeting to make [the enhancements] available at no cost to the government if they would sign a licensing agreement agreeing that they would not copy them and disseminate them outside the offices that were slated to receive them. And Mr. [Snider] said to me that's not the way the government does business. If the government wants your proprietary enhancements, the government will pay for them. You don't have to give up your proprietary rights in order to protect your proprietary enhancements.

Mr. Hamilton further testified that Messrs. Brewer and Videnieks stated at both the February 4 and March 10 meetings that they wanted the pilot-based software combined with the five BJS enhancements.

Mr. Hamilton volunteered the enhancements. He informed his counsel in a letter dated February 15, 1983, that

INSLAW is prepared to make these proprietary enhancements available to the Executive Office under the present contract without any increased cost to the contract if the Executive

Office will amend the contract by agreeing not to disseminate the U.S. Attorneys' Office version beyond the USAOs currently numbering 94 offices.

Mr. Hamilton made a similar offer to Mr. Brewer on August 9, 1984:

To provide time for both sides to untangle the issues without undue time or monetary pressures, we have proposed that the Government release the questioned amounts pending resolution of the questions.

As an inducement to the Government to take such action, INSLAW has offered to agree in writing to repay with interest any sums which would be ultimately found to be owed the Government.

As a further inducement, INSLAW made what we believe is an extraordinarily valuable offer to the Executive Office for U.S. Attorneys. We are currently converting the PROMIS software for full-function but inexpensive micro-computers under the U[NIX] operating system. We have offered to provide this product to the Executive Office for the small to medium [USAOs] at a nominal cost, such as $1 a copy. This is the same product that we proposed producing for the Executive Office for U.S. Attorneys for about $600,000 in our unsolicited proposal of February 27, 1984.

Mr. Hamilton previously made this offer in a letter dated July 6, 1984, in the hope that DOJ would release the withheld payments. These offers were made as compromise offers and were not attempts by INSLAW to establish the value of the enhancements.

payments and proprietary enhancements issues were discussed. Mr. Videnieks' letter to Mr. Hannon of February 25, 1983, confirms the interrelatedness:

> The Government views the advance payments and data rights issues as interrelated with respect to assessing the overall risk to the Government in continuing advance payments to INSLAW under the subject contract.
>
> If additional information with respect to INSLAW's position regarding PROMIS software data rights is not received expeditiously, the Contracting Officer's decision with respect to discontinuation of advance payments will be made without the benefit of additional input.

Plaintiffs seem to urge the point that DOJ orchestrated this meeting and the problems with the Advance Payments Clause, then sprang the data rights issue in order to "get the goods"—INSLAW's proprietary software—without paying for it.

Defendant contends that DOJ did not learn about INSLAW's alleged use of proprietary enhancements until this meeting. Messrs. Videnieks; Brewer; William J. Snider, JMD Administrative Counsel; and Kamal J. Rahal, JMD Director, Procurements and Contracts Staff, attended this meeting for DOJ. Messrs. Hamilton, Merrill, and Sherzer represented INSLAW.[47] Mr. Brewer was surprised on learning during the meeting from Mr. Merrill that INSLAW could not give DOJ its version of the PROMIS software because it contained proprietary enhancements. Mr. Brewer testified that he felt outrage and shock. He never believed that there were any enhancements, especially when considering that

> there had been a great commingling of money from our enhancement or from our BJS and other activities of I[NSLAW]. And we knew that we had been a major client, if not the only—and sometimes the only client of theirs, depending on which timeframe, during this period. I was pret-

ty convinced that there had been no things that were exclusively developed with private money.

Mr. Hamilton could not remember who raised the proprietary rights issue or when it was raised. He could not even remember whether DOJ officials stated that the meeting was the first time they had heard of the proprietary rights issue. Mr. Hamilton could not deny whether his business partner Mr. Merrill was the first to raise the proprietary rights issue and whether it only occurred at the end of the meeting, as suggested by government witnesses. Mr. Hamilton did remember, however, that DOJ wanted software to which DOJ had unlimited rights.

On March 8, 1983, Mr. Videnieks sent Mr. Sherzer a letter stating:

> Finally, I understand that you told Mr. Snider on March 4 that Government representatives were aware of the enhancements to the data bases. Nothing was said by INSLAW representative in this regard at the February 4 meeting in response to the statement by Government representative that this was the first time this issue was raised. Of course, any such communications would not supersede the terms and conditions of the contract. However, if it is now I[NSLAW]'s position that Government representatives were aware of the enhancements, please provide me with the names of those representatives and the dates on which they were notified of the enhancements.

INSLAW never responded to this request.

Mr. Hamilton also took the position that INSLAW's Technical Proposal, which is incorporated into the 1982 Contract, put DOJ on notice that INSLAW was developing enhancements to the PROMIS program, citing the following provision:

> During the life of this project—but not as a part of this project—INSLAW plans new enhancements and modifications to

---

**47.** According to Mr. Hamilton, Messrs. Brewer and Videnieks explained that computer programs included any programs developed for the word-processing portion of the contract, as well. Pursuant to DOJ's request, INSLAW claims that it furnished DOJ word-processing diskettes on March 17, 1983. Interestingly, DOJ in its requests did not mention the word-processing PROMIS, and Mr. Snyder testified that the word-processing diskettes were delivered under the 1982 Contract and had nothing to do with Modification 12.

the basic PROMIS software and to the original version of PROMIS for [USAOs]. For example, one enhancement that is currently under separate DOJ finding is software that will allow the tailoring of data entry screens that can accept data applicable to several data records ("transactions") and distribute the data to the appropriate records. This enhancement would result in a savings of data entry time and in greater flexibility by allowing sequencing of data entry operations on the data element level rather than on the case level at case initiation. Another example is revision of the collections software to expedite the entry of scheduled payments. These enhancements and other modifications that are developed will be added to the versions of PROMIS operating in the District of New Jersey and the Southern District of California, as well as to the systems in the districts to be automated during this project. In addition to the specially funded enhancements* (*These are funded under contract No. J–LEAA–006–79.), improvements funded by other sources, and developed and accepted for inclusion in the software supported by INSLAW will be made available to the [USAOs].

INSLAW states that "improvements funded by other sources, and developed and accepted for inclusion in the software supported by INSLAW will be made available...." This statement, however, does not support an inference that INSLAW will utilize the enhancements in performing the 1982 Contract. Indeed, Mr. Hamilton recognized that the statement meant, at most, "[If] the [USAOs] wanted to have then [the enhancements], we would sell them to them." The only other "enhancements" to which INSLAW refers in this section of the Technical Proposal are to "maintenance listings (fixes)." Bug fixes, however, are required under the 1982 Contract.

Plaintiffs argue that INSLAW notified DOJ of INSLAW's claim to proprietary enhancements in its response to an undated letter, sent by Mr. Videnieks, notifying IN-

SLAW that its proposal had "been recommended by the Technical Evaluation Panel for further contract consideration." However, Mr. Videnieks requested INSLAW to clarify its proposal on several points and to submit its clarifications and corrections "by close of business January 13, 1982." He asked INSLAW to explain why it considered its database adjustment program proprietary. INSLAW responded on January 14, 1982, with an Amendment to Proposal of December 2, 1981:

All of INSLAW's software is proprietary to it thus far.[48] A broad misconception is current concerning the nature of ownership of the PROMIS programs developed under contract with the government (mainly with LEAA). The term "public domain" has been erroneously applied to them. These programs are copy righted by INSLAW. As to those developed under federal funding, the government has a nonexclusive, plenary license for their use under terms of the contracts under which they were developed. INSLAW retains all the indicia of ownership.

As to the specific data base adjustment program which INSLAW proposes to use for this project:

A data base adjustment design was delivered under contract no. J–LEAA–006–79, and the government enjoys the same license to that design as for the basic PROMIS software, the Land and Natural Resources version and the U.S. Attorneys version. Execution of the design was not funded.

Subsequent to May, 1981, INSLAW began to receive funding from local government and private sector clients. The data base adjustment design was reviewed and adjusted and the software was written and tested under that funding. Those clients have no claim to the software but benefit from INSLAW's application of it to their needs.

---

48. As the court ruled, Clause 74(b)(1) gave the Government unlimited rights in the PROMIS software delivered under the 1982 Contract. *INSLAW*, 35 Fed.Cl. at 303–05. The pre-contractual written and oral exchanges between the parties were not admitted to vary or contradict the clear, unambiguous contract terms.

It differs from the general PROMIS software, therefore, in that it is not under licence to the government nor to any INSLAW client.

Subsequent to this letter, the 1982 Contract was signed on March 16, 1982.

Plaintiffs also contend that DOJ was put on notice by Mr. Hamilton's April 1, 1982 memorandum. Mr. Hamilton maintained that the memorandum conveyed:

That we at I[NSLAW] were about to begin to offer licenses for a fee to the Sum of the unlimited rights version of PROMIS, and privately financed enhancements that were not required to be delivered by the Government under any contract; and that we wanted the Government to understand what we were doing because they had spent a lot of money during the previous decade financing I[NSLAW] to develop the unlimited rights version, and we didn't want them to be confused about what this was about; and we wanted them to understand it; and we also needed their sign off in writing to what we were doing in order to continue our co-marketing agreement with IBM.

However, INSLAW's General Counsel, Mr. Kelley, sent DOJ the April 20, 1982 letter stating that deliverables under the contract would not be affected by INSLAW's proprietary enhancements. This letter assured DOJ that INSLAW would deliver a version of software consistent with the 1982 Contract. No notice can be imputed to DOJ for events occurring before the date of INSLAW's April 20, 1982 letter.

Mr. Hamilton testified that, based on their regular visits to INSLAW offices and his conversations with Mr. Rugh, COTR Snyder, and Mr. Brewer. DOJ knew that INSLAW was operating the timesharing portion of the contract on a VAX computer. Therefore, according to Mr. Hamilton.

[j]ust because there never had been a VAX version of PROMIS. PROMIS had never—the unlimited rights version of PROMIS had never operated on a VAX computer. And the fact that we were using a VAX to provide PROMIS timesharing meant that someone other than the Government had paid for it.

Plaintiffs posit that DOJ had to have known about the alleged proprietary enhancements and, in particular, the port to VAX. Mr. Hamilton explained that DOJ would have known that INSLAW was using a VAX version of PROMIS "because we told them in the proposal that we were going to use the VAX version and I believe it's reflected in the contract itself. . . ." Because of DOJ's close relationship to INSLAW, DOJ would know that it did not pay for the port to VAX and that INSLAW was only providing a service. Nevertheless, Mr. Hamilton did not have any personal knowledge that DOJ officials knew about the proprietary enhancements. The court finds that although DOJ knew that INSLAW operated the timesharing with a VAX version, this knowledge was insufficient to provide DOJ with notice of a claimed proprietary enhancement because the contract required INSLAW to use a VAX 11/780.

6. *Drafting of Modification 12*

After the February 4, 1983 meeting, Mr. Sherzer, INSLAW's government contracts counsel, sent Mr. Videnieks a letter dated February 10, 1983, responding to various "misunderstandings" surrounding the Advance Payments Clause and INSLAW's apparent violation thereof. Mr. Sherzer wanted to address reasons why cessation of advance payments would prove injurious to the Government and the apparent atmosphere of hostility surrounding the administration of the 1982 Contract, which Mr. Sherzer referred to as a very "charged and difficult relationship." Thus, Mr. Sherzer advocated:

Along those lines, we urge the Department take all necessary action to make such a commitment meaningful, and that the atmosphere of unfounded accusation and hostility, unfortunately evidenced by some at the February 4 meeting be corrected, if need be for a change of administrative personnel on the Government's side or otherwise.

. . . .

There appears to be agreement that INSLAW's performance under the contract has been excellent. No purpose would be

served by jeopardizing performance under this vital program because of anyone's personal effort to seek retribution against INSLAW, against the best interests of the Department, and/or to pursue their view of a *possible* technical breach of the covenants in the advance payments article of the contract, *i.e.*, assuming that the Department did not know and/or reasonably should not have inquired into the details of INSLAW's new banking relationship earlier. It thus is necessary to look afresh at whether advance payments still are warranted by the facts and hence should be continued. The facts compel an affirmative response.

He testified:

[T]here is not undue risk because physical progress on the contract is approximately equal to the advance payments, if that's the case what I am saying is that to use advance payments as a lever or a mechanism to in effect stop performance of the contract is not constructive.

Thus, Mr. Sherzer's overall impression was that the advance payments issue was serious, but did not warrant the type of attention it was receiving. He sent his letter in an attempt to get the two sides to communicate. There was a "very charged atmosphere, because I do recall there was a very charged atmosphere between some people in the Department and some people at INSLAW." Included in this charged atmosphere was a "negative cast ... [resulting from] an atmosphere of bias or retribution." Mr. Sherzer stated that one person in particular stood out, Mr. Brewer. Mr. Sherzer considered that Mr. Brewer had a particular "animus" against INSLAW and Mr. Hamilton. Mr. Sherzer thought that Mr. Brewer resented Mr. Hamilton, as he was "in a position to benefit from the 10 or 12 or 15, whatever the number of years were, existence of the prior not-for-profit grantee organization." The court agrees with Mr. Sherzer's assessment, but not his attribution of bias or retribution to Mr. Brewer.

Mr. Sherzer sent another letter to Mr. Videnieks on March 9, 1983, in which Mr. Sherzer attempted to summarize the state of the parties' dispute over proprietary enhancements. He stated:

If ... the Government wishes to obtain the latest versions of INSLAW's PROMIS software—which, as a technical matter, is in the Government's best interest to assure that the software obtained is consistent with that presently utilized under the contract—then INSLAW must have the Government's written agreement, through a modification to the contract or otherwise, that such enhancements will not be disseminated beyond the [EOUSA] and the 94 [USAOs] covered by the contract.

The parties found themselves in this position, in large part, because of the Government's delay in obtaining computer hardware. Until DOJ selected and secured computer hardware, INSLAW committed itself to providing the PROMIS software on its VAX computer on a timesharing basis to specified USAOs. Mr. Hamilton explained that, although it was known in January 1983 that DOJ selected PRIME computers for the larger USAOs, INSLAW could not begin installing PROMIS until INSLAW received the government-furnished equipment. As a result, the first PRIME installation did not take place until August 1983, with the last installation in January 1985.

The parties held another meeting on March 10, 1983, to discuss a proposed contract modification. Attendees at this meeting included Messrs. Sherzer, Hamilton, and Dimm and Messrs. Rugh, Videnieks, and JMD Administrative Counsel Snider. The next day, Mr. Sherzer sent Mr. Snider a letter, containing a draft escrow agreement. DOJ was concerned

about the issue of risk in continuation of advance payments, which is the issue which is proper to be concerned about, albeit on the merits we thought there wasn't risk here, that one way of resolving that would be to take the software itself and physically put it in a bank deposit box so that if, in the unlikely event I[NSLAW] went bankrupt, the Government would have the software.

As of this date, INSLAW had not delivered software under Article XXX of the contract in accordance with Mr. Videnieks' demand

and had not voiced an objection to the Government's rights to the software under Article XXX.

Mr. Videnieks responded to Mr. Sherzer's March 9, 1983 letter, and sent a counterproposal to the escrow agreement under consideration. Mr. Videnieks stated that the escrow agreement did not provide DOJ with sufficient protection; however, DOJ would agree to limit its software distribution to the 94 USAOs covered by the contract "until the data rights of the parties are resolved."

Mr. Sherzer accepted Mr. Videnieks' alternative to the escrow agreement by letter dated March 23, 1983. He stated: "I believe that the alternative which [DOJ] proposed is sound and reasonable." This statement by INSLAW's counsel is important for two reasons: 1) INSLAW admits that DOJ was acting reasonably; and 2) Mr. Sherzer submitted draft language for a contract modification memorializing the parties' agreement. This draft language contains some language identical to that found in Modification 12 as finally adopted.

According to Mr. Sherzer, the modification did not alter the terms and conditions of the contract. Rather, the modification

> would provide to the Government the latest updated version of its PROMIS software, inclusive of the proprietary enhancements, and at the same time the Government would agree to limit and restrict dissemination of the software to the [EOUSA] and 94 [USAOs], and wouldn't permit any further dissemination pending resolution of the issues between the parties as to what the respective rights were to the enhanced software.

Mr. Sherzer did not recall how the parties were to resolve the dispute outside the typical contract language reciting the terms and conditions of the contract. Mr. Sherzer did note, however, that Mr. Videnieks' March 18, 1983 letter described the information that INSLAW was to provide. Specifically, Mr. Videnieks advised that "INSLAW must now undertake to identify the 'proprietary enhancements' that it can demonstrate were developed at private expense and that were developed outside the scope of INSLAW's performance of any Government contract.

Please provide the information identifying the 'proprietary enhancements' by April 4, 1983."

The parties adopted Modification 12 in lieu of an escrow agreement. It should be noted that Mr. Brewer was opposed to a bilateral modification. He believed that the "contract required certain performance standards and that we should adhere to the contract." Ultimately, Mr. Brewer agreed to the signing of the modification.

### 7. The application of Modification 12 to both the VAX and PRIME versions of PROMIS

 Modification 12, effective on April 11, 1983, provided, in pertinent part:

> The purpose of this Supplemental Agreement is to effect delivery to the Government of VAX–Specific PROMIS computer programs and documentation requested by the Government on December 6, 1982, pursuant to Article XXX—Date Requirements, and to at this time resolve issues concerning advance Payments to the Contractor.
>
> A. The Contractor shall deliver to the Government all PROMIS Computer programs and supporting documentation developed for or relating to this contract by April 6, 1983, including but not limited to:
>
> . . . .
>
>> 6. All computer programs and documentation, except for Digital Equipment Corporation licensed software, used in for planned or use in the performance of this contract but not named above.
>
> To the greatest extent possible this information shall be provided on magnetic tape using standard VAX utilities to create the tape file from the corresponding disk files. Computer programs shall be provided in at least source and object code formats. All operating system command files, system configuration parameters, and other information used to tailor and operate all above mentioned programs must be included.
>
> The information provided pursuant to this request must include everything nec-

essary to transfer all above mentioned operational versions of PROMIS to a differing VAX computer with a minimum of effort, and to further develop, tailor, and implement PROMIS software to the extent contemplated in this contract on a different VAX computer.

The court's earlier opinion addressing Modification 12 found its language to be ambiguous in that it called for delivery of " 'all PROMIS computer programs and supporting documentation developed for or relating to this contract.' " *INSLAW*, 35 Fed.Cl. at 305 (quoting Modification 12). The parties presented evidence to demonstrate the meaning of the Modification; *i.e.*, does Modification 12 apply to the VAX-specific version of PROMIS or both the VAX-specific and PRIME-specific version of PROMIS? The testimony on this point is highly inconclusive; neither party presented consistent evidence, and witnesses for both parties contradicted other party-sponsored witnesses. In fact, some witnesses contradicted themselves on this point.

By its letters dated November 19 and December 6, 1982, and January 6, 1983, DOJ demanded:

All computer programs and documentation, except for Digital Equipment Corporation licensed software, used in or planned for use in the performance of this contract. . . .

The latest demand was in January 1983. At that time INSLAW knew that DOJ was ordering PRIME computers and that INSLAW had to tailor PROMIS so as to run on the government-furnished PRIME computers. Thus, both DOJ and INSLAW:new that the PRIME computers would be installed at the various USAOs scheduled to receive PROMIS.

These letters also phrased the demand, as follows: "Pursuant to Article XXX of the subject contract the Government requests that you provide immediately all computer programs and supporting documentation developed for or relating to this contract." Mr. Hamilton testified that this language required INSLAW

to deliver the software for the word processing machines, the software for the

PRIME Government-furnished machines, and the software made by I[NSLAW] for timesharing, and the software that I[NSLAW] used to commit to perform two other services, batch update and database adjustment.

However, as Mr. Gizzarelli noted, none of these letters refers to the word-processing diskettes or portion of the contract. Nonetheless, plaintiffs maintain that DOJ had issued a continuing request and that pursuant to it INSLAW gathered material and submitted information to DOJ, *i.e.*, after Modification 12, INSLAW continued to turn over later versions of word-processing diskettes and PROMIS software. Plaintiffs also take the position that DOJ's demand letters demonstrate that Modification 12 includes not only the VAX version of the then-operating software, but also the PRIME version, because DOJ asked for a copy of all software documentation and data used to perform the 1982 Contract.

The documentary trail and Mr. Hamilton's prior testimony do not necessarily support this proposition. For example, in a January 16, 1983 letter to one of INSLAW's attorneys, Mr. Hamilton stated:

In December 1982, the Department's Contracting Officer requested that INSLAW turn over copies of the version of PROMIS that INSLAW was then operating on its own computers in a time-sharing service for major city [USAOs].

The only operating software at that time was the VAX-specific version of PROMIS. Mr. Hamilton states in that same letter:

The Supplemental Agreement [Modification 12] addresses the "VAX-specific" version of the software, i.e., the version of PROMIS that INSLAW was then operating in a time-sharing service on INSLAW's [DEC] VAX 11–780 mini-computers for the 10 largest [USAOs]. INSLAW turned over the "VAX-specific" version immediately after the Supplemental Agreement was executed, and also later turned over the version of the same software that operates on PRIME 50–series mini-computers, the brand of computer hardware selected by the [EOUSA] for the 20–odd largest

[USAOs]. The PRIME version is 85–90% identical to the "VAX-specific" version addressed in the Supplemental Agreement.

Consequently, Mr. Hamilton states that IN-SLAW turned over two products, the "VAX-specific version" pursuant to Modification 12 and subsequently the PRIME version.

Mr. Hamilton previously testified in the bankruptcy trial:

Some time in December the contracting officer . . . sent a letter to INSLAW which did not arrive . . . saying that he wanted copies of the software that we were running on the VAX computer along with copies of the [USAOs] data bases.

Mr. Hamilton understood that the then-operating software to which Modification 12 makes reference is the VAX version, not the PRIME. Moreover, he did not recall telling any DOJ officials his views concerning Modification 12 and the PRIME PROMIS other than Deputy Assistant Attorney General for Administration Wallace in 1985. Even then, however, Mr. Hamilton did not address Modification 12, but spoke more generically. He stated: "I would not have gotten into talking about Mod 12, but I would have talked in terms that the department got the right to use that in those offices pending the outcome of this agreement, and then frustrated our ability to obtain a resolution."

Defendant contends that DOJ informed INSLAW that DOJ wanted physical custody of the current operational PROMIS program. The only program in existence was the VAX version. However, in the March 18, 1983 letter to Mr. Sherzer, Mr. Videnieks stated:

Before the Government can commit itself to accepting a version of PROMIS excluding "proprietary enhancements" already in use under the contract by several [US-AOs], it must know what those enhancements consist of.

Plaintiffs contend that DOJ is talking about future versions of PROMIS that, according to Mr. Hamilton, are "going to be delivered for operation on Government-furnished equipment, which is the PRIME version." As further support that Modification 12 covers both PRIME and VAX versions, plaintiffs cite other language in Mr. Videnieks' letter of March 18, 1983:

Following resolution of the data rights issue, the Government will review the effect of any enhancements which are determined to be proprietary, and then either direct I[NSLAW] to delete those enhancements from the versions of PROMIS to be delivered under the contract. . . .

Plaintiffs contend that INSLAW was not to delete any "proprietary enhancements until the resolution of the proprietary enhancements question." Mr. Hamilton explained that, after Modification 12 was signed, IN-SLAW delivered the PROMIS software with the enhancements to DOJ "[b]ecause when we signed the bilateral Modification No. 12, it obliged us legally to do so", and "protected [INSLAW] if [it] did." [49]

DOJ counters that at both the February 4 and March 10, 1983 meetings, DOJ requested INSLAW not to use an enhanced PROMIS in fulfilling the 1982 Contract. When asked at trial if INSLAW "made a conscious decision to keep putting in what it considered to be proprietary enhancements in the software being used to perform the contract," Mr. Hamilton answered in the affirmative, but stated that it was within INSLAW's rights to use a proprietary PROMIS for the timesharing version of the contract. According to Mr. Hamilton, with respect to the timesharing version of the contract, INSLAW only was required to provide a service and could use whatever software it chose, regardless of DOJ's comments. In the letter of January 16, 1983, to one of INSLAW's attorneys, Mr. Hamilton stated: "INSLAW took the position that it is impractical for INSLAW to maintain more than one version of the software, and prohibitively expensive to do so. INSLAW further stated that its PROMIS proposal to the Department had assumed the more economical practice of keeping current a single version of the software."

Mr. Hamilton asserted that after Modification 12 and various correspondence of the parties, including Mr. Videnieks' March 18, 1983 letter, the contract was modified so that

---

49. Plaintiffs submit that the March 18, 1983 letter from Mr. Videnieks was the predicate upon which Modification 12 was based, and the court agrees.

INSLAW was obligated to use the proprietary enhanced PROMIS.[50] Mr. Hamilton stated: "I think Modification 12 required us to deliver the proprietary enhancements to the Government, not just once, not only at the time of execution on April 11, 1983, but as paragraph six states clearly, in all future deliveries under the contract."

Defendant counters with the language of sundry correspondence to demonstrate that the letters refer to a "version" of PROMIS in the singular, not plural. Mr. Hamilton rejoins that, if DOJ meant the "enhanced PROMIS," then it could be referring to both PRIME and VAX versions of PROMIS.

INSLAW had regularly scheduled progress meetings after Modification 12. EOUSA's Mr. Rugh and COTR Snyder attended them. The parties would discuss the VAX PROMIS conversion to the PRIME. Mr. Snyder on June 21, 1983, wrote Mr. Videnieks:

> What INSLAW needs to provide to the government is documentation on the conversion of PROMIS from the VAX to the PRIME. This documentation should include a brief description of the tasks involved in the conversion.

As a result of these discussions and these meetings, INSLAW determined that it should provide PRIME software pursuant to Modification 12.

> THE COURT: So what did you turn over relative to PRIME that's the subject of this litigation?
>
> THE WITNESS: [Mr. Hamilton]: The VAX version modified to operate on the PRIME after the Government gave us the PRIME, the Government-furnished PRIME configuration, which was after Modification No. 12.
>
> THE COURT: So after Modification 12, instead of coming forth with what we've talked about being built in the pilot project

you just modified your VAX timesharing version to work on the PRIME computers?

> THE WITNESS: We added the remaining BJS enhancements, Your Honor. There were two of them that were not in the VAX.
>
> THE COURT: Why didn't you do this on the pilot project? That's what the contract called for.
>
> THE WITNESS: Because they had modified the contract. It told us that we had no authority to remove the proprietary enhancements from the versions that we were to deliver for the Government-furnished equipment.

After Modification 12 became effective on April 11, 1983, Mr. Videnieks sent a letter to Mr. Sherzer on April 21 quoting the language in his March 18 letter referring to "a version of PROMIS ex[cl]uding 'proprietary enhancements' already in use under the contract by several [USAOs]."[51] The VAX version of PROMIS already had been delivered on April 20, 1983. Mr. Hamilton explained:

> He's saying before the Government can commit itself to accepting the version for the Government furnished PRIME computers, that doesn't have in it the same proprietary enhancements that are in the VAX version which I[NSLAW] has already given—delivered to me pursuant to Mod. 12. So before I will allow you to deliver anything without those, we have to have the resolution of this data rights clause.

Mr. Hamilton took the position that consequently the "contract had been modified and the contracting officer is telling us exactly what we are to do in writing."

Mr. Brewer's testimony supports that of Mr. Hamilton. Although Mr. Brewer testified that he was uncertain if Modification 12 governed both the PRIME and VAX versions of the contract, his April 26, 1996 deposition testimony was that Modification 12 applied to both the PRIME and VAX versions because

---

**50.** Mr. Hamilton contends that some of the correspondence of the parties also changed the scope of contract performance. Included in Mr. Hamilton's view was Mr. Videnieks' demand under Article XXX of the contract. Mr. Hamilton considered that the demand for the software then in existence was in derogation of the contract because Mr. Hamilton believed that DOJ was not entitled to it. Nevertheless, Mr. Hamilton did not advise DOJ of his views that the demand altered the scope of contract performance.

**51.** This language was quoted again in Mr. Videnieks' letter of July 21, 1983.

INSLAW sought a resolution to its proprietary enhancements issue. According to Mr. Brewer, it made no sense to resolve one issue without resolving the other. Mr. Brewer's trial testimony was that under Modification 12, once INSLAW demonstrated that it had made enhancements to the PROMIS software and demonstrated their proprietary nature, DOJ had an obligation to negotiate with INSLAW concerning the enhancements. Until that time Mr. Brewer believed that DOJ did not have any obligation to negotiate with INSLAW.

Whether Modification 12 required the PRIME or VAX version is largely irrelevant. Mr. Gizzarelli stated that pursuant to Modification 12 INSLAW turned over its "source code." When asked about whether the source code was provided in VAX format, Mr. Gizzarelli stated: "There's only one,version of the source code." Mr. Gizzarelli explained:

When an improvement was made, we incorporated it into the software that we were using at the time. How it came to happen, that's how it came to happen. It was simply incorporated into the software that was in use at the time.

Mr. Gizzarelli, Ms. Deroy, and Drs. Davis and DeLutis testified that once enhancements were added to the source code, it would be extremely difficult, if not impossible, to remove them from the source code. Thus, whether INSLAW turned over a PRIME or VAX version of PROMIS, the source code is the same, complete with all current enhancements. Mr. Gizzarelli stated that he did not know whether INSLAW furnished the PRIME version of PROMIS pursuant to Modification 12. However, according to Mr. Gizzarelli, it makes no difference; once the source code was delivered "[a]ny competent programmer could write a compiler for a new machine, another machine, and

run it on whatever machine they wanted to run it on."

Ms. Deroy, who was INSLAW's Vice President for Software Development, stated that once an enhancement is loaded into the PROMIS software, it becomes an "integral" part of that software. In a memorandum to Mr. Hamilton dated January 31, 1983, she stated:

A number of enhancements that were not funded by federal sources have been incorporated into the EOUSA's version of PROMIS. The incorporation was necessary to simplify maintenance of VAX/PROMIS *i.e.*, to maintain a single version of most of the computer programs for EOUSA and for INSLAW's other clients.

Finally, ¶ 6 of Modification 12 provides for delivery of "[a]ll computer programs and documentation, except for [DEC] licensed software, used in or planned for use in the performance of this contract but not named above." INSLAW reasonably believed that it was to deliver all software developed in the future. This provision would have been surplusage if it were construed not to apply to the PRIME version, because DOJ already had all of INSLAW's claimed proprietary enhancements, and a computer programmer could convert the VAX program to any platform with relative ease. In other words, DOJ already had the goods. The court finds that Modification 12 applied to both the PRIME and VAX versions of PROMIS.

This ruling has no effect, however, because under Modification 12, DOJ agreed to limit distribution of the VAX and PRIME versions to the 94 USAOs. Plaintiffs produced no evidence that DOJ disseminated the software elsewhere during the period covered by Modification 12, *i.e.*, April 12, 1983, to February 21, 1986.[52] *See infra* at 399–400 & n. 58.

---

52. Although DOJ received the VAX version of PROMIS pursuant to Modification 12 on April 20, 1983, INSLAW was viable and implementing PROMIS in the various offices called for by the 1982 Contract. Thus, Mr. Snyder testified that he never opened the box INSLAW delivered to EOUSA containing the VAX version of PROMIS and did not know whether anyone ever opened the box. Mr. Rugh testified that no one ever used the tapes. The court agrees with Burton

Grad, plaintiffs' expert in pricing and marketing software products and business and financial planning for software companies, that use of software is not relevant, but possession is. Had plaintiffs established that INSLAW had proprietary rights in the software delivered pursuant to Modification 12 to DOJ, the court would have discounted Messrs. Snyder's and Rugh's testimony that the VAX tapes never were used.

8. *The meaning of "resolution" in Modification 12*

■ Modification 12 provides, in pertinent part:

B. The Government shall limit and restrict the dissemination of the said PROM-IS computer software to the [EOUSA], and to the 94 United States Attorneys' Offices covered by the Contract, and, under no circumstances shall the Government permit dissemination of such software beyond these designated offices, pending resolution of the issues extant between the Contractor and the Government under the terms and conditions of Contract No. JVU-SA–82–C–0074. . . .

DOJ did not give up its unlimited rights forever under Modification 12, but only until such time as the proprietary enhancement issue was resolved. INSLAW did attempt to furnish proof of its allegedly proprietary enhancements. Mr. Rugh, Assistant Director, EOUSA Office of Management Information Systems and Support, was Mr. Brewer's subordinate and COTR Snyder's supervisor. He described himself "as between Mr. Brewer and Mr. Snyder." Mr. Rugh was involved in the development of the RFPs and the requirements developed for acquisition of computers and word-processing systems for USAOs. He provided Mr. Brewer with technical advice and worked along with Contracting Officer Videnieks. He analyzed INSLAW's submissions in support of the enhancement claims and recommended DOJ's rejection of IN-SLAW's proposed methodology.

Ms. Deroy developed the first methodology to prove INSLAW's proprietary enhancements. Ms. Deroy's association with IN-SLAW commenced with the founding of the not-for-profit Institute in 1973. Mr. Hamilton described her role:

[S]he was the top technical software executive of the company. She had overall responsibility for the technical decisions that are made by the software and how to upgrade it; how to maintain it; how to package it from a technical standpoint.

In his March 18, 1983 letter, Mr. Videnieks directed:

[t]he data rights clauses of several different contracts between INSLAW and the Government govern the rights of the parties. In order to determine whether the Government has any rights in any private enhancements, it is necessary to know precisely what the private enhancements are and the requirements of the contracts.

. . . .

INSLAW must now undertake to identify the "proprietary enhancements" that it can demonstrate were developed at private expense and that were developed outside the scope of INSLAW's performance of any Government contract. Please provide the information identifying the "proprietary enhancements" by April 4, 1983.

As noted, Mr. Sherzer acknowledged that the letter outlined the information that INSLAW was to provide. DOJ's statement of the parameters for INSLAW's showing was straightforward and otherwise reasonable.

On April 5, 1983, Mr. Sherzer sent Mr. Snider, JMD's Administrative Counsel, a letter in which Mr. Sherzer purportedly conveyed information regarding "the approximately eight hundred (800) proprietary enhancements to the PROMIS software." Attached to this letter was a memorandum from Ms. Deroy to Mr. Hamilton also dated April 5, 1983. The information provided was incomplete and "totally incomprehensible" because it contained only "odd numbered pages," as Mr. Videnieks related to Mr. Sherzer in his letter dated April 7, 1983. INSLAW resubmitted a corrected copy of the memorandum on April 12, 1983.

Q [By plaintiffs' counsel]: All right. At that point in time, was it—was I[NSLAW]'s position as to whether it had complied or not with what the Government wanted at that point?

A [By Mr. Hamilton]: Well, we thought that was our compliance with our responsibilities under Modification Number 12.

By this submission INSLAW could not have been satisfying its responsibilities pursuant to Modification 12. The date of the first submission was April 5. Modification 12 was not signed until April 11. In its April 12 submission, INSLAW stated that the first

submission contained two "unrelated errors:" "1) Exhibits B and D were interchanged;" and 2) "Exhibit C was incorrectly copied from a 2–sided original." No additional changes were made. Because INSLAW merely corrected errors found in the April 5 submission, the document could not have been submitted pursuant to a contract modification that had yet to occur. Mr. Hamilton testified that he thought INSLAW made a good-faith, reasonable attempt to identify INSLAW's proprietary enhancements and to demonstrate private funding. Ms. Deroy characterized the submissions as an "extremely imperfect, non-mathematical type of thing, the best we had." She was more accurate.

Ms. Deroy's submission identified 251 enhancements. The sole evidence of private funding consisted of Ms. Deroy's statements: "We estimate that approximately 90 percent of the changes cataloged in Exhibits A, B and D were entirely developed with private funds;" and "INSLAW maintained and improved this enhancement using private funds. All enhancements in Exhibit C were financed entirely with private funds." As for proof of private funding, Mr. Hamilton gave an explanation at trial remarkable for its non-responsiveness to Mr. Videnieks' March 18, 1983 letter:

And the proof, if you are not satisfied with that, but keep in mind they have been working with Joyce Deroy, knew her to be a person of honesty and integrity. If they wanted proof, then they would have to go to our accounting records. But the Government is in there auditing us every year constantly.

Mr. Videnieks commented on INSLAW's submissions by letter dated April 21, 1983. Despite the claim of more than 800 proprietary enhancements, the April 5 and April 12 submissions could account for only "25 1 changes." Mr. Videnieks also noted:

In her memorandum, Ms. Deroy has identified three specific enhancements (Replication, Historical Purge, and Tally), out of the total 251 changes included in the exhibits, as being financed entirely with private funds. None of the remaining 248 changes were so identified. INSLAW

must identify each of the remaining 248 changes being claimed as proprietary. For each change claimed as proprietary, including the Replication, Historical Purge, and Tally enhancements, INSLAW must provide all information necessary to demonstrate that the change was developed both at private expense and outside the scope of INSLAW's performance of any Government contract. Please provide this information by April 29, 1983.

DOJ rejected the methodology proposed in Ms. Deroy's submission. DOJ's position continued to be reasonable. A contracting officer must make sure that he is not spending the Government's money on the same item twice, and, in view of INSLAW's bizarre submissions, his instructions were well framed and not burdensome.

On May 4, 1983, Mr. Sherzer wrote Mr. Videnieks that he had discussed the inadequacies of the prior submission with INSLAW and

responsive to your request, the company proposes the accumulation of additional supporting information and documentation using the methodology described in the memorandum attached hereto. Since the effort necessarily will be time consuming, I would request that you contact me indicating whether the approach proposed suffices for the Department's purposes and/or whether any revisions thereto are suggested.

Attached to Mr. Sherzer's letter was a new methodology proposed by Ms. Deroy contained in a memorandum to Mr. Sherzer dated April 26, 1983.

By letter to Mr. Sherzer dated June 10, 1983, Mr. Videnieks rejected Ms. Deroy's methodology:

Your letter requests that the government either approve the INSLAW proposal for identifying and demonstrating that certain enhancements are proprietary, or suggest revisions to that approach. The government is in a position to do neither. The burden of identifying those enhancements and proving that they were, in fact, developed at private expense outside the scope of any government contract remains with INSLAW. Unless INSLAW provides

such information before July 11, 1983, the government will be forced to conclude that all 251 changes/enhancements identified earlier were developed within the scope of current and previous government contracts, and are to be delivered to the government for its unrestricted use.

Mr. Videnieks also declined to comment on the issue in a subsequent conversation with Mr. Gizzarelli.

DOJ's rejection of Ms. Deroy's new methodology was reasonable. Ms. Deroy explained her methodology at trial. She noted that INSLAW claimed four stand-alone enhancements as of the date of her submission. These enhancements included: print inquiry, replication, historical purge and tally. None of these enhancements is claimed as proprietary in this proceeding.

Ms. Deroy's methodology also failed to identify a software change as a bug or an enhancement. She testified:

> A computer professional might read then and, you know, that that first one is clearly a bug because it sounds like one. And know that something like the one in the middle of this 10506 where you're just displaying a different error message was clearly an enhancement because it wasn't necessary for the operation, but you could call it either way whether somebody could or couldn't.

However,

> I think you'd need at least a computer professional and even then it would be sort of a I don't think anybody could with any degree of certainty say whether they were bugs or enhancements unless they knew the PROMIS system. And, even then, there's no true distinction between bug and enhancement, you know, five people in the room, maybe three of them would say, oh, that's a bug and three an enhancement. So it's not, this is not an exact science. The computer software, you know, like anything else, it can be interpreted different ways.

Despite DOJ's request for proof of private funding for these enhancements, Ms. Deroy admitted that the exhibit does not indicate any method for identifying funding. It does not indicate for which enhancements a client paid. In fact, her methodology required someone to estimate the number of hours a programmer spent on a change, and, if the programmer billed sufficient non-federal hours to cover the estimated cost of a software change, the methodology required one to assume that the software change was privately funded.

Plaintiffs complain that DOJ failed to provide any feedback on INSLAW's proposed methodology. As of August 1, 1983, INSLAW abandoned its efforts to prove proprietary enhancements. Plaintiffs' argument ignores the March 18, 1983 letter from Mr. Videnieks, which states exactly what DOJ expected. Plaintiffs ignore the language in his letter of June 10, 1983, which describes in detail the inadequacies with INSLAW's proposed methodology. Mr. Videnieks stated:

> Thus, Ms. Deroy acknowledges that INSLAW's claim of proprietary enhancements is limited to only those items in Exhibits A–D included with your April 12, 1983 letter and is made tip of a mix of corrections (changes) and enhancements. Indeed, she simply indicates that the changes/enhancements specified in those exhibits should be further subdivided. However, no matter what counting procedure is used, the claim you have made regarding "proprietary" changes/enhancements remains limited to those items included in the referenced exhibits.
>
> When the issue of proprietary enhancements was first raised by INSLAW there was an assumption that the firm could immediately and readily demonstrate the validity of their claim. The Government has twice requested that INSLAW "identify the 'proprietary enhancements' that it can demonstrate were developed at private expense and that were developed outside the scope of INSLAW's performance of any government contract." INSLAW has failed to comply with either of these requests. The methodology proposed by Ms. Deroy in her memorandum to you appears to demonstrate that INSLAW will be unable to justify its claim, because apparently all of the work its personnel have performed on PROMIS software has been

in conjunction with or related to federal finding under one or more government contracts. The proposed methodology is unacceptable, because as proposed, it requires the government to acknowledge proprietary interest in software development efforts which may have been the result of co-mingled federal and private monies.

Mr. Videnieks announced a July 11, 1983 deadline. INSLAW retracted its claim that DOJ refused to comment on its proposed methodology, but instead insisted that DOJ failed to make revisions to its proposed methodology. On the contrary, Mr. Videnieks' June 10, 1983 letter demonstrates that DOJ was entertaining a dialogue with INSLAW and was providing feedback. The principal problem with Ms. Deroy's methodology was that it allowed for the co-mingling of funds.

INSLAW knew, based on other contracts, the types of data DOJ would accept as proof of proprietary enhancements. For example, a letter dated February 10, 1982, from Donald A. Manson, Government Project Monitor on the BJS contract, to Mr. Hamilton, represented:

> Previous letters have expressed our concern regarding the status of items scheduled for public-domain release not having been released. INSLAW's responses simply raise other questions. INSLAW's statement that work was completed under separate funding does not negate the public-domain issue. The funding source must be identified. If governmental funds were utilized to complete the work, please identify the funding agency. That agency and the [BJS] will decide the status issue. If private funds were utilized, please identify the organization involved. BJS must be afforded the opportunity to communicate with the organization regarding the status, since significant amount of governmental funds may have been used to support the development effort.

Although Mr. Manson's statements do not constitute an instruction under Modification 12, they do constitute notice to INSLAW, as of one month before the 1982 contract was signed, that INSLAW must be able to identify the private organizations with contracts that represent private funding for enhancements.[53]

INSLAW nonetheless maintained that DOJ acted inappropriately. Based on negotiations with Mr. Snider in the February 3, 1983 meeting, Mr. Hamilton considered that DOJ was to

> work in a cooperative fashion with us because this is a complex, technical undertaking ... And ... the communication from Mr. Snider at the meeting was quite clear that he anticipated the possibility that the Government would want these enhancements. And he wanted them to review it and make an informed decision about them.

In response to Mr. Videnieks' June 10, 1983 letter, INSLAW charged its employees with additional tasks and came up with another methodology. This proposed methodology was outlined by Mr. Gizzarelli in his June 22, 1983 memorandum to Messrs. Hamilton, Merrill, and Hannon, and Ms. Deroy:

> We should proceed as follows:
>
> First, Harvey [Sherzer] will write to Peter [Videnieks] informing him that we will assemble records and documents that will provide proof of our ownership that July 11 is not only an unreasonable deadline, but one that violates their agreement not to distribute the software or use it outside of the [USAOs] pending resolution of the dispute; that it will take us 3 months.
>
> Next, we will begin assembling information as follows:
>
> 1. Using the Software Development Division "bug sheets" we will identify each change made under non-federal finding, the time period in which it was made and the person making the change. Joyce [Deroy] will assign this task.
>
> 2. A list of persons and dates will be provided to Accounting. They will pro-

---

53. Mr. Hamilton chose to ignore this notice, stating that Mr. Manson was not the contracting officer; therefore, his remarks constituted "one person's opinion being expressed to me in a letter." In responding to Mr. Manson's letter, INSLAW ignored his comments concerning any alleged proprietary enhancements.

vide a summary of each project the persons named billed to during the period and the number of hours billed. Murray will assign this task.

3. Taking the results, we will divide the changes into two categories:

a. Changes made solely with non-federal funds where the person performing the work billed no time to federal projects during the period, if there are any.

b. Changes made solely with non-federal funds where the person performing the work also billed some time to federal projects for *different* work during the period. These latter projects will be identified, and if possible, the nature of the work described. I will undertake this third task.

Enhancements made other than as a result of bug sheet reports will be separately identified and the funding source listed. Backup documentation, such as contracts and agreements will be assembled. I will also put this material together.

We will submit this information to Harvey and discuss with him the method of presentation.

This proposed methodology involved a review of the accounting and finance records.

Although INSLAW did not notify DOJ of this new proposed methodology, Mr. Sherzer wrote Mr. Videnieks on July 7, 1983:

This will confirm and follow up our telephone conversation yesterday and previous correspondence and discussion regarding the submission of additional information by INSLAW, Inc. regarding the approximately eight hundred (800) proprietary enhancements to the PROMIS software. As I have indicated, since our first conversation after receipt of your letter dated June 10, 1983 responsive to my letter of May 4, 1983 which set forth a proposed methodology for accumulation of additional supporting information, the July 11, 1983 date set

forth in your June 10 letter is unrealistic given the magnitude of the number of enhancements and the requirements for accomplishment of ongoing work at INSLAW. As I described, INSLAW expects that its Software Development Division will have identified and documented the proprietary enhancements by the end of this month and that the time and funds expended in making the enhancements will be correlated by INSLAW's Accounting Department by the end of next month. Accordingly, we should have a fully supported presentation ready by early September.

As further discussed yesterday and previously, the Government can, of course, if it so chooses, issue a Contracting Officer's Final Decision on the question of proprietary enhancements on July 11 or at a later date. We believe, however, that no purpose would be served by placing this matter into a formal dispute resolution posture prior to review and analysis of INSLAW's supporting information and documentation. [54] In any event, of course, Modification No. P0012 to the Contract dated March 16, 1982 will apply, restricting dissemination of the PROMIS computer software to the [EOUSA] and to the 94 [USAOs] covered by the Contract pending resolution of the data rights issues.

If you have any questions in connection with the above, please do not hesitate to write or call.

Thus, INSLAW took the position that dissemination pursuant to Modification 12 was limited to the 94 USAOs.[55]

Mr. Videnieks responded on July 21, 1983:

This is in response to your letter of July 7, 1983. In that you again refer to "the approximately eight hundred (800) proprietary enhancements to PROMIS software", we again must emphasize that the issue of proprietary enhancements remains limited

---

54. This sentence demonstrates that INSLAW specifically advised that it did not want Mr. Videnieks to issue a contracting officer's final decision.

55. One month later, in August 1983, INSLAW made its first delivery of PRIME PROMIS to a

United States Attorneys' office. Mr. Hamilton claims that Mr. Sherzer's July 7, 1983 letter was sent "to make sure that everybody understood that the Modification 12 was being relied upon by us to protect our proprietary rights."

to only those changes and enhancements identified in Exhibits A–D enclosed with your April 12, 1983 letter.

In the first paragraph of your letter you imply that the methodology being used to substantiate INSLAW's claim of proprietary enhancement may be the one proposed in your letter of May 4, 1983, and rejected in our response of June 10, 1983. We must reiterate that the Government continues to find that methodology unacceptable. The Government cannot condone the expenditure of INSLAW resources to accumulate and classify information in the manner set forth in your May 4 letter since that information will not substantiate the INSLAW claim of the proprietary nature of certain PROMIS enhancements. We require that you provide no later than August 1, 1983, a detailed explanation of the alternative methodology to be used to identify enhancements which INSLAW claims are proprietary and to support those claims. Because INSLAW initially raised the issue of proprietary enhancements at our February 4, 1983, meeting, requiring an explanation of an alternative methodology by August 1 should not represent an unreasonable burden on INSLAW.

We agree with you that Modification No. P0012 to the Contract continues to limit dissemination of that version of the PROMIS computer software specified in the modification. Modification No. P0012 will continue to apply in the event that the Government invokes the provisions of Clause 22, "Disputes," in that the Government will limit dissemination pending a Contracting Officer's Final Decision in the matter.

As we have stated previously, the contract requires, and INSLAW must provide, a functional version of PROMIS for unlimited government use. Before the Government can commit itself to accepting a ver-

sion of PROMIS excluding "proprietary enhancements" already in use under the contract by several [USAOs], we must know what those enhancements consist of.[56] Over five months have now passed since INSLAW first raised the issue proprietary enhancements, yet we are no closer to resolving the issue. Indeed, INSLAW has yet to provide even a simple identification of those enhancements which it considers proprietary. The lack of a timely, responsive submission for Government review and action can only lead us to believe that, in fact, there are no proprietary enhancements. Although we have now requested a description of INSLAW's alternative methodology, please do not lose sight of the fact that the real requirement is for an accurate identification of PROMIS enhancements which INSLAW considers proprietary along with substantiation information.

Mr. Brewer testified that DOJ understood INSLAW's concerns about having an approved methodology, but disavowed any obligation to revise INSLAW's proposed submission. Indeed, there is no affirmative requirement placed on the contracting officer to provide a methodology for a contractor to prove its claims, and DOJ did not impede INSLAW's efforts to prove its proprietary enhancements by not providing one. Mr. Videnieks' March 18, 1983 letter told INSLAW what information DOJ expected, and his subsequent letters gave adequate direction concerning Ms. Deroy's methodologies that should have proved sufficient. Although Mr. Videnieks' notes of May 9, 1983, reflect that DOJ did consider providing an acceptable methodology,[57] and DOJ had the capability to do so, DOJ's actions were adequate and reasonable.

INSLAW's submissions were utterly inadequate. INSLAW had no adequate docu-

---

**56.** This is the third reiteration of the same language. *See supra* note 51.

**57.** Mr. Videnieks' notes indicated that DOJ considered three alternatives:

 1. Flat out denial of [contractor's] proposed method and [government] decision that [con-

tractor] has failed to substantiate ... (J[ack] R[ugh]: drastic).

2. Response that method is not acceptable and suggest acceptable method.

3. Response that [contractor] has not substantiated claim and ask them to substantiate—however, they wish ... i.e. don't agree to any method.

mentation in 1983, and this trial in 1997 confirmed that plaintiffs never had, or could not develop, information that could substantiate INSLAW's claims. That DOJ could have provided a methodology does not shift the burden, which remained with INSLAW. The evidence did not show that DOJ failed to accept a reasonable showing or imposed exacting requirements or perversely kept sending INSLAW back to provide more information or was not telling INSLAW what was needed. The methodologies proposed to DOJ were inaccurate. DOJ had made a reasonable assumption, as reflected in Mr. Videnieks' June 10, 1983 letter: "When the issue of 'proprietary' enhancements was first raised by INSLAW there was an assumption that the firm could immediately and readily demonstrate the validity of their claim."

This case does not involve a claim that a contractor incurred in the ordinary course of performing a contract, but, rather, the contractor knew from the outset that it planned to market its enhancements to DOJ after inserting them into the contract deliverables. The contractor could not sit back and claim surprise, but DOJ could. As Drs. Davis and DeLutis and Mmes. Deroy and Holton all testified, INSLAW easily could have adopted a non-burdensome procedure by which to track the costs of privately funded enhancements. Similar to INSLAW's decision to market its enhancements, it chose not to account for its enhancements, but to include them in all software delivered under any contract by maintaining only one copy of the PROMIS software. In these circumstances plaintiffs can claim neither breach of any obligation or other wrongdoing by DOJ.

The court finds that Modification 12 contemplated that INSLAW's data rights claims be resolved by INSLAW's submitting proof of its enhancements in a manner consistent with Mr. Videnieks' March 18, 1983 letter; that INSLAW failed to do so within a reasonable time; that DOJ did not impede, frustrate, or refuse to respond unjustifiably or in bad faith to INSLAW's effort to resolve its claims; that DOJ officials did not preclude INSLAW from proving the existence and ownership of any enhancements in the software delivered pursuant to Modification 12; that INSLAW abandoned its attempts to resolve its data rights claims as of August 1, 1983; that Modification 12 expired by its terms on February 21, 1986, the date on which the contracting officer issued his final decision on INSLAW's data rights clauses; and that no evidence was presented that up to and including February 21, 1986, DOJ disseminated the PROMIS computer software beyond the 94 USAOs specified in the 1982 Contract, as allowed by Modification 12.[58]

### 9. *Good-faith negotiations*

██ Over the years INSLAW accused DOJ of failing to engage in good-faith negotiations concerning INSLAW's proprietary enhancements and computer center costs. The testimony of the distinguished witness Elliot L. Richardson put the issues in context.

Mr. Richardson became "deeply interested in the criminal justice system," first as a U.S. Attorney and then as Attorney General of the Commonwealth of Massachusetts. From the beginning of his service as Attorney General of the United States, around May or June 1973, Mr. Richardson wanted to know what DOJ was doing with respect to criminal justice issues under the federal law enforcement system. Consequently, he contacted LEAA and came to know Mr. Hamilton and familiarized himself with the Institute. Mr. Richardson developed a passion for implementing a stronger criminal justice system.

---

58. Mr. Videnieks' letter of July 21, 1983, agrees with INSLAW's position, as reflected in Mr. Sherzer's letter of July 7, 1983, that Modification 12 continues to limit dissemination of the version specified pending a contracting officer's final decision in the matter, provided that the Government invokes the Disputes Clause (Clause 22). The court finds that INSLAW abandoned its attempts to resolve the data rights issue as of August 1, 1983. All the witnesses who testified on point anticipated an ex-

peditious resolution of the issue, and the court construes Modification 12 to reflect that intent. Although plaintiffs insist that the term resolution is open-ended because plaintiffs have pressed INSLAW's data rights claims up to the present, the evidence is solidly against them. As of August 1, 1983, INSLAW stopped making submissions to the contracting officer in support of its claims, as required by Modification 12. The contracting officer's decision resolved the controversy.

The Institute created software that generated data allowing increased analysis of criminals, repeat offenders, and career criminals, leading to more favorable dispositions in cases. At the end of 1980, Mr. Richardson became Chairman of the Board of Trustees of the Institute, during the period when the Institute's business was winding down and the for-profit INSLAW was being formed. One of Mr. Richardson's law partners represented the Institute in its transition to a for-profit corporation. The primary role of Mr. Richardson and the other trustees was to determine how to use appropriately the funds that would become available to the not-for-profit Institute upon the sale of its assets.

Mr. Richardson's next involvement with INSLAW came after the award of the 1982 Contract. He testified that a dispute arose concerning the withholding of payments under the contract. On December 22, 1983, Mr. Richardson contacted Edward C. Schmults, the Deputy Attorney General, whom he had known during his years with the Nixon Administration at Treasury. Mr. Schmults told Mr. Richardson to contact Assistant Attorney General for Administration Rooney in an attempt to settle the dispute.

Mr. Richardson and Mr. Hamilton met with Messrs. Rooney and Tyson at Mr. Rooney's office in December 1983. A meeting of the PROMIS Oversight Committee [59] took place after Mr. Richardson's meeting with EOUSA Director Tyson on December 29, 1983. Mr. Tyson telephoned Mr. Richardson after this meeting and informed him that a show-cause order was issued "on the question of whether or not the entire INSLAW contract should be terminated." Mr. Tyson

suggested that Mr. Richardson follow tip with the Deputy Attorney General.

Mr. Richardson did just that. In January or February 1984, Mr. Richardson and Donald E. Santarelli, the former head of LEAA, arranged a meeting with Deputy Attorney General Jensen. Associate Deputy Attorney General Stephens also attended. Messrs. Richardson and Santarelli addressed the importance of INSLAW, the PROMIS software, and the absolute necessity of the payments DOJ was holding. Although Mr. Richardson did not have "any detailed knowledge" about the problems on DOJ's side, he brought to Mr. Jensen's attention that INSLAW "was the victim of the personal animosity of the project manager, C. Madison 'Brick' Brewer, who had been fired for cause by the Institute before the creation of the new for-profit company." [60] The meeting "addressed the issue of payments, the possible contribution to that problem arising out of the personal animosity of Brewer, and the importance to the Government in general and the law enforcement system in particular of assuring the survival of INSLAW."

Mr. Richardson was away from Washington, DC, beginning in March 1984, and left his partner, John Shenefield, former Assistant Attorney General for the Antitrust Division, to "take over this good office's role." Mr. Richardson returned in October 1984. In the interim Mr. Shenefield kept track of the meetings between DOJ attorneys and INSLAW.

In August 1984 Janice A. Sposato was JMD General Counsel. Ms. Sposato testified that she met Mr. Richardson during 1984, after Assistant Attorney General for Admin-

---

59. The record reflects little about the "PROMIS Oversight Committee." The only reference to its existence is in Mr. Richardson's testimony, the agenda for the PROMIS Oversight Committee Meeting of December 29, 1983, and plaintiffs' Proposed Finding No. 25, filed Jan. 30, 1997.

60. Mr. Richardson testified:

THE COURT: ... Did Mr. Hamilton relate to you that the background of this allegation of his being the victim of personal animosity of Mr. Brewer or did you have another source of information?

THE WITNESS: [Mr. Hamilton] told me about it when I was trying to understand what laid

behind the hold up of payments to I[NSLAW]. I knew there were delays arising out of the attempt to fulfill the Government's misguided insistence upon stuffing the I[NSLAW] software into word processes, which was a notion that Mr. Hamilton and other people had tried to talk the Government out of from the beginning, because here was this sophisticated software system the Government wanted to have operated by word processe[r]s for the 70 smaller U.S. Attorneys' Offices.

Mr. Richardson testified that the sum of what he knows about Mr. Brewer was conveyed to him by others.

istration Raymond Liotta asked her to meet with INSLAW officials and to act as the Government's chief negotiator in attempting to settle contract disputes. To prepare herself for this assignment, Ms. Sposato reviewed materials and met with Contracting Officer Videnieks, COTR Snyder, and IN-SLAW representatives. She reported her progress to Mr. Liotta, and, subsequently to Assistant Attorney General for Administration Wallace, who replaced Mr. Liotta. Ms. Sposato's information-gathering process was on-going; at the Hamiltons' suggestion, she brought in a technical adviser who had nothing to do with the 1982 Contract. Ms. Sposato stated that her negotiating sessions did not begin until the time of INSLAW's bankruptcy in 1985.[61]

Mr. Richardson believed that progress had not been made. He contacted a third Deputy Attorney General, Carol Dinkins, in late 1984. Once again the situation did not improve. It was not until this point that Mr. Richardson decided he should "try to learn exactly what the problems were, and so I spent a lot of time digging into this, particularly with respect to the most significant in terms of money involved, which was a computer center issue, and several others."

Next, Mr. Richardson had discussions with both Messrs. Liotta and Wallace. First, Mr. Richardson sent Assistant Attorney General Wallace a letter dated December 20, 1984, purporting to set forth the issues between INSLAW and DOJ. In response Mr. Wallace gave Mr. Richardson his assurances of fair play. Mr. Richardson characterized subsequent contacts as providing "reassuring sounds."

On November 25, 1985, Mr. Richardson sent Deputy Attorney General Jensen a "last ditch effort" letter in which Mr. Richardson outlined the issues in dispute and expressed the hope that Mr. Jensen would take action. In response to this letter, Messrs. Jensen, Stephens, Richardson, and Hamilton met in

late 1985. Mr. Richardson attempted to convey that

> unless there could be very quick action on both these fronts, keeping INSLAW afloat through the Government's requisition of the enhancements, and the much more responsive approach to the outstanding issues that were seen, that we would have no choice but to sue the Government for breach of contract, and for by then the unauthorized use of the INSLAW software.

According to Mr. Richardson, Mr. Jensen did not respond. During the period in which the Sposato negotiations were taking place, DOJ took the position reflected in Mr. Stephens' letter of November 27, 1985:

> The contract negotiations are the appropriate, and most expeditious, mechanism for INSLAW to resolve its differences with the Department. I do not intend to intervene in these negotiations, but I can assure you that the status of the negotiations as well as any settlement proposals resulting from the negotiations will receive careful review at an appropriate level in the Department. I have confidence in this negotiation process, and I recommend that you urge your client to continue to pursue the negotiations for a resolution of any disputes relating to the EOUSA contract.

Mr. Richardson became convinced that IN-SLAW was not receiving fair treatment. He had one more meeting with Deputy Attorney General Jensen in December, which was followed by Mr. Jensen's January 15, 1986 letter, which Mr. Richardson characterized as giving INSLAW the "back of [the] hand." Mr. Richardson responded to Mr. Jensen's letter on March 14, 1986, informing Mr. Jensen that he had advised INSLAW to sue and that INSLAW would be filing a claim for compensation on account of misappropriation of INSLAW's proprietary software.

Ms. Sposato testified concerning many of the same events and commented on Mr. Richardson's commendable efforts to settle

---

61. Throughout this litigation, plaintiffs represented that negotiations occurred in 1985 with Ms. Sposato acting as the mediator pursuant to a bankruptcy court order. This was not the case. During trial defense counsel asked plaintiffs' counsel for a copy of the bankruptcy order requiring negotiations. Plaintiffs' counsel stated that they were not the subject of an order. Apparently, Mr. Richardson's meeting resulted in these negotiations, and the bankruptcy judge stated that he thought the negotiations were a good idea.

the dispute. Mr. Richardson became passionate about a technological breakthrough that greatly assists our criminal justice system and became friends with Mr. Hamilton; however, until February 1985, when he became an attorney for INSLAW, Mr. Richardson had not undertaken an independent investigation of the facts. The witness left the court with the firm impression that he merely sponsored INSLAW's position papers, as revealed by his correspondence on behalf of INSLAW.

Mr. Hamilton would alert Mr. Richardson when the negotiations were not progressing. Calling on Mr. Richardson, however, only delayed resolution of INSLAW's claims. Ms. Sposato testified:

> [T]he negotiating session were going well in the sense that both parties were engaged and cooperating and working together. But periodically, INSLAW—I think through Elliot Richardson, but again, I wouldn't have been party to this—would—would approach the leadership of the Department, usually the Deputy Attorney General's Office, and request . . . various things. But part of their request often was can't you just settle this at your level where we were sort of moving too slowly at my level?
>
> THE COURT: How would that sense that you have had [sic] an effect on the meetings? You indicated they were interrupted.
>
> THE WITNESS: Well, because while a request was pending with the leadership, the Hamiltons weren't meeting with me. I guess they didn't want to. Or I don't remember that clearly. But I know that when that happened, the negotiating sessions were interrupted and they'd sort of be waiting for the response to—the official response to come from the Department. And, you know, I would be asked by the Deputy's Office to tell them the status of the negotiations and that kind of thing and a letter would be prepared responding. And all that would happen before we'd start negotiating again.

The first negotiating session with Ms. Sposato took place on April 4, 1985. Mr. Hamilton prepared a summary after the first meeting, which reflects his "understanding of what we [INSLAW and the Government] agreed to and the order to which we agreed to take them up" and includes the data rights issue. Ms. Sposato, however, insisted on reaching an agreement on computer center costs first, and, according to Mr. Hamilton, that subject consumed most of the ten or eleven sessions that he could recall. Nevertheless, that is not what Mr. Hamilton represented to his attorney in a memorandum of January 16, 1986.

> On April 4, 1985, INSLAW and the [DOJ] had the initial meeting in a series of about 10 meetings designed to achieve a "global settlement" of all issues, claims and counterclaims, resulting from the three-year INSLAW PROMIS contract that had ended on March 15, 1985. During this meeting, the two parties agreed on a negotiation agenda that specifically included the proprietary enhancements.

Ms. Sposato stated that the first time she was made aware of the proprietary enhancements claim was in a letter from Mr. Hamilton to Assistant Attorney General for Administration Wallace dated September 9, 1985. Mr. Wallace transmitted this letter to Ms. Sposato, and Ms. Sposato said that the negotiations had completely broken down at this point. The parties, in effect, were not negotiating. In a subsequent letter to Ms. Sposato dated September 24, 1985, suggesting a settlement of all outstanding issues, Mr. Hamilton admitted that the proprietary enhancements issue "was not monetized in any fashion until [his] letter to Assistant Attorney General H. Lawrence Wallace of September 9, 1985." Thus, when Ms. Sposato testified that she did not recall that the order of issues was a matter of concern, the court finds her testimony fully credible. She stated:

> The Government early in the negotiations took the position that it wanted to negotiate and reach an agreement upon all of the issues and that there wouldn't be a settlement if we couldn't agree on all of the issues. So order wouldn't have been important because we had an up-front agreement that this was—we—we'd reach an

agreement on everything or there was no agreement.

In her opinion the Hamiltons were amenable to this agreement.

Mr. Hamilton hoped that the negotiations would solve the controversy or, at the least, that Messrs. Brewer and Videnieks would be removed and that the issues would be decided on the merits. Without their removal Mr. Hamilton considered a true settlement unreachable. He continued to believe that Messrs. Brewer and Videnieks were involved in the negotiations.

At one of the meetings [Ms. Sposato] said that her people ... already feel discredited by the concessions that she has made in negotiations and were unwilling to allow her to make any more concessions. And it was clear to me that she was talking about the [EOUSA], but I don't believe that she ever admitted it.

In fact, Messrs. Brewer and Videnieks did submit information to Ms. Sposato.

INSLAW did not make any allegations of bad faith against Ms. Sposato or DOJ during the time of negotiations. Indeed, in an August 6, 1985 letter Mr. Hamilton acknowledges the good faith exhibited by DOJ.

[E]ight of the nine negotiation sessions held thus far have focused on the computer center cost question. We believe that the government has displayed good faith in these meetings, and that we and the government have made significant progress in resolving the areas of disagreement. We are grateful to the government for the efforts it has made in addressing the complex, technical and sometimes tedious questions surrounding the allocation of computer center costs.

Ms. Sposato however, questioned INSLAW's good faith:

A: Well, eventually we—we looked at it— there was one year, I don't recall which one anymore, that was where the bulk of the contested computer center costs were. We focused on that year and records that were available for that year. And we reached an agreement about that year. And frankly, I don't remember which method we used to reach that agreement.

But we did. I think the records surely reflect what it was.

And we just—we, the Government attorneys—made an offer to INSLAW for that year which INSLAW accepted for that year subject to being able to reach agreement on the other years that were involved.

Q: [By defense counsel] And what agreements did you—or offer did the Government propose with respect to the other two years?

A: The other two years as I recall it involved much less money for the Government because our use I guess had decreased. And we decided that almost as a strategic matter, we would simply offer for those other years to give INSLAW what it claimed for those years. And so we offered INSLAW a package—the overall package for computer center costs was the amount we had negotiated for that big year, plus exactly what they had claimed for the other remaining year or two.

Q: And did I[NSLAW] accept that package?

A: No. To our surprise they didn't accept the package. Not—at least not initially.

Q: Okay. But can you tell us what happened with that?

A: Well, we were surprised that they didn't accept the package because it consisted of an item they had agreed to plus some other items that were exactly what they asked for. And we—I believe we sent them a letter, although maybe it wasn't by letter. But we were—we questioned their good faith in the negotiations. And then they wrote back to us about their good faith. And it was sort of a back and forth on that.

Eventually, that led to INSLAW asking—and there was some frustration on INSLAW's part that this was going so slowly. They—they needed—or they were in a financial situation where they needed whatever cash was going to come out of these settlements soon, quickly. And as a way of saving face, getting the negotiations back and going, INSLAW suggested and we accepted a proposal to do what we called a global settlement, stop looking at

issue by—this painstaking issue-by-issue kind of thing and just talk more globally.

Now, from our perspective, I knew we would still have to look at it issue-by-issue to see what we should make as our global offer. But we wouldn't at least have to agree with INSLAW issue-by-issue. We could just look at it globally. And from our perspective, the amount that we would put in our global settlement for computer center costs would be the amount that we believed we had negotiated.

In his letter dated August 6, 1986, Mr. Hamilton stated: "[W]e are prepared to proceed immediately with a proposal for a lump sum settlement of all remaining cost and fee issues under the contract." INSLAW made a global settlement offer on September 24, 1985. DOJ rejected this offer and made its own counter-proposal at the close of negotiations on November 15, 1985, proposing that INSLAW pay it $680,000.00, plus interest. INSLAW was in bankruptcy at the time and could not make any payments. Obviously, the offer gravely disappointed INSLAW. Ms. Sposato testified that the settlement offer was not intended to end the negotiation process. DOJ's counterproposal stated:

We look forward to having the opportunity to discuss this counter-proposal with you. While some of the elements of the proposal are not likely to benefit from further by discussion, we recognize that others may be refined and improved upon further by discussion.

INSLAW did not request further negotiations. The evidence supports a finding that DOJ proceeded to negotiate voluntarily and in good faith.

### 10. Computer center costs

The 1982 Contract was a cost-reimbursement-plus-incentive-fee contract. Under such a contract, INSLAW could recover only its actual, allowable, and allocable costs of performance plus an incentive fee, which varied depending on whether INSLAW performed within a contractually specified target cost. Mr. Hamilton put forward that DOJ ultimately withheld $1.77 million in costs and fees.

During 1983 INSLAW could bill its computer center costs at rates set forth in a negotiated umbrella agreement executed on December 15, 1982, by James W. Johnston, Assistant Director Contract Administration Service for DOJ, and Mr. Hamilton for INSLAW. The agreement established the methodology for reimbursement of INSLAW's computer center costs. It "fixed" the billing rate for fiscal year 1983; if INSLAW over- or underpaid, the amount of the over- or underpayment would be carried over into the next fiscal year. This "carryover" would be taken into consideration when negotiating the following year's rate. The 1983 umbrella agreement also provided that INSLAW was to notify DOJ of any changes to INSLAW's accounting system; moreover, its applicability was conditioned expressly upon INSLAW's costs being "allowable under the governing cost principles."

The umbrella agreement, however, did not represent a true fixed rate with carry forward provision. Rather, it contained a delta clause, which provided:

Within 30 days after the end of each fiscal quarter the Contractor will submit a report reflecting budgeted and actual activity for the computer center for that quarter. If the computer center operations produces a $60,000.00 over/under recovery for a given fiscal quarter, the SRU rate will be subject to renegotiation.

JMD's Chief Auditor, Mr. Whiteley, explained that DOJ negotiated this provision because "INSLAW had several, I think it was like several hundred thousand dollars that it had to absorb from the previous year and we did not want that over or under absorption to occur in the current year." The umbrella agreement applicable for the previous year, fiscal year 1982, did not contain this delta clause.

On April 8, 1983, Mr. Hannon, INSLAW's Controller, sent DOJ a letter requesting a contract modification "to cover costs and fee associated with the higher than anticipated use of [INSLAW's] time sharing service." Attached to Mr. Hannon's letter was a copy of a letter to DOJ dated March 8, 1983, from Mr. Dimm, INSLAW's Acting Project Manager, wherein Mr. Dimm explained that DOJ

was performing more transactions than expected and that, consequently, INSLAW "anticipate[d] the total costs (exclusive of fees) of the [1982 C]ontract to exceed project estimates by approximately $535,422.00."

Although Mr. Hannon stated that Mr. Whiteley audited INSLAW's billings under the umbrella agreement for fiscal year 1982, Mr. Whiteley explained that it was not until March 1983, the month before Mr. Hannon's letter, that DOJ learned that INSLAW was billing DOJ for its computer center costs using two separate algorithms, while allocating all of INSLAW's computer center costs to a single cost pool. INSLAW used two different billing algorithms called "SRUs," or system resource units—one for INSLAW's VAX that operated the timesharing software and one for INSLAW's VAX on which IN-SLAW did its development work. INSLAW then allocated these two SRUs to a single cost pool, which, Mr. Hannon agreed, is in violation of the cost accounting standards. Because INSLAW's costs were no longer allowable under the government cost principles, an express condition precedent of the umbrella agreement could not be met.

Although Mr. Hannon stated that he was unsure whether the delta clause was triggered, Mr. Whiteley testified that Mr. Hannon's request for an extra half-million dollars "caused the $60,000 threshold to be applicable and INSLAW should have come in for a modification." At one point Mr. Whiteley voiced his concern to Mr. Videnieks, who asked Mr. Rugh to comment on the potential cost overrun. In his memorandum dated May 6, 1983, Mr. Rugh analyzed the changes in timesharing costs. However, at the time that Mr. Rugh prepared this memorandum, he did not know about the carry-forward provision. At a DOJ meeting on May 18, 1983, Mr. Rugh summarized the issue and concluded that INSLAW may have overcharged DOJ. Thereafter, Mr. Whiteley recommended partially suspending certain timesharing payments, pending a cost audit, and Mr. Videnieks suspended payment on May 26, 1983.

DOJ also requested, on May 25, 1983, information to determine whether INSLAW's timesharing methodology distributed costs equitably and reasonably. INSLAW responded to DOJ's request on June 2, 1983; however, INSLAW failed to respond to DOJ's concerns. Thus, Hurley V. Blackenship, a Cognizant Auditor with the JMD, requested INSLAW to provide information on June 21, 1983. By July 18, 1983, after INSLAW had yet to furnish the information, Mr. Videnieks reiterated DOJ's requests in a letter to Mr. Hannon.

During a meeting on August 29, 1983, the parties conferred regarding the suspension of data center costs. In response to this meeting, Mr. Hannon sent DOJ a letter dated September 2, 1983, listing alternative billing methodologies for computer center costs. INSLAW noted, however, that

> [t]he high volume of transactions in the latter part of FY 83 has resulted in what appears to be an over-recovery by IN-SLAW in FY 83. Absent some change in the mechanism for identification and recovery of data center costs, such over-recovery will be corrected through its recognition in the calculation of the FY 84 SRU rate.

INSLAW agreed with DOJ that the billing algorithm resulted in an over-recovery to INSLAW.

After this meeting, once he learned of the carry-forward provision, Mr. Rugh undertook a second analysis and submitted it to Mr. Videnieks in September 1983. In this memorandum Mr. Rugh determined a "more reasonable estimate" of the actual computer center costs, resulting in a decrease in the proportion of computer center costs withheld.

Responding to Mr. Hannon's letter on September 29, 1983, Mr. Videnieks maintained that it will "continue to make cost suspension decisions on a voucher-by-voucher basis if, in our judgment, the amount overcharged appears to be so excessive that recovery by DOJ may be jeopardized." Ultimately, on July 26, 1984, Mr. Hamilton wrote a letter asserting that DOJ should ask its own auditors for information about INSLAW's SRUs. Prior to this letter, on March 9, 1983, Mr. Videnieks had sent INSLAW a letter stating: "Furthermore, the clause of this contract

entitled 'Allowable Cost, Incentive Fee, and Payment' limits payment to the contractor to reimbursement of allowable costs and applicable fee." Although the contractor must demonstrate the reasonableness of a cost, Mr. Hamilton attempted to shift that burden on DOJ.

Mr. Rugh's analysis, as accepted by Mr. Videnieks, led to the suspension of payments for computer center costs. This analysis, however, suffered from a fundamental misunderstanding with respect to the labor included in INSLAW's computer center costs. INSLAW's computer center and its main office were at two separate locations. Mr. Rugh only accounted for personnel located at INSLAW'S computer center. INSLAW, however, employed many more people at its main office who performed work relating to the timesharing operation of the 1982 Contract. Mr. Rugh accounted for three people when, in fact, 32 other people performed work devoted to the computer center operations. This flaw was not discovered until 1985, when the negotiations led by Ms. Sposato between INSLAW and DOJ were at an advanced stage.[62] Ms. Sposato did not learn that off-site personnel performed work that was charged to the computer center until sometime around May 1985, so DOJ operated under this serious misunderstanding with respect to a portion of INSLAW's computer center costs for approximately two years. However, Ms. Sposato testified that once the misunderstanding was clarified, it only resulted in a negligible difference in calculating INSLAW's costs: "It was a small adjustment."

INSLAW maintains that under the negotiated agreement DOJ was required to renegotiate the rate or adjust the next year's cost rate to reflect the inequities of the previous year. Mr. Hannon explained:

> Now, there was an additional provision that said both parties could suffer a great deal if, as with the Executive Office, you had a lot more charges than you anticipated, so that if in any quarter it was plus or

minus 60,000, then the rate could be adjusted.

> But, again, whatever you are allocating, you are dealing with two items. That is, the costs coming into the pool, and the amounts going—charged to contracts coming out of the pool. So that if the costs are way low, and your estimate is correct on charges you, you can have an overcharge of $60,000 regardless of the fact that your costs are that, and therefore there is a procedure to adjust.

Mr. Hannon did not know if the predicted increase in the limitations of cost resulted in a $60,000.00 difference in one quarter.

Whether or not the $60,000.00 minimum threshold was reached, Mr. Hannon admitted in a letter to Mr. Videnieks on September 2, 1983, that INSLAW was recovering more than INSLAW's actual costs, although he proposed that the over-recovery be corrected in calculating the SRU rate for FY 84. INSLAW's own CPA firm determined that for FY '83 the costs of the computer center were $1.6 million, whereas INSLAW was representing that they were $2.175 million. Mr. Hannon's letter to Mr. Videnieks of September 2, 1983, explained that typically

> such over-recovery will be corrected through its recognition in the calculation of the FY 84 SRU rate. This apparently is of concern, however, to the EOUSA ..., since the expected reduction in transactions by the EOUSA in FY 84 may (theoretically) result in the EOUSA enjoying a smaller percentage, proportionately, of the over-recovery "pay back" through the FY 84 SRU rate than other users of INSLAW's data center. Accordingly, the EOUSA seeks some possible alternative which would eliminate this concern.

Because of the extreme increase in cost, Mr. Whiteley grew concerned, and DOJ asked for supporting documentation. Mr. Rugh testified that DOJ feared that it would be unable to recover the extensive overpayments made to INSLAW through the fixed-with-carry-over rate. The supporting documentation never arrived. Mr. Hannon sent alternative

---

**62.** Mr. Rugh was unaware of the discrepancy until plaintiffs' counsel questioned him during this trial.

billing arrangements, and Mr. Hamilton sent a letter essentially telling the Government to get the answers to its questions itself. Consequently, consistent with the regulations, Mr. Videnieks suspended payment.

INSLAW insists that DOJ should not have suspended payments for the computer center costs, but waited until the following year to renegotiate the rate. Nonetheless, INSLAW's billing practices violated the cost accounting standards, thereby rendering the umbrella argument ineffective. *See* 41 C.F.R. 1–3.1220–1 –2 (1983). Both INSLAW and DOJ had the right to renegotiate the umbrella agreement if the delta clause were triggered.

The drastic increase—over $500,000.00—in computer center costs was sufficient to make DOJ wary. DOJ also had learned, for the first time, of a second billing algorithm. Although Mr. Rugh's analysis triggering the suspension was erroneous, INSLAW's billing for computer center costs was also erroneous. This legitimate concern led to a reasonable inquiry. Despite Mr. Hannon's contention that one piece of information, the SRU capacity of the VAX machine, was a question that no one could answer, DOJ requested other information that INSLAW failed to provide. When this information was not forthcoming, DOJ properly suspended payment. *See* 41 C.F.R. 1–3.809(c)(1)(i) (1983).

### 11. *Overview of contract administration*

The court has examined the parties' course of dealings under the 1982 Contract and the conduct of DOJ officials and employees in representing the Government. The court finds that Mr. Brewer did not commit an unjustified governmental act that damaged plaintiffs, nor did any other DOJ employee do so. While he was hot-headed, angry, and distrustful, Mr. Brewer's intense negative feelings for Mr. Hamilton and INSLAW did not impact any of INSLAW's rights under the 1982 Contract. The standard for an unjustified governmental act is negligence or other wrongdoing with specific intent to injure. The court finds that neither Mr. Brewer nor other DOJ personnel were negligent or committed wrongdoing with a specific intent to injure the Hamiltons or INSLAW.

A basis exists in the record for finding that Mr. Brewer's intense negative feelings surfaced after he learned that INSLAW planned to market an enhanced PROMIS, having been developed with federal funding, and that it was not attributable to his prior employment. However, DOJ should not have hired Mr. Brewer as Project Manager for the 1982 Contract in the first place, thereby fueling a protracted problem. His employment and retention may have been judgmental errors, but cannot be characterized as negligence or wrongdoing. Plaintiffs did not present credible evidence that any actions occurred evidencing a specific intent to injure. Not a single episode was one-sided; for the most part, DOJ had reasonable explanations for its actions, and when DOJ did not (such as the erroneous premise about the number of INSLAW's computer center employees), no specific intent to injure was present. Finally, the court should note that, if Mr. Brewer set out to orchestrate an effort to undermine INSLAW's performance, he failed. Messrs. Rugh, Snyder, and Whiteley impressed the court that they acted independently. Mr. Videnieks was not a person to be pressured into doing another's bidding. Together these DOJ employees were not friends of INSLAW, but they arrived at that common point by different routes.

Ms. Sposato was the least involved DOJ employee who was at the same time knowledgeable about decisions dealing with administration of the 1982 Contract. Her observations were candid:

> [Ms. Sposato]: Well, overall I thought that there were a lot of disputes that arose over the course of this contract. And it seemed to me that none of them were resolved promptly or during the contract period. They just sort of piled up and lingered. That's the primary thing that I would be critical of. There were individual decisions that I might not have made myself or I might have advised differently about.
>
> THE COURT: Such as?
>
> THE WITNESS: Well, the decision to suspend SRUs I might not have made at the time, suspend payment on the SRUs.

THE COURT: What alternative approach might you have taken?

THE WITNESS: I think I would have tried to negotiate and dig in. You know, at the time they suspended the SRUs, there was a lot of experience under the contract and they could have had the kind of negotiation we had back at the time of the contract, when the contract was going on, rather than simply suspending it and putting it off as a claim until later.

THE COURT: Was your problem with that particular individual decision the fact that to put [sic] the matter off for later resolution or did you have some other concerns about its effect?

THE WITNESS: Well, I think it clearly had a big cashflow effect on the contractor which until you have the negotiation you don't know if that's warranted or not.

Although critical of these decisions as a matter of contract administration, they did not amount to misconduct in her opinion. The court agrees.

The court finds that INSLAW was not treated in a manner that violated any legal standard or amounted to an unjustified governmental act that caused damage to plaintiffs.

## IV. *Damages*

### 1. *Plaintiffs' data rights claims*

Plaintiffs asked the court to impose a constructive trust on INSLAW's software in the possession of DOJ and other government agencies and to predicate damages on a licensing fee. The court has determined that plaintiffs failed to prove that INSLAW had any ownership interest in its claimed enhancements. The remedy of a constructive trust therefore is not available. D. Dobbs, *Dobbs Law of Remedies* § 4.3(2), at 392–93 (2d ed.1993). Assuming that a constructive trust were the appropriate legal theory, plaintiffs argue for licensing fees, rather than the value of the claimed proprietary enhancements, the measure of damages urged by defendant. The court agrees with plaintiffs that, had they established a taking of INSLAW's copyrighted interests in proprietary enhancements, recovery would be based on a reasonable royalty. *See ITT Corp. v. United States,* 17 Cl.Ct. 199, 202 (1989) (citing cases). As the court has found, however, plaintiffs failed to prove that the claimed enhancements were copyrighted.

The court cannot make a finding as to licensing fees for the 12 discrete enhancements that INSLAW delivered to DOJ pursuant to Modification 12 because plaintiffs failed to associate any available funds from non-federal sources with any specific claimed enhancement. *See Willems Indus., Inc. v. United States,* 155 Ct.Cl. 360, 376, 295 F.2d 822, 831 (1961) (holding that claimant must establish amount of loss with certainty). Even if these hurdles had been overcome, plaintiffs' proof failed because plaintiffs did not provide to Dr. Davis, defendant's expert, the similar DOCKETRAC software, which plaintiffs used to calculate licensing fees, in sufficient time before trial to allow the expert to determine the significance of the 229 changes in the DOCKETRAC code that do not appear in the PROMIS code. The court did not strike plaintiffs' evidence regarding DOCKETRAC, as defendant had requested, but upon review of the record finds the deficiency to be decisive. The testimony of Burton Grad, plaintiffs' expert in pricing and marketing software products, does not establish that any significant changes in the DOCKETRAC software were culled out. Mr. Grad, who did not review the DOCKETRAC source code, stated that he would not have reason to disagree with an analysis by another expert of the differences in the number of modules and the number of changes made in DOCKETRAC. Dr. Davis was unable to perform that analysis due to plaintiffs' delayed production of the DOCKETRAC software. *See INSLAW, Inc. v. United States,* Cong. Ref. No. 95–338X, at 4 (Fed.Cl. Feb. 21, 1997); Tr. at 71–76 (Fed.Cl. Feb. 20, 1997).

### 2. *Plaintiffs' claims relating to contract administration*

All issues for trial but one relating to contract administration were grounded in plaintiffs' data rights claims. That issue was computer center costs. Plaintiffs adduced no proof of damages specific to the issue. Be-

cause the court does not find a basis for finding defendant liable, whether or not DOJ overpaid INSLAW is beyond the scope of the court's inquiry.

## CONCLUSION

The court has addressed all the issues for trial. They were posed under the dual criteria for congressional reference cases: the existence of a legal claim or one in equity, which itself requires a finding of some wrong. The court has considered all the evidence; the witnesses and documents not mentioned are regarded as cumulative, not probative, or peripheral. Plaintiffs failed to prove that INSLAW's claimed enhancements were proprietary; that DOJ acted unjustifiably in respect of them; that the Government had less than unlimited rights in enhanced PROMIS as delivered and installed; that DOJ in any way frustrated or impeded proof of IN-SLAW's proprietary rights to the claimed enhancements; or that DOJ administered the 1982 Contract in bad faith. Plaintiffs have shown no basis for recovery in law or equity. Any recovery would be a gratuity.